Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5

CONFIDENTIAL

DD/A Registry
81-1403

ODP # 81-879

MEMORANDUM FOR: Deputy Director for Administration

FROM: Charles A. Briggs
Inspector General

SUBJECT: Inspection Report of the Office of Public Affairs

1. Forwarded herewith are sections of a draft of the Office of Inspector General survey of the Office of Public Affairs which pertain to your directorate as follows:

Chapter V

2. Please review this section for accuracy and substance. We would appreciate your response by 21 July 1981. When your comments and corrections are received, we will incorporate them as appropriate into the final report to the DCI. In case of disagreement, we will attach your comments to the report when it is forwarded to the DCI.

3. Because of the recent absorption of the Office of Public Affairs into the Office of Policy and Planning, certain anachronisms remain in the current text. These will be corrected in the final version.

4. Should any of your officers wish to discuss this report informally with the inspectors who conducted the survey, they should contact Mr ☐                                   25X

☐                                   25X

Charles A. Briggs

Attachment:
As stated

25X

All portions are
classified
CONFIDENTIAL

CONFIDENTIAL

Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5

Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5
CONFIDENTIAL

## V. THE PUBLICATIONS REVIEW BOARD

### Background

The Publications Review Board (PRB) reviews nonofficial publications and planned oral presentations by current and former Agency employees to ensure they do not contain intelligence-related information which is classified or classifiable or reveal sources and methods. ☐ also gives the Board authority to deny approval for publication by current (but not former) employees material "which reasonably could be expected to impair the employee's performance of duties or interfere with authorized functions of the Central Intelligence Agency, to include, for example, information which could have a serious adverse impact on the foreign relations or security of the United States."

5X1

In the 1950's and 1960's, reviews of texts intended for open publication were usually conducted by OS in association with OGC and other affected Agency components, including the Special Assistant to the DCI for Public Affairs. These arrangements proved generally adequate throughout those years as few employees, current or former, were engaged in writing or speaking publicly on intelligence.

The 1970's saw a marked increase in the volume of writing and public speaking by active and former CIA officers on intelligence. The Vietnam War, the Church and Pike Committee investigations and Watergate had created a climate which encouraged former employees to write in a critical and revealing way about their profession. The 1974 book, The CIA and the Cult of Intelligence, by former Special Assistant to the DDCI Victor Marchetti and State Department intelligence specialist John Marks, was the first major expose of Agency activities by a disaffected ex-employee. This book had been reviewed prior to publication by an Agency task force, which sought many deletions on security grounds. The authors took the Agency to court and had a fair number of the deletions restored.

Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5

CONFIDENTIAL

While some former intelligence officers wrote to grind a political ax or for commercial gain, many books by former officers were written to defend the Agency and intelligence work. A former DCI, speaking before a group of Agency retirees in the mid-1970's, encouraged retired officers to "write good books about the Agency," following up soon thereafter with a book of his own.

Unfortunately even supportive books about the Agency and its operations have proved damaging, since almost inevitably any such book tends to reveal operational data or sources and methods. A passage in a former DO officer's book merely stating that he was Chief of Station in a particular country could be of assistance to hostile counterintelligence elements, could embarrass that country's government, and certainly could be exploited in anti-American propaganda. Such revelations also can hamper liaison relationships; cooperating services regard books by former officers about their careers in intelligence as astonishing breaches of professional discipline.

Agency management therefore decided to improve and formalize the process whereby nonofficial books and presentations were reviewed. Headquarters Notice [ ] 25X 10 June 1976, formally established a PRB, called "the Board," to review nonofficial writings of current employees, designating the Assistant to the DCI (Public Affairs) as Chairman. In 1977 the responsibility of the Board was expanded to review the writings of former Agency employees. With the issuance of HR [ ] 27 September 1979 (Tab A), the 25X Board and its membership and procedures became a matter of regulation.

The highly publicized 1979 Supreme Court decision in the case of U.S. v. Snepp legally established that the Agency secrecy agreement requires that all current and former Agency employees submit for Agency review all texts prepared for nonofficial publication or presentation containing any reference to intelligence data or activities or any material based on information classified by law or executive order. HN [ ] 25X

Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5

Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5

October 1980 (Tab K) informed employees of their obligations under the secrecy agreement in the light of the Snepp decision.

## Membership and Functions

### Membership

The Board consists of the DPA as chairman, and representatives from the DO, DA, DS&T, NFAC, OS, and the Central Cover Staff. The OGC provides a legal adviser to the Board who also acts as the Board's spokesman in Agency contacts with former employees submitting material to the Board.

The Deputy DPA serves as the assistant Board chairman. The Chief, PPPRS is the Board's executive secretary and he and two other members of the OPA staff comprise the Board's executive secretariat. The work of the executive secretariat consists essentially of distributing and ensuring the timely review by Agency components of submitted manuscripts and conducting and keeping minutes of the weekly Board meetings. OPA estimates the combined contribution of its staff to the chairing and functioning of the Board at nearly two man years.

5X1    HR [ ] permits the current employee to submit his manuscript for review either to his directorate or to the Board, and most current employees do refer their submissions to their directorates. Former employees are required to submit their manuscripts to the Board through OGC, where an attorney is assigned the task of dealing with these submissions. This attorney also serves as the OGC adviser to the Board.

Once a manuscript has been submitted to the Board, the executive secretary of the Board distributes copies to PRB members for review to determine whether the manuscript contains classified or sources and methods information. The members pass the manuscript to designated reviewers in their components. After the reviewers identify classified or otherwise objectionable items in the submitted manuscript, they

CONFIDENTIAL

Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5

pass their findings to their components' Board members and these findings are then considered at a formal Board meeting, which takes place normally once a week. The Board reviews the findings, determines which passages should be revised or deleted, and communicates its conclusions to the author. If the author concurs, the Board's work on the manuscript is essentially finished. In the event of the author's disagreement with the Board's conclusions, the Board and the author attempt to negotiate an agreement. Such negotiations are conducted by the Board member from the employee's component in the case of current employees and by the OGC adviser in the case of former employees.

Under present procedures, both current and former employees may appeal PRB decisions to the DDCI through the Inspector General (IG), who reviews the PRB decision and the author's argumentation and makes his own recommendation to the DDCI.

Since the establishment of the Board, there has been only one appeal to the DDCI through the IG. In that instance, the DDCI approved the IG's finding in favor of the Board's action. There is also currently one case in litigation--the first of its kind--by a former DO employee contesting the results of a PRB review of his manuscript. In this instance the employee brought suit against the Agency without appealing the Board's decision to the DDCI through the IG. (Flow charts showing the review process and the appeals procedure are at Tab L.)

Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5

CONFIDENTIAL

## PRB Workload

In the last two years there has been a dramatic increase in the amount of material submitted to the Board, probably a result of the Snepp decision. The figures below reflect the growing volume of submissions by current and former employees between 1977 and 1981.

|                    | 1977 | 1978 | 1979 | 1980 | 1981* |
|--------------------|------|------|------|------|-------|
| Current employees  | 30   | 30   | 47   | 20   | 12    |
| Former employees   | 12   | 32   | 47   | 128  | 62    |
| Total              | 42   | 62   | 94   | 148  | 74    |

These figures total 420 submissions since the Board was formed. The following chart shows a breakdown of these 420 submissions by type.

|                  | Non-Fiction | Fiction | Total |
|------------------|-------------|---------|-------|
| Article          | 238         | 10      | 248   |
| Book             | 67          | 44      | 111   |
| Book Review      | 21          | 0       | 21    |
| Letter to Editor | 2           | 0       | 2     |
| Outline          | 9           | 1       | 10    |
| Script           | 3           | 2       | 5     |
| Speech           | 10          | 1       | 11    |
| Other            | 10          | 2       | 12    |
| Total            | 360         | 60      | 420   |

These figures do not include manuscripts submitted by current employees to their directorates for approval.

Reviewing a submission can be an arduous task. PRB reviewers at times must work closely with authors, usually former DO employees, not only to delete specific classified items but to recast entire passages and segments of manuscripts that the DO considers

---

*Figures are for January through 4 June 1981.

CONFIDENTIAL

damaging. Some authors are more receptive to this detailed and time-consuming remodeling work than others. One DO reviewer has spent hundreds of hours in helping a former employee. We apparently are reaching the limit to which the Agency can render such help.

As the PRB works under a thirty-day deadline* for reviewing and returning manuscripts, component reviewers, who are often line officers with other responsibilities, must work under even shorter deadlines to allow time for their component managers and eventually the Board itself to evaluate and rule on their findings.

Moreover, distinguishing between classified and unclassified information in articles dealing with intelligence operations demands care and may require file research. The tendency is for harrassed reviewers to declare passages classified on questionable grounds. This has led to conflict between the DO and OGC at PRB meetings. OPA is preparing a handbook which should facilitate the reviewing process. Nevertheless, the growing workload may compel management to hire retirees on a contractual basis to assist in the reviewing function. DO is already using one retiree to work on the particularly difficult text of a book by a former senior case officer.

Recent component estimates of the man hours spent by their reviewers on PRB submissions for the one-year period April 1980 to April 1981 follow. The total is equivalent to five man years. This is a high expenditure of resources for an activity unconnected to intelligence collection and analysis. Moreover, the Board executive secretary considers these figures conservative and not fully reflective of the research

---

*The thirty-day deadline is not legally binding on the Board. It was established by the Judge in the Marchetti case as a "reasonable" period. At times the Board finds the deadline impossible to meet, but it always makes an effort to do so.

CONFIDENTIAL

V - 6

and clerical time expended on reviews. <u>We suggest that Board members maintain accurate records of man hours expended on this activity so that senior management can be made aware of the full dimensions of the problem.</u>

|           | Man-hours |
|-----------|-----------|
| DO/IMS    | 1500      |
| DO/OCS    | 300       |
| NFAC      | 390       |
| DA/OIS    | 830       |
| DA/OS     | 330       |
| DS&T      | 410       |
| OGC       | 3000      |
| OPA/PRB   | 3640      |
| TOTAL     | 10400     |

## Directorate Approvals

5X1      HR ☐ permits active employees to clear publications and presentations through their directorates. Most current employee directorate approvals involve NFAC. Many NFAC analysts have been interested, for professional and personal reasons, in publishing overtly. Also, NFAC Notice 6-1 of 21 November 1980 (Tab M) directs NFAC employees to clear their presentations with the DD/NFAC, rather than the PRB. In the past 17 months, NFAC has approved 127 submissions by its employees for publication without recourse to the PRB. During the same period, other directorates approved 40 submissions. NFAC notifies the Board of its approvals as they occur and is alert to the need to consult other Agency components about planned publications which may impinge on their equities.

NFAC uses its approval procedure to clear presentations by NFAC analysts to academic and specialist groups. Normally, when an NFAC analyst makes such a presentation, or participates in a seminar, he will become involved in spontaneous exchanges with other scholars. This could occasionally lead to inappropriate public

CONFIDENTIAL

statements, as indicated by the example cited in Chapter IV of the analyst who publicly discussed changes in our estimate of future Soviet oil production. <u>We suggest that D/NFAC ensure that NFAC officers are routinely reminded that they are obligated to protect classified information and need not answer all questions directed at them in a public forum.</u>

### The OGC Role

In several PRB meetings we attended, disagreements arose between the OGC adviser and the DO PRB member. These stemmed for the most part from OGC's insistence that deletions could be justified in court. The DO normally wants to delete substantially more than OGC is willing to accept as validly classifiable. The DO believes that two manuscripts now under review are disallowable <u>in toto</u> because much of their content involves the discussion of recent operations in detail.* OGC does not accept this view.

There is a strong sense within the directorates, particularly the DO, that OGC should be more willing to serve as an advocate of their views within the executive and judicial systems. OGC responds that if it concurred in legally unsound positions on classification issues, the Agency could be sued and possibly lose in court. This would erode the credibility of the Agency and the PRB process, and conceivably spark public and Congressional calls for the establishment of an outside reviewing authority.

<u>We do believe, however, that the newly appointed General Counsel should review the present OGC position on what can be disallowed in manuscripts by former DO officers which deal almost in toto with actual operations and agents. Specifically, he should determine if there is sufficient merit in the DO argument that such books should</u>

---

*Available at Tab N is the DO argumentation concerning one of these manuscripts.

CONFIDENTIAL

V - 8

Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5

be disallowable in their entirety as to warrant the Board's taking a stronger stand on such submissions, accepting the possibility of litigation.

As noted, the OGC adviser to the PRB serves as the Agency contact for former employees dealing with the Board. Some officers associated with the PRB process expressed the view that having an OGC attorney serve as the initial contact establishes an unnecessarily adversarial cast to the relationship at its inception. Some also believe it may deprive the Agency of an opportunity to have a senior line officer, perhaps a former colleague of the author, seek to influence the author through friendly persuasion either not to write or at least to modify his draft. However, several retired employees and some serving officers who had submitted manuscripts to the Board said they had no objection to dealing with an OGC attorney as their Agency contact. We agree with their view that, beyond the obvious advantage of having an OGC attorney serve as the Agency contact because of his legal expertise, the use of an attorney establishes an appropriately formal atmosphere from the beginning.

Also, OGC attorneys have expressed apprehension that a senior line officer meeting alone with an author might unwittingly go too far in trying to exercise friendly persuasion--there is a fine legal line here--thus opening up the Agency to a lawsuit over attempted abridgement of First Amendment rights. We think there is merit in the OGC concern, but we see no reason why an OGC attorney and a senior line officer could not meet together with writers in those instances where there is deep DO concern about a manuscript and a justifiable desire to attempt to get the writer to change his work. The presence of an attorney should ensure that undue influence is not exerted.

We learned in the course of this survey that the present Deputy General Counsel, a former DO officer, will be the OGC adviser to the PRB henceforth. Thus the principal

contact with retiree authors henceforth will combine legal expertise and long-time DO experience.

### Is the Board Fair?

A concern employees have expressed about the Board was whether it acted fairly. Was the Board giving equal treatment to critical as well as pro-Agency texts? Was it basing its decisions purely on law and regulation or showing bias when an article or book by a disaffected ex-DO case officer ▓▓▓▓ was reviewed?                                25X

External doubts about the Board's impartiality have been fueled by the widely held belief that the Agency has not sought redress against certain former employee authors who have seemingly broken the rules (such as ▓▓▓▓ William Colby and Cord                 25X
Meyer), whereas it has encouraged government suits against others (such as Philip Agee,
5X1    Frank Snepp ▓▓▓▓).

The team attended a number of Board meetings during the survey and interviewed both current and former employees who had submitted manuscripts to the Board, including employees who had been requested to make changes in their submissions by the Board. We did not find any significant variance in the treatment accorded by the Board to individual authors. However, the fact that former senior officers of the Agency are writing frequently for publication on apparently sensitive matters has cast a shadow on the Board's reputation for impartial dealing, for example:

a.  <u>William Colby</u>--Many employees believe former DCI Colby's autobiography <u>Honorable Men: My Life in the CIA</u> is an instance of the Agency's allowing greater latitude to an author because of his former status and presumed pro-Agency bias. Colby made the text of the book, including classified information, available to his French publisher before it had been reviewed and approved by the PRB. To some, it would

appear the government had far less reason to prosecute Frank Snepp for his breach of contract than it does to pursue Colby. There is a perception of unfairness.

Many employees are unaware that it is the Attorney General and not the DCI or the Agency who makes the final determination to go to court. We understand OGC has discussed the Colby case with the Department of Justice and that a final determination regarding litigation is still pending.

b. Cord Meyer—Former ADDO Cord Meyer, now a newspaper columnist, does not submit his columns to the PRB before they appear. Some employees speculated that the Agency was tolerating his not following the rules whereas it would seek to take others to court for the same thing. We determined that the DPA has tried to persuade Meyer to submit his articles in advance, assuring him of rapid turn-around service to enable him to meet his deadlines. Meyer turned down the DPA's offer, insisting that as a journalist he writes only his opinions of current developments in foreign affairs without discussing operations or other activities which he knows about as a former Agency officer. Meyer did submit his recent book, Facing Reality, to the PRB for review since it described his Agency career.

The PRB has in effect accepted Meyer's position though it carefully reviews each of his columns after publication for any material which appears sensitive. The DPA has advised Meyer that he runs the risk that he will inadvertently use classified material, thus opening himself up to possible legal or other action. Meyer understands and accepts this risk. However, there remains the perceptual problem of its generally being known that Meyer does not submit his articles for PRB review.

This perception is compounded by the fact that some believe that Meyer has maintained close ties with still active former colleagues and periodically visits Agency

CONFIDENTIAL

Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5

Headquarters, which fosters the impression of his having continuing access to intelligence information.

Perhaps Meyer's claim to being a journalist should be accepted at face value, and he should be accorded no more special treatment or access to Agency officers at Headquarters than any other Washington journalist receives. Again, we stress this is more of a perceptual problem than a substantive one, but the credibility of the PRB hinges to a considerable extent on its perceived impartiality.

c. *Stansfield Turner*—Former DCI Turner recently delivered the text of a newspaper article in person to OPA at 5:30 p.m. and asked that it be returned by noon the following day for him to meet the deadline of a local daily which had agreed to publish it.

Authors publishing articles on current events topics often request the Board to meet early deadlines, and the Board has at times extended itself to meet their wishes, even if their articles are hostile to the Agency. In this instance an almost immediate response was requested. The DPA and his two most senior subordinates reviewed the article carefully and, acting on their own, advised Turner through OGC that his article did not contain classified information and had been approved.

At the PRB Conference in November 1980 the Board authorized the DPA to make a unilateral decision on submissions with a short deadline after consulting only with concerned components and not necessarily with the entire Board membership. The Turner article was forwarded to the appropriate Board members, but the DPA conveyed PRB approval of the article to the author before those members had the opportunity to respond.

Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5

The text was politically highly sensitive. Moreover, it contained certain passages which someone unfamiliar with the area involved could not have determined were free of classified information. Both knowledgeable DO and NFAC officers told us they believed that the article did reveal classified data. At a minimum, the concerned DO area division should have had the opportunity to review and comment before approval was granted. It is apparent that because of the author's status OPA accorded him privileged treatment.

DDCI Remedial Action

As a result of the Turner article and another incident, the DDCI gave an immediate oral instruction to the DPA that in the future all submissions by former Agency Directors and Deputy Directors be sent to him for his personal review. We view this step as a sound one in view of the DDCI's knowledge of current foreign policy developments and sensitivities. It also gives him a timely opportunity to take any measures he deems appropriate to deal with troublesome submissions by former Agency leaders. The DDCI did not designate who would conduct such a review in his stead when he is traveling abroad or otherwise absent for an extended period from Headquarters.

The DDCI's insertion of himself into the PRB review process may require a change to his present designation as the appeal authority for authors contesting PRB decisions. We were advised the Board is presently considering amending the appeal process to designate the DCI as the appeal authority rather than the DDCI.

<u>We believe such an amendment is desirable.</u>

### Computer Support for PRB

Every PRB member interviewed, as well as other officers involved in the PRB process, expressed concern over the increasingly difficult task of keeping track of intelligence-related information which has found its way into the public domain. Failure

CONFIDENTIAL
Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5

to develop a comprehensive institutional memory of material released to the public hastens the day when the Agency will be embarrassed (and possibly sued) because it denies an author the right to publish material which it has already made publicly available.

Public release of intelligence data occurs in various ways including: Agency responses to FOIA and Privacy Act requests, Executive Branch Disclosures, Congressional testimony and publications, unclassified Agency publications, publications by current and former Agency officers, and unauthorized leaks. Only portions of this material, such as information released by the DO under FOIA, is stored in automated data bases and is readily retrievable. Reviewers rely heavily on human memory and time-consuming, manual file searches to attempt to determine whether information has become public. The Agency's human memory is swiftly eroding due to retirements and other departures. The rising volume of new manuscripts and other materials published and in preparation by former employees further compounds the problem.

Agency managers including the DPA have taken some initial steps to cope with this situation. At the PRB Conference held in November 1980, the ranking agenda issue was the need to develop an adequate data storage mechanism to enable the Board to record and rapidly retrieve intelligence-related material appearing in publications the PRB itself had reviewed and approved.

Before the Conference there had been discussions about developing a storage and retrieval system which would include all disclosures made by the Agency, but the concept had been rejected by senior Agency management as too expensive. The Conference focused on the narrower issue of developing a storage and retrieval system solely to record material reviewed by the PRB. Conference participants unanimously supported the development of such a system; however, no one volunteered to undertake the task.

Subsequently the DPA chose to use OPA's own resources to create a small staff and begin the groundwork to build the system. Accordingly, the DDCI on 10 December 1980 approved the DPA's proposal to establish "a small research/library staff to index manuscripts reviewed and, using existing Agency systems, to assist the Board in the future by identifying and locating specific materials officially declassified or released..." (Later the current DDCI approved the reprogramming of $29,000 of OPA funds to proceed with putting the Church Committee report and selected other documents frequently used by the reviewers into an existing full text automated data storage system in OCR—the Rapid Search Machine.)

In March 1980 DPA assigned the task of studying the alternatives for a suitable mechanism to a professional in the PPPRS. She has held extensive discussions with officers in the key components engaged in the PRB review process to develop a clear picture of component and reviewer needs. She has also consulted with Office of Data Processing (ODP) specialists.* While her explorations have established general system requirements, OPA is clearly at the point now where it needs the help of an ODP system designer for a short time, perhaps 30 days, to enable it to develop a suitable system design and to identify resource requirements.

We believe that senior management should encourage the modest efforts OPA has made thus far, support the temporary detailing of an ODP specialist to OPA, and ensure that the necessary resources are allocated.

### Stopping the Books: Beyond the PRB

While PRB members and other senior managers expressed general satisfaction with the PRB mechanism, there continues to be widespread concern about the Agency's failure

---

*This employee has recently departed on extended leave without pay. Chief, PPPRS is temporarily acting in her stead.

to find a way to discourage former officers from writing books detrimental to the Agency. Everyone concedes that it is difficult to deter disaffected ex-officers like Agee

5X1 ⬚ from publishing their views, even by taking legal action against them. But much damaging writing comes from former officers seeking to defend the Agency, or at least their own careers, who seem unaware of the adverse impact their works may have on current Agency equities, personnel and operations. Moreover, their efforts result in a serious drain on the time of PRB members and component reviewers.

We heard several proposals for discouraging such writing in the future. All present difficulties. For example, some officers advocate further strengthening of the secrecy agreement or extracting a signed statement from new DO employees that they will never write or talk publicly about the clandestine service or their own activities. This, OGC lawyers advise us, would run counter to the First Amendment and be legally unenforceable.

Others believe management should seek to prevent DO officers from lifting their cover status on retirement. However, recent efforts to tighten the guidelines under which cover can be lifted on retirement have proved difficult to apply.

Still others advocate more intensive briefing of junior officers on the damage done to us by overt publications. However, it is evident that junior officers are naturally concerned about cover and secrecy in order to protect their careers, while it is senior officers, approaching retirement, who are likely to do harm in the immediate future.

<u>We believe the most effective step which could be taken at this time to discourage writing by former employees would be to enhance the exit briefing.</u> Departing officers should be given a clearer understanding of the damage books by former employees do to operations and other Agency equities. OS currently touches on this subject in the exit briefing, but <u>we believe the Counterintelligence (CI) Staff could handle this issue in a</u>

more convincing and detailed way, since they deal with it on a continuing basis; moreover, as DO professionals, their position would carry greater weight with their particular colleagues. (A more widespread incorporation of this theme into initial, mid-career and senior courses could be contemplated.)

We also believe that senior management should take the opportunity, whenever appropriate, in speaking to groups inside and outside the Agency, to point up the harm being done by the plethora of books which have appeared in recent years by former officers. Part of the problem lies in the fact that among the authors of recent publications on intelligence are a former DCI, a former DDI, two former ADDO's, two former DO Division Chiefs, and others who occupied positions of responsibility. This cannot but encourage other former officers who believe they have a story to tell. Current leadership could counter the influence of these former senior officers by making clear their own views on this subject.

## Findings

We conclude that the DPA and the OPA staff which comprise the PRB executive secretariat have done an excellent job in developing and managing an effective system for reviewing manuscripts and other submissions from current and former employees. The DPA has created an atmosphere in which disputes among Board members are fully aired and successfully resolved. We give the OPA staff high marks for fair and impartial treatment the Board accords all submissions, including those from hostile authors. (Our cited example of former DCI Turner's article being approved too hastily we view as an aberration.)

We believe OPA should move rapidly ahead to develop an automated storage and retrieval system to support the PRB. Development of the system will require the support of other Agency directorates but could benefit the PRB and the Agency considerably. It

Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5
CONFIDENTIAL

would enhance and accelerate the review process and help the Agency to avoid public embarrassment and lawsuits in reviewing future submissions. (It would represent, however, only a piece of the larger information release program, as noted above.)

We are satisfied that the role of the OGC Board adviser in acting as Board representative to former employee authors is both appropriate and necessary. The adviser's acting in that capacity does not appear to have an adverse effect on former employees in and of itself and it serves to underline the seriousness with which the Agency views literary efforts by its former employees. It does not exclude the possibility of other senior Agency officers, perhaps former colleagues of the author, also participating in dealings with the former employee. The participation of an OGC attorney does appear essential, however, to prevent actions towards a former employee that could unintentionally violate his First Amendment rights.

Finally, we conclude that while the Board itself has developed into an effective and efficient mechanism for dealing with the current number of submissions, there is little it can do to deter former employees from writing damaging manuscripts. We believe continued efforts to tighten cover restrictions upon retirement, energetic pursuit of all clearcut violations of the secrecy agreement, enhancing Agency exit briefings to include a presentation by the CI Staff, and efforts by current Agency leaders to convey their views about retiree memoirs and apologias—all would contribute to fostering a climate which would discourage former employees from writing about CIA.

### Recommendations

We recommend that:

V. A. The General Counsel examine the merits of DO argumentation for disallowing certain manuscripts *in toto* whose text largely concerns DO methodology and operations.

CONFIDENTIAL

Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5

Approved For Release 2003/11/06 : CIA-RDP84-00933R000400080025-5

V. B.    The DDA approve the short-term assignment of an Office of Data Processing storage and retrieval specialist to provide consultative assistance to the PRB in the design of computer support for the publications review process.

V. C.    The DDO and the Director of Personnel arrange for Chief, Counterintelligence Staff, to prepare and administer a briefing on the damages caused by books by former employees to be given as part of the exit briefing for all officers departing the Agency.