# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| GARY BERNSTEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:05cv01482-CKK |
| | ) | |
| THE CENTRAL | ) | |
| INTELLIGENCE AGENCY, | ) | |
| | ) | |
| Defendant. | ) | |

## DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

Pursuant to Federal Rule of Civil Procedure 56 and LCvR 56.1, defendant, the Central

Intelligence Agency, respectfully moves this Court to enter summary judgment for defendant for

the reasons set forth in the accompanying Memorandum of Points and Authorities.

Dated: April 28, 2006

Respectfully submitted,

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

_____/s/ Steven Y. Bressler_____
VINCENT M. GARVEY
STEVEN Y. BRESSLER D.C. Bar #482492
Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, DC  20044
(202) 514-4781

Attorneys for Defendant

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

_____
                              )
GARY BERNSTEN,                )
                              )
                 Plaintiff,   )
                              )
        v.                    )        Civil Action No. 1:05cv01482-CKK
                              )
THE CENTRAL                   )
INTELLIGENCE AGENCY,          )
                              )
                 Defendant.   )
_____)

## DEFENDANT'S STATEMENT OF UNDISPUTED MATERIAL FACTS

Pursuant to Local Civil Rules 7.1(h) and 56.1 and this Court's Minute Order of February 15, 2006, defendants submit this statement of material facts as to which defendants contend there is no genuine dispute:

1.     Plaintiff Gary Berntsen was a covert employee of defendant the Central Intelligence Agency ("CIA") from 1982 to 2005.  Unclassified Declaration of Marilyn A. Dorn, attached as Exhibit A to Defendant's Motion for Summary Judgment ("Unclass. Decl.") ¶¶ 14, 22.

2.     Plaintiff voluntarily, willingly and knowingly entered into a secrecy agreement with the CIA on October 6, 1982, as a condition of employment in a position of special confidence and trust relating to the national security, and in consideration of being given access to information that is classified in accordance with Executive Order 12958, as amended, and other information which, if disclosed in an unauthorized manner, would jeopardize foreign intelligence activities of the United States Government.  The agreement applies both during

employment with the CIA and at all times thereafter.  See Unclass. Decl. ¶ 14; Pl. Secrecy

Agreement, Exh. 1 to Unclass Decl.

    3.     In his secrecy agreement, plaintiff agreed never to disclose information or

material "obtained . . . in the course of . . . employment or other service with the Central

Intelligence Agency" that is classified, that he knows, or has reason to know, should be

classified, or that identifies any person or organization who has or has had a relationship with the

United States government that the government has taken affirmative measures to conceal.

See Unclass. Decl. ¶ 15; Pl. Secrecy Agreement ¶ 3.

    4.     In his secrecy agreement, plaintiff also agreed that he would submit certain

material to the CIA for review and receive written permission from the CIA before taking any

steps toward public disclosure.  Id. ¶ 16; Pl. Secrecy Agreement ¶ 5.  The agreement provides:

> As a further condition of the special confidence and trust reposed in me by the [CIA], I
> hereby agree to submit for review by the [CIA] all information or materials . . . which
> contain any mention of intelligence data or activities, or contain data which may be based
> upon information classified pursuant to Executive Order, which I contemplate disclosing
> publicly or which I have actually prepared for public disclosure, either during my
> employment or other service with the [CIA] or at any time thereafter prior to discussing it
> with or showing it to anyone who is not authorized to have access to it.  I further agree
> that I will not take any steps toward public disclosure until I have received written
> permission to do so from the [CIA].

Pl. Secrecy Agreement ¶ 5; Unclass. Decl. ¶ 16.  This prepublication review requirement

extends, but is not limited, to books, academic journal articles, magazine articles, newspaper

columns, letters to the editor, book reviews, screenplays, speeches, interviews, testimony, court

filings, and other written or oral disclosures.  Pl. Secrecy Agreement ¶ 5; Unclass. Decl. ¶ 16.

Prior to approval for publication, such materials and information shall not be disclosed to any

other person.   Pl. Secrecy Agreement ¶ 5; Unclass. Decl. ¶ 16.

5.      The secrecy agreement plaintiff signed states that plaintiff understands that the CIA will respond to his requests for prepublication review within "a reasonable time."  Unclass. Decl. ¶ 17; Pl. Secrecy Agreement ¶ 6.

6.      The CIA's Publications Review Board ("PRB") is the CIA body charged with reviewing, coordinating, and formally approving in writing all proposed intelligence-related materials intended for publication or public dissemination.  Unclass. Decl. ¶ 18.  In conducting prepublication review of manuscripts by former CIA employees, the PRB identifies information for deletion or revision only to the extent necessary to protect information the disclosure of which could reasonably be expected to harm national security.  Id. ¶ 19.

7.      Pursuant to the requirements of his secrecy agreement, plaintiff submitted a book manuscript for prepublication review on May 18, 2005.  This manuscript concerned Plaintiff's activities at the CIA in multiple areas of the world, and spanned the years 1998 to 2001.  See id. ¶ 21.

8.      At the time of his manuscript submission, plaintiff was a current, covert employee of the CIA.  At plaintiff's request, his cover was lifted and rolled back on June 12, 2005.  This change in employment status altered the standards governing the CIA's review of his manuscript.  Id. ¶ 22.

9.      On June 27, 2005, Plaintiff submitted a rewrite of five of the chapters in his manuscript.  On July 25, 2005, he submitted a series of photos and maps for the book.  Three days later, he filed his first Complaint in this action.  Id. ¶ 23; Compl.

10.      The CIA PRB completed its review of plaintiff's manuscript and returned it to him with redactions, as well as a chart outlining what information the CIA had redacted, on August

23, 2005.  See Unclass. Decl. ¶ 24.

11.     After receiving the CIA's response, Plaintiff sought a meeting with the PRB.  On

August 29, 2005, plaintiff met with the PRB for approximately eight hours to give his position

on the classified material in the manuscript.  On August 30, 2005, Plaintiff submitted a four-page

memorandum to the PRB contesting the CIA's classification of some of the material in his

manuscript.  Plaintiff subsequently resubmitted his manuscript for review in installments from

August 31, 2005 to September 2, 2005.  Plaintiff's rewritten manuscript included some of the

revisions required by the PRB, included notes to the PRB in the text of the manuscript, and

added new material.  Several of the additions in the rewritten manuscript were new references to

information that Plaintiff had agreed to redact in other portions of his manuscript.   Unclass.

Decl. ¶ 25.

12.     The CIA PRB completed its review of plaintiff's rewritten manuscript, and

returned the manuscript with classified information redacted, on October 18, 2005.  Id. ¶ 26.

13.     Marilyn A. Dorn is the Information Review Officer for the National Clandestine

Service of the CIA.  Unclass. Decl. ¶ 1.  As a senior CIA official and under a written delegation

of authority pursuant to Executive Order 12958, § 1.3(c), as amended, Ms. Dorn holds original

classification authority at the TOP SECRET level.  Id. ¶ 4.  Ms. Dorn is, therefore, authorized to

conduct classification reviews and to make original classification and declassification decisions.

Id.

14.     Ms. Dorn has reviewed plaintiff's draft manuscript and determined that it may

only be released with the redactions designated by the PRB because the manuscript contains

information that is currently and properly classified pursuant to Executive Order 12958, as

amended, as its disclosure reasonably could be expected to cause serious damage to the national security.  Id. ¶¶ 6, 38, 40, 80.

15.    The classified CIA information in plaintiff's draft manuscript concerns intelligence sources, methods, foreign relations, and foreign government information.  As Ms. Dorn has determined, that information is all properly classified pursuant to Sections 1.4(b), 1.4(c) and 1.4(d) of Executive Order 12958, as amended.  Unclass. Decl. ¶ 40; Classified Declaration of Marilyn A. Dorn, Exhibit B to Defendant's Motion to Dismiss ("Class. Decl.") ¶¶ 41-43.

16.    As Ms. Dorn has determined, plaintiff's draft manuscript reveals intelligence sources, methods and activities, foreign government information, and information impacting U.S. foreign relations.  Public disclosure of this information reasonably could reasonably be expected to cause serious damage to national security by depriving the United States of critical intelligence information, endangering the safety and lives of those individuals who work for and with the CIA, and undermining the CIA's ability to collect intelligence information and to conduct intelligence operations in support of the national security of the United States.  Unclass. Decl. ¶ 8; Class. Decl. ¶¶ 37-109.

17.    None of the information that the CIA required be redacted from plaintiff's manuscript has been officially disclosed by the CIA.  Unclass. Decl. ¶¶ 72-79; Class. Decl. ¶¶ 110-125.

18.    On December 27, 2005, plaintiff published his manuscript under the title *Jawbreaker, The Attack on Bin Laden and Al-Qaeda:  A Personal Account by the CIA's Key Field Commander*.   Unclass. Decl. ¶ 27.

Additional relevant, detailed facts in this case are classified, and as such, are set forth in the Classified Declaration of Marilyn A. Dorn that has been submitted for this Court's ex parte, in camera review.

Dated: April 28, 2006

                                         Respectfully submitted,

                                         PETER D. KEISLER
                                         Assistant Attorney General

                                         KENNETH L. WAINSTEIN
                                         United States Attorney

                                             /s/ Steven Y. Bressler
                                         _____
                                         VINCENT M. GARVEY
                                         STEVEN Y. BRESSLER D.C. Bar #482492
                                         Attorneys, U.S. Department of Justice
                                         Civil Division, Federal Programs Branch
                                         Post Office Box 883
                                         Washington, DC  20044
                                         (202) 514-4781

                                         Attorneys for Defendant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| GARY BERNSTEN, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:05cv01482-CKK |
| | ) | |
| THE CENTRAL | ) | |
| INTELLIGENCE AGENCY, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

PETER D. KEISLER
Assistant Attorney General

KENNETH L. WAINSTEIN
United States Attorney

VINCENT M. GARVEY
Deputy Branch Director

STEVEN Y. BRESSLER D.C. Bar #482492
Trial Attorneys, U.S. Department of Justice
Civil Division, Federal Programs Branch
Post Office Box 883
Washington, DC 20044
(202) 514-4781

Attorneys for Defendant

## TABLE OF CONTENTS

Page(s)

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

BACKGROUND . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

I.      Standards of Review . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

II.     The Court Should Grant Summary Judgment for the CIA on
Plaintiff's Claim That He Has a First Amendment Right to
Publish Certain Classified Information in His Memoirs . . . . . . . . . . . . . . . . . . . 6

        A.    Plaintiff Has No First Amendment Right To Publish
Classified Information . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

        B.    The CIA's Classification Decisions Are Entitled To
Utmost Deference . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

        C.    The CIA Properly Classified Portions of Plaintiff's
Manuscript . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

                1.    Classified By an Original Classification Authority . . . . . . . . . . . 15

                2.    Information Under the Control of the Government . . . . . . . . . . . 16

                3.    The Classification Categories of Section 1.4 . . . . . . . . . . . . . . . 17

                4.    Identifiable Damage To National Security . . . . . . . . . . . . . . . . . 17

                        i.    Foreign Government Information . . . . . . . . . . . . . . . . . 19

                        ii.    Intelligence Sources, Methods, and
Activities . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

                        iii.    Foreign Activities and Foreign Relations . . . . . . . . . . . 21

        D.    The Classified Information In The Plaintiff's Manuscript
Has Not Been Officially Released By The Government
Into The Public Domain . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

1.    Elements of Official Release into the Public Domain . . . . . . . . . 24

    a.    General discussion is not a basis for release of
more specific information . . . . . . . . . . . . . . . . . . . . . . . . 25

    b.    Information is not in the public domain unless it
is exactly the same as, and covers the same time
period as, previously, officially released information . . . 26

    c.    Information is not deemed to be in the public domain
unless it was released through an official and docu-
mented disclosure . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

2.    Plaintiff Cannot Demonstrate the Elements of Official Release
by the Government into the Public Domain . . . . . . . . . . . . . . . 32

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

# TABLE OF AUTHORITIES

Page(s)

## CASES

ACLU v. DOJ,
  548 F. Supp. 219 (D.D.C. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Afshar v. Dep't of State, 702 F.2d 1125 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . 25, 27, 29, 31

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Baez v. U.S. Dep't of Justice,
  647 F.2d 1328 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

CIA v. Sims,
  471 U.S. 159 (1985) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  13

Carlisle Tire & Rubber Co v. U.S. Customs Serv.,
  663 F.2d 210 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

Celotex Corp. v. Catrett,
  477 U.S. 317 (1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Center for Nat'l Security Studies v. DOJ,
  331 F.3d 918 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Chicago & Southern Air Lines v. Waterman S.S. Corp.,
  333 U.S. 103 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10

Colby v. Halperin,
  656 F.2d 70 (4th Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Dep't of the Navy v. Egan,
  484 U.S. 518 (1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 10, 11

Earth Pledge Foundation v. CIA,
  988 F. Supp. 623 (S.D.N.Y 1996), aff'd 128 F.3d 788 (2d Cir.
  1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 22, 28, 29

Ellsberg v. Mitchell,
    709 F.2d 51 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 15

Fitzgibbon v. CIA,
    911 F.2d 755 (D.C. Cir. 1990) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Foster v. United States, 12 Cl. Ct. 492 (1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

Frugone v. CIA,
    169 F.3d 772 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  11, 12, 14, 28

Gardels v. CIA,
    689 F.2d 1100 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12, 13

Haig v. Agee,
    453 U.S. 280 (1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  2

Halkin v. Helms,
    598 F.2d 1 (D.C. Cir. 1978) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  12

Halkin v. Helms,
    690 F.2d 977 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4

Halperin v. CIA,
    629 F.2d 144 (D.C. Cir. 1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 12, 18

Halperin v. NSC,
    452 F. Supp. 47 (D.D.C. 1978), aff'd 612 F.2d 586 (D.C. Cir. 1980) . . . . . . . . . . . . .  13

Hayden v. NSA,
    608 F.2d 1381 (D.C. Cir. 1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 15

Holy Land Foundation v. Ashcroft,
    333 F.3d 156 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4, 11

Jifry v. FAA,
    370 F.3d 1174 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  4,6

Judicial Watch, Inc. v. DOJ,
    306 F. Supp. 2d 58 (D.D.C. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  19

Klaus v. Blake,
    428 F. Supp. 37 (D.D.C. 1976) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  18

Knopf v. Colby,
    509 F.2d 1362 (4th Cir. 1975), cert. denied, 421 U.S. 908 (1975) . . . . . . . 16, 24, 28, 31

Lee v. CIA, Civ. No. 03-206-TPJ (unpublished) (D.D.C. July 7, 2004) . . . . . . . . . . . . . . . . . . 6

Malizia v. DOJ,
    519 F. Supp. 338 (S.D.N.Y. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19, 20

McGehee v. Casey,
    718 F.2d 1137 (D.C. Cir. 1983) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Military Audit Project v. Casey,
    656 F.2d 724 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26, 28

Phillippi v. CIA,
    655 F.2d 1325 (D.C. Cir. 1981) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

Public Citizen v. Dep't of State,
    11 F.3d 198 (D.C. Cir. 1993) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25, 26, 28

Public Citizen v. Dep't of State,
    787 F. Supp. 12 (D.D.C. 1992), aff'd 11 F.3d 198 (D.C. Cir. 1993) . . . . . . . . . . . . . . 25

Salisbury v. United States,
    690 F.2d 966 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Schlesinger v. CIA,
    591 F. Supp. 60 (D.D.C. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 31

Snepp v. United States,
    444 U.S. 507 (1980) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Stillman v. CIA,
    319 F.3d 546 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

Students Against Genocide v. Dep't of State,
    50 F. Supp. 2d 20 (D.D.C. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13, 29, 30

Taylor v. Department of the Army,
    684 F.2d 99 (D.C. Cir. 1982) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 9

Tilden v. Tenet,
    140 F. Supp.2d 623 (E.D. Va. 2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

United States v. Curtiss-Wright Export Corp.,
    299 U.S. 304 (1936) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  10, 22

United States v. Marchetti,
    466 F.2d 1309 (4th Cir. 1972), cert. denied, 409 U.S. 1063 (1972) . . . . . . . . . .  9, 12, 24

Van Atta v. Defense Intelligence Agency, Civ. No. 87-1508,
    1988 WL 73856 (D.D.C. July 6, 1988) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  30

Washington Post v. Dep't of Defense,
    766  F. Supp. 1 (D.D.C. 1991) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  26

## STATUTES

50 U.S.C.A. § 435 note at 165 (Supp. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

## EXECUTIVE ORDERS

Executive Order 12958, 60 Fed. Reg. 19825 (April 17, 1995), as amended . . . . . . . . . . . passim

Executive Order No. 13292, 68 Fed. Reg. 15315 (March 25, 2003) . . . . . . . . . . . . . . . . passim

## MISCELLANEOUS

Fed. R. Civ. P. 1 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

Fed. R. Civ. P. 56(c) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  5

## INTRODUCTION

It is well-established that "[t]he Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." Snepp v. United States, 444 U.S. 507, 509 n.3 (1980) (per curiam); see also Haig v. Agee, 453 U.S. 280, 307 (1981) ("no governmental interest is more compelling than the security of the nation"). To vindicate those interests, defendant the Central Intelligence Agency ("CIA" or "the Agency") requires all of its employees such as plaintiff Gary Berntsen, as a condition of employment, to sign secrecy agreements that protect classified information. Plaintiff voluntarily and knowingly signed such a secrecy agreement that prohibits him from disclosing classified information, and that requires him to submit for prepublication review any writings containing, inter alia, information about intelligence activities. Yet plaintiff now asks this Court to find that the CIA violated his First Amendment rights when, in its prepublication review process, the CIA determined that certain information in plaintiff's draft manuscript is classified and therefore cannot be published.

The CIA has properly determined that certain portions of the plaintiff's account of his work for the CIA reveal intelligence activities, sources and methods as well as foreign government information and information about the foreign activities of the United States, that if disclosed, could reasonably be expected to cause serious identifiable damage to our national security. In making this determination, the Agency has segregated the classified information that plaintiff cannot publish from the unclassified details of his employment that he may publish. Indeed, plaintiff has now published a partially redacted version of his manuscript. Nonetheless,

in his Amended Complaint plaintiff challenges the CIA's determination that certain information

in his draft manuscript is classified and claims that the Agency's determinations have violated his

First Amendment rights. Plaintiff's claim fails because there is no First Amendment right to

publish classified information. Moreover, plaintiff has no right to publish information

protected under his secrecy agreement, the disclosure of which could reasonably be expected

to jeopardize national security.

The CIA's pertinent classification determinations fully comply with Executive Order

12958, as amended by Executive Order 13292, which governs the classification of

information.[1] In support of its determination, the Agency has submitted two declarations by

Marilyn A. Dorn, a CIA classification expert. The first is an unclassified declaration that

includes as much justification of the agency's classification determinations as can be disclosed

on the public record. The second, classified declaration provides a more detailed explanation

of the Agency's decisions. Because the disclosures of the explanations in the classified

declaration could themselves endanger national security, it will be delivered separately to a

secure facility in the Courthouse for this Court's ex parte, in camera review.[2]

---

[1]     Executive Order 12958, 60 Fed. Reg. 19825 (April 17, 1995), was amended by
Executive Order 13292 in March, 2003. See Executive Order No. 13292, 68 Fed. Reg. 15315
(March 25, 2003). All citations in this memorandum to Executive Order No. 12958 are to the
Order as amended by Executive Order No. 13292. See Executive Order No. 12958, 3 C.F.R. 333
(1995), reprinted as amended in 50 U.S.C.A. § 435 note at 165 (Supp. 2005).

[2]     Ms. Dorn's classified declaration provides highly sensitive information regarding
the bases for CIA's classification decisions with respect to the plaintiff's manuscript. Neither
plaintiff nor plaintiff's counsel is authorized for access to this classified information. Plaintiff's
prior access as a CIA employee to the information in his manuscript and plaintiff's counsel's
limited approval to know of plaintiff's employment at a time when his employment was
classified do not entitle them to access to a declaration that provides a detailed explanation of
other, additional classified facts and circumstances that underlie and justify the government's

The CIA's determination that serious harm could result from the disclosure of the information in plaintiff's memoirs is entitled to utmost deference. As courts have uniformly held, there is no more compelling government interest than national security, and the judiciary lacks the necessary expertise to second-guess the Executive Branch's reasoned, articulated concerns about the harm to national security that could result from the disclosure of secret government information. Under this well-established framework, the Court should conclude, based on its review of the Agency's unclassified and classified declarations submitted in

classification decision. Unclassified Declaration of Marilyn A. Dorn ("Unclass. Decl.") (Exhibit 1) ¶¶ 11-13. The CIA has determined that plaintiff and his counsel do not have the "need-to-know" the information in Ms. Dorn's classified declaration pursuant to Exec. Order 12958, as amended. Id. Thus, national security concerns require ex parte, in camera review of the government's classified declaration. See Stillman v. CIA, 319 F.3d 546, 549 (D.C. Cir. 2003) (national security concerns required ex parte, in camera review of the government's classified declaration in prepublication review case). See also Ellsberg v. Mitchell, 709 F.2d 51, 61 (D.C. Cir. 1983) (national security concerns required ex parte, in camera review of the government's classified declaration asserting state secrets privilege); Hayden v. NSA, 608 F.2d 1381, 1386 (D.C. Cir. 1979) (national security concerns required ex parte, in camera review of the government's declaration in a FOIA case); Holy Land Foundation v. Ashcroft, 333 F.3d 156, 164 (D.C. Cir. 2003) (national security concerns required ex parte, in camera review of the government's classified declaration justifying plaintiff's designation as Specially Designated Global Terrorist); cf. Jifry v. FAA, 370 F.3d 1174, 1182 (D.C. Cir. 2004) (national security concerns required ex parte, in camera inspection of administrative record on review of revocation of non-resident aliens' flight credentials). Even in cases where plaintiff's counsel has received a limited security approval and has been previously granted access to some classified information, courts have rejected demands that certain sensitive information be shared with the plaintiff or plaintiff's counsel. See Colby v. Halperin, 656 F.2d 70, 72 (4th Cir. 1981); Foster v. United States, 12 Cl. Ct. 492, 494 (1987) (ex parte, in camera review of declaration permitted based on national security concerns notwithstanding the fact that counsel received security approval and reviewed other classified documents relevant to the litigation); Tilden v. Tenet, 140 F. Supp.2d 623, 626 (E.D. Va. 2000). While ex parte, in camera review of the Agency's declaration involves some compromise of the adversary process, in certain cases such as this action, such a compromise is required to ensure the protection of critical national security information. See Hayden, 608 F.2d at 1385; Halkin v. Helms, 690 F.2d 977, 995 (D.C. Cir. 1982); ACLU v. DOJ, 548 F. Supp. 219, 222, 223 (D.D.C. 1982); see also Stillman, 319 F.3d at 549 (in prepublication review cases "in camera review of affidavits, followed if necessary by further judicial inquiry, will be the norm").

support of its classification determinations, that the CIA's classification decisions were proper. For these reasons, and as set forth more fully below, this Court should grant Defendant's Motion for Summary Judgment.

## BACKGROUND

The pertinent background that may be set forth on the public record is included in Defendants' Statement of Material Facts Not in Dispute, filed herewith and incorporated herein by reference. Additional relevant facts in this case are classified, and as such, are set forth in the Classified Declaration of Marilyn A. Dorn (hereafter "Class. Decl.") (Exh. 2) that is being submitted for this Court's ex parte, in camera review.

## ARGUMENT

### I. Standards of Review

Summary judgment is appropriate where "there is no genuine issue of material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247 (1986). Summary judgment is properly regarded "not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action'." Celotex Corp. v. Catrett, 477 U.S. 317, 327 (1986) (quoting Fed. R. Civ. P. 1).

In reviewing the government's classification of national security information, district courts are to give the agency sufficient opportunity to present detailed in camera affidavits and "accord substantial weight to [those affidavits] concerning the classified status" of the information in dispute. Salisbury v. United States, 690 F.2d 966, 970 (D.C. Cir. 1982); see Stillman, 319 F.3d at 548 ("in camera review of affidavits, followed if necessary by further

judicial inquiry, will be the norm") (quoting McGehee v. Casey, 718 F.2d 1137, 1149 (D.C. Cir. 1983)); Lee v. CIA, Civ. No. 03-206-TPJ, Slip Op. at 2 (D.D.C. July 7, 2004) (following Stillman and McGehee; stating "the Court finds that it can resolve the classification issue ex parte, without any further aid from plaintiff's counsel"); see also Jifry, 370 F.3d at (noting that "the court has inherent authority to review classified material ex parte, in camera as part of its judicial review function."). Because of the CIA's unique expertise concerning the adverse effects of the disclosure of national security information, so long as the Agency's declarations are submitted in good faith and contain "reasonable specificity demonstrating a logical connection between the deleted information and the reasons for classification," the judiciary "cannot second-guess CIA judgments" with respect to classification decisions. McGehee, 718 F.2d at 1148-49.

Under these standards, there is no genuine issue of material fact as to plaintiff's claim for judicial review of the Agency's determination that certain information is classified, and the Court should grant summary judgment for the CIA.

II.   **The Court Should Grant Summary Judgment for the CIA on Plaintiff's Claim That He Has a First Amendment Right to Publish Certain Classified Information in His Manuscript.**

A.   **Plaintiff Has No First Amendment Right To Publish Classified Information.**

Plaintiff alleges that the CIA violated his First Amendment rights by denying him the right to publish certain information in the draft memoirs that he submitted to the Agency for prepublication review. See, e.g., Amen. Compl. ¶ 17.[3] Plaintiff asserts that the defendant has

---

[3]     Plaintiff's Amended Complaint identifies not only the First Amendment but also the Administrative Procedure Act, Declaratory Judgment Act, All Writs Act and CIA internal regulations as bases for his claims. See Amen. Compl. at 1 (first, unnumbered paragraph). This

"failed to demonstrate the existence of substantial government interests that would enable it to prohibit the publication of certain information within [plaintiff's] memoirs." Id. ¶ 16.

Unlike the typical plaintiff in a First Amendment suit, plaintiff here is bound by a secrecy agreement. See Secrecy Agreement between Gary Berntsen and the CIA dated October 6, 1982, attached to Unclass. Dorn Decl. as Exh. A ("Pl. Secrecy Agreement"). The agreement prohibits plaintiff from any unauthorized disclosure of classified information, classifiable information, or information identifying any person or organization that has or has had a relationship with a U.S. foreign intelligence organization that the United States government has taken steps to conceal, received in the course of his Agency employment. See id. ¶ 3. The burden of determining whether particular information is subject to the secrecy agreement, or whether a disclosure is unauthorized, rests on plaintiff. Id. ¶ 4. Plaintiff's secrecy agreement (which he signed voluntarily and knowingly) requires him to submit any proposed writings to the CIA for its review prior to publication that contain any mention of intelligence data or activities or contain data that may be based upon classified information. Id. ¶ 5. It is in the context of this binding secrecy agreement and and the government's compelling need to protect national security that the Court should consider plaintiff's claim that the Agency violated his right to free speech. See, e.g., Snepp, 444 U.S. at 510.

---

language is identical to that in the corresponding paragraph of plaintiff's original Complaint, which raised a different (and now moot) claim based on the alleged failure of the CIA to complete its review of plaintiff's draft manuscript in a reasonable time. The only count in plaintiff's Amended Complaint, however, articulates plaintiff's claim that his First Amendment rights have been violated by the CIA's classification decisions. Amen. Compl. at 4. Regardless, the claim in plaintiff's Amended Complaint fails under any theory because, as discussed infra, plaintiff has no right to publish classified information, and the information the CIA required to be redacted from his draft manuscript was and is properly classified.

It is well-settled that the prepublication review requirement imposed by secrecy

agreements such as the one signed by the plaintiff passes constitutional muster.  Id. at 510 n. 3

(prepublication review requirement imposed on government employees with access to classified

information is not an unconstitutional prior restraint); McGehee, 718 F.2d at 1146 (upholding the

CIA's prepublication review scheme in context of First Amendment challenge).  In Snepp, the

Supreme Court considered whether a former CIA employee's similar secrecy agreement was an

improper prior restraint on free speech.  Concluding that it was not, but rather was reasonable

and enforceable, the Court recognized the government's compelling interest in the protection of

national security:

> The Government has a compelling interest in protecting both the secrecy of
> information important to our national security and the appearance of
> confidentiality so essential to the effective operation of our foreign intelligence
> service.

Snepp, 444 U.S. at 510 n.3; see also Dep't of the Navy v. Egan, 484 U.S. 518, 527 (1988)

(government has a compelling interest in protecting national security information); McGehee,

718 F.2d at 1143 (same).  Indeed, the Snepp Court concluded that even in the *absence* of an

express agreement, the CIA could have imposed reasonable restrictions on employee activities to

protect these compelling interests.  Snepp, 444 U.S. at 501 n.3.

In light of the government's compelling interest, courts uniformly have concluded that

there is no First Amendment right to publish properly classified information: "[i]f the

Government classified the information properly, then [plaintiff] simply has no first amendment

right to publish it."  Stillman, 319 F.3d at 548; see also Snepp, 444 U.S. at 510 n. 3; McGehee,

718 F.2d at 1143 ("CIA censorship of 'secret' information contained in former agents' writings

and obtained by former agents during the course of CIA employment does not violate the first

-8-

amendment."); United States v. Marchetti, 466 F.2d 1309, 1315-16 (4th Cir. 1972) ("Although the First Amendment protects criticism of the government, nothing in the Constitution requires the government to divulge [national security] information . . . . "), cert. denied, 409 U.S. 1063 (1972). Thus, the only question presented by plaintiff's claim is whether the information identified by the CIA in his manuscript is properly classified.

###    B.    The CIA's Classification Decisions Are Entitled To Utmost Deference

The Executive Branch's classification determinations are entitled to "utmost deference" by the judiciary. See Taylor v. Department of the Army, 684 F.2d 99, 109 (D.C. Cir. 1982) (requiring "utmost deference" to affidavits of military intelligence officers) (quoting Halkin v. Helms, 598 F.2d 1, 9 (D.C. Cir. 1978)). The D.C. Circuit has emphatically "reject[ed] any attempt to artificially limit the long-recognized deference to the executive on national security issues." Center for Nat'l Security Studies v. DOJ, 331 F.3d 918, 928 (D.C. Cir. 2003) (reviewing cases). Courts have emphasized this deference across the entire spectrum of national security jurisprudence. In prepublication review cases, such as this, the D.C. Circuit has held that courts "should defer to CIA judgment as to the harmful results of publication" because the judiciary "cannot second-guess CIA judgments on matters in which the judiciary lacks the requisite expertise":

> Due to the mosaic-like nature of intelligence gathering, for example, what may seem trivial to the uninformed may appear of great moment to one who has a broad view of the scene and may put the questioned item of information in context.

McGehee, 718 F.2d at 1148-49 (internal quotation marks and citations omitted); see also Stillman, 319 F.3d at 549 (observing, in the context of prepublication review case, that there is an "appropriate degree of deference owed to the Executive Branch concerning classification

decisions").  Similarly, in the FOIA context, because "executive departments responsible for

national defense and foreign policy matters have unique insights into what adverse effects might

occur as a result of public disclosure," the classification of information "is a matter as to which

the agency has a large measure of discretion."  Salisbury, 690 F.2d at 970, 973 (quotation marks

and citations omitted); see Halperin v. CIA, 629 F.2d 144, 147-48 (D.C. Cir. 1980) (according

"substantial weight" to agency declarations asserting protection of national security interests).

This judicial deference to the Executive Branch in matters of national security and

foreign relations is appropriate given the Executive's constitutional role:

> [I]n this vast external realm, with its important, complicated, delicate and
> manifold problems, the President alone has the power to speak or listen as a
> representative of the nation . . . .  "The President is the constitutional
> representative of the United States with regard to foreign nations. . . . The nature
> of transactions with foreign nations, moreover, requires caution and unity of
> design, and their success frequently depends on secrecy and dispatch . . . ."  [The
> President] has his agents in the form of diplomatic, consular and other officials.
> Secrecy in respect of information gathered by them may be highly necessary, and
> the premature disclosure of it productive of harmful results.

United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 319, 320 (1936) (quoting 8 U.S.

Sen. Reports, Committee on Foreign Relations, at 24 (Feb. 15, 1816)) (internal quotation marks

omitted).  The Executive Branch's ability to maintain secrecy with regard to foreign intelligence

matters is essential.  Id.; see also Chicago & Southern Air Lines v. Waterman S.S. Corp., 333

U.S. 103, 111 (1948) ("The President, both as Commander-in-Chief and as the Nation's organ

for foreign affairs, has available intelligence services whose reports are neither nor ought to be

published to the world. . . . [T]he very nature of executive decisions as to foreign policy is

political, not judicial.  Such decisions are wholly confided by our Constitution to the political

departments of the government, Executive and Legislative").  In Egan, 484 U.S. at 527, the

-10-

Supreme Court repeated that

> [the President's] authority to classify and control access to information bearing on
> national security . . . flows primarily from this constitutional investment of power
> in the President and exists quite apart from any explicit congressional grant.

See also Holy Land Found. v. Ashcroft, 333 F.3d 156, 164 (D.C. Cir. 2003) (permitting ex parte,

in camera review of declarations in light of "the primacy of the Executive in controlling and

exercising responsibility over access to classified information, and the Executive's 'compelling

interest' in withholding national security information from unauthorized persons in the course of

executive business.") (citation omitted)).

Because of the President's constitutional role in national security matters, the Executive

Branch is uniquely situated to assess the national security consequences of the disclosure of

particular information.  See Frugone v. CIA, 169 F.3d 772, 775 (D.C. Cir. 1999) ("[m]indful that

courts have little expertise in either international diplomacy or counterintelligence operations,

we are in no position to dismiss the CIA's facially reasonable concerns"); Egan, 484 U.S. at 529

(judgments as to harm that would result in the disclosure of certain information "must be made

by those with the necessary expertise in protecting classified information"); Salisbury, 690 F.2d

at 970 (describing "unique insights" of executive departments responsible for national defense

and foreign policy into the effects of disclosure of classified information).  Only the nation's

intelligence community has a complete picture of which disclosures pose a danger to national

security.  Courts commonly refer to this as the "mosaic theory" of intelligence:

> It requires little reflection to understand that the business of foreign intelligence
> gathering in this age of computer technology is more akin to the construction of a
> mosaic than it is to the management of a cloak and dagger affair.  Thousands of
> bits and pieces of seemingly innocuous information can be analyzed and fitted
> into place to reveal with startling clarity how the unseen whole must operate . . . .
> "The courts, of course, are ill-equipped to become sufficiently steeped in foreign

intelligence matters to serve effectively in the review of secrecy classifications in
that area."

Halkin v. Helms, 598 F.2d 1, 8 (D.C. Cir. 1978) (quoting Marchetti, 466 F.2d at 1318); see

also McGehee, 718 F.2d at 1149.  The CIA's assessment of potential harm must be respected

because "each individual piece of intelligence information, much like a piece of jigsaw puzzle,

may aid in piecing together other bits of information even when the individual piece is not of

obvious importance itself." Gardels v. CIA, 689 F.2d 1100, 1106 (D.C. Cir. 1982) (quoting

Halperin, 629 F.2d at 150).

The judiciary, which lacks this necessary "broad view" of foreign intelligence matters,

see Marchetti, 466 F.2d at 1317, is not in a position to second-guess the national security and

foreign relations concerns articulated by the Executive Branch.  As the Court of Appeals for the

D.C. Circuit explained:

> America faces an enemy just as real as its former Cold War foes, with capabilities
> beyond the capacity of the judiciary to explore. . . .  It is abundantly clear that the
> government's top counterterrorism officials are well-suited to make this
> predictive judgment.  Conversely, the judiciary is in an extremely poor position to
> second-guess the executive's judgment in this area of national security.

Ctr. for Nat'l Security Studies, 331 F.3d at 928; McGehee, 718 F.2d at 1149 ("judicial review of

CIA classification decisions, by reasonable necessity, cannot second-guess CIA judgments on

matters in which the judiciary lacks expertise."); Frugone, 169 F.3d at 775 ("Mindful that courts

have little expertise in either international diplomacy or counterintelligence operations, we are in

no position to dismiss the CIA's facially reasonable concerns" about the harm that disclosure

could cause to national security.).  In short, "it is the responsibility of the [Executive], not that of

the judiciary, to weigh the variety of complex and subtle factors in determining whether

disclosure of information may lead to an unacceptable risk of compromising the Agency's

intelligence-gathering process." <u>CIA v. Sims</u>, 471 U.S. 159, 180 (1985).  This Court should, therefore, accord substantial weight to the Agency's declarations concerning the national security harms that may result from disclosure of information in plaintiff's manuscript.

For this same reason, any declaration or other submission by plaintiff disputing the CIA's classification experts' proper determination would be unnecessary and irrelevant.  Neither plaintiff nor his counsel has original classification authority, <u>see</u> Executive Order 12958, as amended, § 1.3, nor does either have the requisite "broad view" of foreign intelligence matters to assess the effect that disclosure of the disputed information could have on our national security. The opinions of plaintiff or plaintiff's counsel on this question carry no weight whatsoever.

Courts have repeatedly, and necessarily, rejected the views of persons who are not original classification authorities on the question of whether a particular disclosure may harm national security.  Views rejected include those of former CIA case officers,[4] foreign policy and national security scholars,[5] and citizens' organizations.[6]  In contrast, as explained <u>supra</u>, the

_____

[4]    <u>See</u> <u>Snepp</u>, 444 U.S. at 512 ("When a former agent relies on his own judgment about what information is detrimental, he may reveal information that CIA–with its broader understanding . . . could have identified as harmful."); <u>Gardels</u>, 689 F.2d at 1106 & n.5 (former agent's "own views as to the lack of harm which would follow the disclosure requested by plaintiff" is insufficient to justify further inquiry beyond the Agency's "plausible and reasonable" informed position).

[5]    <u>See</u> <u>Halperin v. NSC</u>, 452 F. Supp. 47, 51 (D.D.C. 1978) (although plaintiff was a self-proclaimed "scholar and actor in the field of foreign policy and national security," nothing in "plaintiff's submissions justifie[d] the substitution of this Court's judgment or the informed judgment of plaintiff for that of the officials constitutionally responsible for the conduct of United States foreign policy as to the proper classification of [documents]"), <u>aff'd</u> 612 F.2d 586 (D.C. Cir. 1980).

[6]    <u>See</u> <u>Students Against Genocide v. Dep't of State</u>, 50 F. Supp. 2d 20, 24 (D.D.C. 1999) ("Plaintiffs cannot simply substitute their judgment for the United States government's judgment that additional disclosure would be harmful."), <u>aff'd in part</u>, <u>remanded in part</u>, 257 F.3d 828 (D.C. Cir. 1999) .

Executive's reasoned judgments that disclosure of the information would pose a risk to national security are entitled to great deference.  Ctr. for Nat'l Security Studies, 331 F.3d at 928; McGehee, 718 F.2d at 1149; Frugone, 169 F.3d at 775.

Of course, the utmost deference owed to the national security judgments of the Executive Branch does not mean that courts have no role to play in the review of agency classification decisions in the prepublication review context.  See Center for Nat'l Sec. Studies, 331 F.3d at 932 ("In so deferring, we do not abdicate the role of the judiciary. Rather, in undertaking a deferential review we simply recognize the different roles underlying the constitutional separation of powers. It is within the role of the executive to acquire and exercise the expertise of protecting national security. It is not within the role of the courts to second-guess executive judgments made in furtherance of that branch's proper role.")  The Court of Appeals for the D.C. Circuit has noted that when a court conducts its in camera review of agency declarations, it must assure itself that the agency's explanations provide "reasonable specificity" and "demonstrat[e] a logical connection between the deleted information and reasons for classification."  McGehee, 718 F.2d at 1148.  Consistent with the standards set forth below, the declarations of Marilyn Dorn, a CIA classification expert, satisfy this requirement by providing detailed explanations of why the information at issue is properly classified.

### C.    The CIA Properly Classified Portions of Plaintiff's Manuscript.

As set forth in the declarations submitted by the CIA, the Agency's classification decisions with respect to plaintiff's manuscript meet the standards required by the executive order governing the classification of information by the Executive Branch, Executive Order 12958, as amended.  The Agency has submitted two declarations in this case, one unclassified

and one classified.  The unclassified declaration provides as much justification of the Agency's classification decision as is possible on the public record.  See Hayden v. NSA, 608 F.2d 1381, 1384 (D.C. Cir. 1979); Unclass. Decl. ¶ 7.  A more detailed explanation in a public declaration or brief would, itself, damage national security for the same reasons that publication of plaintiff's manuscript poses such danger.  See Ellsberg v. Mitchell, 709 F.2d 51, 59 n.41 (D.C. Cir. 1983) ("It is one of the unfortunate features of this area of the law that open discussion of how the general principles apply to particular facts is impossible.").  Accordingly, the CIA's classified declaration (submitted ex parte for in camera review) provides a more detailed description of the harm to national security that may result from the disclosure of the information at issue.

Executive Order 12958, as amended, requires four conditions for the classification of national security information: (1) the information must be classified by an "original classification authority"; (2) the information must be "under the control of" the government; (3) the information must fall within one of the authorized classification categories listed in section 1.4 of the Executive Order; and (4) the original classification authority must "determine[ ] that the unauthorized disclosure of the information reasonably could be expected to result in damage to the national security" and must be "able to identify or describe the damage." Exec. Order No. 12958, as amended, § 1.1.   All four requirements are met here.

**1.    Classified By an Original Classification Authority**

The CIA official who made the classification determinations at issue in this case has "original classification authority" under the Executive Order.  The Executive Order defines "Original Classification Authority" as an individual "authorized in writing . . . by agency heads or other officials designated by the President, to classify information in the first instance."  Id. §

6.1(cc).   Marilyn A. Dorn, the National Clandestine Service Information Review Officer and an official with original classification authority, has determined that the information at issue in plaintiff's manuscript satisfies the classification criteria of Executive Order 12958.  See Unclass. Decl. ¶¶ 1, 4.

## 2.    Information Under the Control of the Government

The information at issue in plaintiff's manuscript constitutes information within the "control of the government" under the Executive Order, which defines "control" as "the authority of the agency that originates information . . . to regulate access to the information." Exec. Order 12958 § 6.1(s).  Here, plaintiff voluntarily signed a secrecy agreement in which he agreed not to disclose classified and certain other government information that he obtained during the course of his employment with the CIA.  See Pl. Secrecy Agreement ¶ 3 (Exh. A, Att. 1).  Plaintiff was required under paragraph 5 of his Secrecy Agreement to submit for prepublication review any writing "which contains any mention of intelligence data or activities or contains any other information or material that might be based upon information classified pursuant to Executive Order." Id. ¶ 5.  See also Knopf v. Colby, 509 F.2d 1362, 1371 (4th Cir. 1975) ("neither should [plaintiff] be heard to say that he did not learn of information during the course of employment if the information was in the Agency and he had access to it."), cert. denied, 421 U.S. 908 (1975).  Plaintiff also agreed that any classified information learned in the course of his CIA employment is and will remain the property of the CIA and the United States Government.  Pl. Secrecy Agreement ¶ 7.  Thus, the portions of plaintiff's manuscript that relate to the CIA's classified intelligence activities, sources and methods or its foreign activities fall within the prepublication review requirements of his secrecy agreement.  The information is

-16-

therefore under the "control" of the government, and satisfies the second condition of the Executive Order.

### 3.    The Classification Categories of Section 1.4

Under section 1.4 of the Executive Order, information shall be considered for classification if it concerns one of eight areas.  The information at issue in plaintiff's manuscript falls into at least three of those eight categories:  (1) foreign government information (§ 1.4(b)); (2) intelligence activities (including special activities), intelligence sources or methods, or cryptology (§ 1.4(c)); and/or (3) foreign relations or foreign activities of the United States, including confidential sources (§ 1.4(d)).  Executive Order 12958, as amended, § 1.4; Unclass. Decl. ¶ 33.  Accordingly, the third classification requirement of § 1.1 of Executive Order 12958 is met.

### 4.    Identifiable Damage To National Security

Finally, defendant has satisfied the fourth requirement for the classification of information under the Executive Order.  All of the information at issue in plaintiff's manuscript is information classified at the "Secret" level.  See Unclass. Decl. ¶¶ 9, 40, 48, 52, 55, 58, 61, 68, 71.  Executive Order 12958, as amended, provides that "Secret" level classification shall be applied to information, "the unauthorized disclosure of which reasonably could be expected to cause serious damage to the national security[7] that the original classification authority is able to identify or describe."  Exec. Order 12958, as amended, § 1.2(a)(2).  As Ms. Dorn describes in

---

[7]    The Executive Order defines "damage to the national security" as "harm to the national defense or foreign relations of the United States from the unauthorized disclosure of information, taking into consideration such aspects as the sensitivity, value, utility, and provenance of that information."  Exec. Order 12958, as amended, § 6.1(j).

her unclassified declaration and in greater detail in her classified declaration, the disclosure of

the information contained in plaintiff's manuscript could reasonably be expected to cause serious

damage to national security.[8]

The Executive Order requires that an Executive Branch official with original

classification authority make a reasoned judgment that damage to the national security "could be

expected" if information in plaintiff's manuscript relating to intelligence activities, sources and

methods or foreign activities or relations were disclosed.  The harm alleged by the government

need not "rise to the level of certainty," but must be "real and serious enough to justify the

classification decision."  McGehee, 718 F.2d at 1150.  As the D.C. Circuit noted,

> [a] court must take into account . . . that any affidavit or other agency statement of
> threatened harm to national security will always be speculative to some extent, in
> the sense that it describes a potential future harm rather than an actual past harm.
> If we were to require an actual showing that particular disclosures . . . have in the
> past led to identifiable concrete harm, we would be overstepping by a large
> measure the proper role of a court . . .

Halperin v. CIA, 629 F.2d at 149 (in FOIA context); see also Earth Pledge Foundation v. CIA,

988 F. Supp. 623, 628 (S.D.N.Y 1996), aff'd 128 F.3d 788 (2d Cir. 1997) (citing Halperin);

Klaus v. Blake, 428 F. Supp. 37, 38 (D.D.C. 1976) ("The national security issue is necessarily

speculative.  Intelligence deals with possibilities.  Our knowledge of the attitudes of and

information held by our opponents is uncertain.  Determinations of what is and what is not

appropriately protected in the interests of national security involves an analysis where intuition

---

[8]       Plaintiff's manuscript contains information that is protected in a "Special Access
Program."  In particular, the manuscript contains information protected through the special
access program known as the "HUMINT Control System," or HCS.  HCS protects information
that would tend to reveal the identity of a clandestine human intelligence source, or of an
individual assisting the CIA in a human intelligence activity.   Unclass. Decl. ¶ 9 n.2.

must often control in the absence of hard evidence.  This intuition develops from experience

quite unlike that of most Judges.").  Moreover, as discussed supra, "[d]ue to the mosaic-like

nature of intelligence gathering, for example, what may seem trivial to the uninformed may

appear of great moment to one who has a broad view of the scene and may put the questioned

item of information in context."  McGehee, 718 F.2d at 1148-49.

Ms. Dorn's declarations – in particular, her classified declaration and the exhibits thereto

– demonstrate with reasonable specificity a logical connection between the information at issue

and the reasons for classification.  McGehee, 718 F.2d at 1148-49.  For the reasons set forth

below and in Ms. Dorn's declaration, serious harm could be expected to result from the

disclosure of certain information in plaintiff's manuscript relating to foreign government

information; intelligence activities (including special activities), intelligence sources, methods

and activities; and/or foreign relations or foreign activities of the United States, including

confidential sources.  Unclass. Decl. ¶¶ 33, 35-71; Class. Decl. ¶¶ 36, 38-109.  Accordingly, the

Agency has satisfied the fourth, and final, component of proper classification.

### i.    Foreign Government Information

Section 1.4(b) of Executive Order 12958, as amended, provides for classification of

information concerning cooperative endeavors between the CIA and foreign intelligence

components.  Under the Executive Order, "'unauthorized disclosure of "foreign government

information" is presumed to cause damage to the national security'."  Judicial Watch, Inc. v.

DOJ, 306 F. Supp. 2d 58, 64 (D.D.C. 2004) (quoting Executive Order 12958, as amended, §

1.1(c)); Malizia v. DOJ, 519 F. Supp. 338, 343 (S.D.N.Y. 1981) (same).  "It is clear that, even

without the presumption of identifiable damage to the national security that is accorded foreign

government information, disclosure of such cooperation with foreign agencies could not only damage the [government's] ability to gather information but could also impair diplomatic relations." Malizia, 519 F. Supp. at 344 (internal citations omitted). Here, as Ms. Dorn explains in her declarations, plaintiff's draft manuscript contains information about CIA's coordination with other foreign liaison services, and the details concerning that coordination. Unclass. Decl. ¶ 48; Class. Decl. ¶ 53. The information involved, and why its disclosure could reasonably be expected to cause serious harm to the national security, is described in Ms. Dorn's unclassified declaration, and in even greater detail in her classified declaration. Unclass. Decl. ¶¶ 41-48; Class. Decl. ¶¶ 44-72. The foreign government information in plaintiff's draft manuscript concerning foreign liaisons is, therefore, properly classified SECRET. Executive Order 12958, as amended, ¶ 1.4(b).

### ii.    Intelligence Sources, Methods, and Activities

Section 1.4(c) of Executive Order 12958, as amended, provides for classification of information concerning intelligence activities (including special activities), intelligence sources and/or methods. As Ms. Dorn explains in her declaration, the continued availability of foreign intelligence sources is of critical importance to our national security, but intelligence sources can be expected to furnish information only when confident that they are protected from exposure by the absolute secrecy surrounding their relationship with the CIA. Unclass. Decl. ¶ 49; see also Snepp, 444 U.S. at 512 ("The continued availability of [] foreign sources depends upon the CIA's ability to guarantee the security of information that might compromise them and even endanger the personal safety of foreign agents."); Fitzgibbon v. CIA, 911 F.2d 755, 763-64 (D.C. Cir. 1990) ("The Government has a compelling interest in protecting both the secrecy of

-20-

information important to our national security and *the appearance of confidentiality* so essential

to the effective operation of our foreign intelligence service."(internal quotation marks omitted)).

Here, the CIA's classification authorities have determined that plaintiff's manuscript

describes or provides essential evidence of intelligence sources, methods, and activities, that, if

disclosed, reasonably could be expected to cause serious harm to our national security. The

categories of information involved and the harm that could be reasonably expected to result from

disclosure are described in Ms. Dorn's unclassified declaration, and in even greater detail in her

classified declaration. See Unclass. Decl. ¶¶ 49-52, Class. Decl. ¶¶ 73-80 (sources); Unclass.

Decl. ¶¶ 53-55, Class. Decl. ¶¶ 81-87 (activities and methods); Unclass Decl. ¶¶ 56-58, Class.

Decl. ¶¶ 88-91 (identities of CIA personnel which, if revealed, may reasonably be expected to

reveal sources, methods and activities); Unclass. Decl. ¶¶ 59-61, Class. Decl. ¶¶ 92-97 (CIA

internal structure, administration, resources and capabilities); 62-68 (existence and location of

CIA covert facilities); Unclass. Decl. ¶¶ 69-71, Class. Decl. ¶¶ 106-109 (plaintiff's comments to

the PRB that tend to reveal intelligence sources, methods, and activities). This information

concerning intelligence sources, methods and activities is, therefore, properly classified

SECRET. Executive Order 12958, as amended, ¶ 1.4(c).

### iii.    Foreign Activities and Foreign Relations

Executive Order 12958, as amended, protects information relating to "foreign relations or

foreign activities of the United States." Executive Order 12958, as amended, ¶ 1.4(d). The

necessity to protect such information is quite straightforward. In the words of President

Washington,

> The nature of foreign negotiations requires caution, and their success must often
> depend on secrecy; and even when brought to a conclusion a full disclosure of all

> the measures, demands, or eventual concessions which may have been proposed
> or contemplated would be extremely impolitic; for this might have a pernicious
> influence on future negotiations, or produce immediate inconveniences, perhaps
> danger and mischief, in relation to other powers.

1 Messages and Papers of the Presidents at 194, quoted in Curtiss-Wright Export Corp., 299 U.S.
at 320-321.

The serious harm that can result from the unauthorized disclosure of information relating to our foreign activities is widely recognized.  See, e.g., Snepp, 444 U.S. at 512 ("[T]he CIA obtains information from the intelligence sources of friendly nations and from agents operating in foreign countries.  The continued availability of these foreign sources depends upon the CIA's ability to guarantee the security of information that might compromise them . . . ."); McGehee, 718 F.2d at 1149-50 ("We also believe, on the basis of plausible scenarios put forward in the CIA affidavit, that the United States could suffer significant strategic and diplomatic setbacks as a result of the disclosure of the deleted information."); Earth Pledge, 988 F. Supp. at 627 (acknowledging the disruption that could occur to foreign relations if it were disclosed that CIA operated a field installation in a foreign country).

As Ms. Dorn explained in her unclassified declaration, and in even greater detail in her classified declaration, certain information in plaintiff's manuscript implicates the foreign relations and/or foreign activities of the United States.  See Unclass. Decl. ¶¶ 41-48, Class. Decl. ¶¶ 44-72 (coordination with foreign liason intelligence operatives and services); Unclass. Decl. ¶¶ 49-52, Class. Decl. ¶¶ 73-80 (sources); Unclass Decl. ¶¶ 62-68, Class. Decl. ¶¶ 98-105 (existence and location of covert CIA facilities).  This information is, therefore, properly classified SECRET.  Executive Order 12958, as amended, ¶ 1.4(d).

*  *  *  *  *

-22-

The CIA seeks to prevent the disclosure *only* of the *classified* information in plaintiff's manuscript. As the redacted manuscript itself (filed with Ms. Dorn's classified declaration) reveals, the CIA has made a significant effort to segregate the classified material from the unclassified details of the plaintiff's CIA career. See Pl. Classified Manuscript (Exh. C to Class. Decl.).

In sum, as set forth above, certain specific information contained in plaintiff's manuscript meets the requirements for proper classification pursuant to Executive Order 12958, as amended, because (1) it is within the control of the government and derived from plaintiff's employment with the CIA, (2) it constitutes "foreign government information," "intelligence activities, sources and methods," and/or concerns the "foreign relations or activities of the United States," and (3) a CIA official with original classification authority has determined that disclosure of the information (4) could reasonably be expected to result in serious damage to national security.

**D.     The Classified Information In The Plaintiff's Manuscript Has Not Been Officially Released By The Government Into The Public Domain.**

Plaintiff asserts that "much of the redacted material" in his manuscript "was either previously declassified for publication" in memoirs of other former government officials, or "otherwise publicly available" through the works of journalists. Amen. Compl. ¶ 12. Plaintiff, however, is incorrect on the facts and misunderstands the law. None of the material redacted from his draft manuscript has been declassified or officially disclosed. Unclass. Decl. ¶ 72. Moreover, even assuming *arguendo* that some of the information redacted from plaintiff's draft manuscript has been *unofficially* disclosed, that is largely irrelevant to the issue before this Court: whether the information is properly classified. See id. ¶¶ 72-79; Class. Decl. ¶¶ 110-125.

### 1.     Elements of Official Release into the Public Domain

As discussed above, plaintiff has no First Amendment right to publish classified information.  Articulating a standard embraced by the D.C. Circuit, the Fourth Circuit Court of Appeals succinctly explained the line between what a former CIA employee may and may not disclose:

> [Plaintiff] retains the right to speak and write about the CIA and its operations, and to criticize it as any other citizen may, but he may not disclose classified information obtained by him during the course of his employment which is not already in the public domain.

Marchetti, 466 F.2d at 1317.  In Knopf v. Colby, 509 F.2d at 1370, which the court described as the "sequel" to the Marchetti litigation, the Fourth Circuit elaborated on the meaning of "public domain" and held that classified information obtained by the CIA "was not in the public domain unless there had been official disclosure of it."

This standard has been adopted by the D.C. Circuit, which has applied it in the FOIA context to determine whether or not agencies have properly withheld information as classified under the Executive Order.  Courts apply three criteria in analyzing whether a piece of information is in the public domain: (1) the information at issue must be as specific as the information that has been publicly disclosed; (2) the disputed information must exactly match the information publicly disclosed; and (3) the information sought to be released must already

have been publicly released through "an official and documented disclosure."  See Fitzgibbon, 911 F.2d at 765 (citing Afshar v. Dep't of State, 702 F.2d 1125, 1133 (D.C. Cir. 1983)).[9]

The official public disclosure requirement has been applied consistently and stringently by this Circuit in cases where plaintiffs seek the release of classified information.  See Public Citizen v. Dep't of State, 11 F.3d 198, 202 (D.C. Cir. 1993) (cataloging cases and describing "stringency" of the test).  As discussed below, these three criteria have been applied across a myriad of circumstances where plaintiffs have asserted that certain information has been officially disclosed by the government.  The information at issue in this litigation does not satisfy any of the three elements of official disclosure.

a.    **General discussion is not a basis for release of more specific information.**

An official public release of a general discussion of a subject matter will not be deemed a basis for release of more specific information, where the agency explains in its declarations that release of the more detailed information poses a threat to the national security.  See Public Citizen v. Dep't of State, 787 F. Supp. 12, 14 (D.D.C. 1992), aff'd 11 F.3d 198 (D.C. Cir. 1993). In Salisbury, 690 F.2d 966, a plaintiff argued that the National Security Agency could not protect information as classified that might reasonably reveal the specific communications channels it monitored between the United States and Hanoi because the NSA had previously generally admitted at one time that it had monitored unspecified communications transmitted between the

---

[9]    The plaintiff, not the government, carries the burden to produce specific information for which all three criteria have been met and thus, to establish that the information is in the public domain.  See Afshar, 702 F.2d at 1130; cf. Pl. Secrecy Agreement ¶ 4 (stating plaintiff understands he bears the burden to learn whether particular information is covered by his secrecy agreement).

locations. The D.C. Circuit soundly rejected this position, noting that "[t]he fact of disclosure of a similar type of information in a different case does not mean that the agency must make its disclosure in every case." Id. at 971. Similarly, in Military Audit Project v. Casey, 656 F.2d 724, 752-53 (D.C. Cir. 1981), plaintiffs claimed that the government's declassification and release of certain documents concerning an alleged CIA plan to recover a wrecked Soviet nuclear submarine using a secret underwater craft, the *Glomar Explorer,* meant that it could not protect other information about the alleged financial arrangements between the government and contractors participating in the *Glomar* project and the purpose of the project. Plaintiff's position was rejected, and the case has since been cited approvingly by D.C. Circuit, which emphasized that it is "unwilling to fashion a rule that would require an agency to release all related materials any time it elect[s] to give the public information about a classified matter." Public Citizen, 11 F.3d at 203. See Ctr. for Nat'l Security Studies, 331 F.3d at 930-31 ("The disclosure of a few pieces of information in no way lessens the government's argument that complete disclosure would provide a composite picture of its investigation and have negative effects on its investigation.").

> **b.      Information is not in the public domain unless it is exactly the same as, and covers the same time period as, previously, officially released information.**

Courts have strictly applied the principle that disputed information will not be deemed to be in the public domain unless it is exactly the same as the information previously released by the agency. An agency's determination that information is classified can be based on the ground that "the context in which the information is discussed would itself reveal additional information, release of which is harmful to the national security." Washington Post v. Dep't of Defense, 766

F. Supp. 1, 10 (D.D.C. 1991). For example, in Afshar, 702 F.2d 1125, the plaintiff sought the release of information (if any) relating to the CIA's relationship with the Iranian intelligence agency SAVAK. In support of its theory that this information was in the public domain, the plaintiff asserted that (1) information was published by the "former head of the CIA's Middle East Department" stating that the CIA "helped to organize and give guidance to a new Iranian intelligence service in the years after the Shah returned to the throne in 1953"; and (2) that there were other discussions in books that "reveal CIA stations in, or intelligence liaisons with, foreign countries other than Iran." Id. at 1132. The court found this argument entirely unpersuasive, noting that the information must have "already been *specifically* revealed to the public." Id. (quoting Lamont v. DOJ, 475 F. Supp. 761, 772 (S.D.N.Y. 1979)). The court observed that any revelations of an early relationship between the CIA and SAVAK could not be used as a basis for arguing that a *continuing* relationship existed between the two agencies because the time periods were not the same:

> [N]one of these books specifically reveals a continuing relationship between SAVAK and the CIA after 1953, the date of the earliest dated document withheld in this case. [The book cited by plaintiff] limits its comments to the early organization and training of SAVAK.

Id at 1132.[10] Similarly, in Fitzgibbon, 911 F.2d at 765-66, the D.C. Circuit held that information in a 1975 congressional committee report referring to the location of a CIA station in 1960 and 1961 did not preclude the Agency from withholding information concerning the station's location in the years *before or after* 1960-61. The Fitzgibbon court properly deferred to the Agency's

---

[10] The court further observed that, as in this case and as discussed infra, none of the sources cited by the plaintiff was "an official and documented disclosure," even though some had been through the CIA prepublication review process. Afshar, 702 F.2d at 1132.

assessment of the harm to intelligence sources, methods and activities that was reasonably likely to result from this disclosure.  Id; see also Public Citizen, 11 F.3d at 202 (citing Fitzgibbon with approval).

> **c.    Information is not deemed to be in the public domain unless it was released through an official and documented disclosure.**

Finally, the courts have repeatedly emphasized the "critical difference between official and unofficial disclosures," Fitzgibbon, 911 F.2d at 765, and have stated that no disclosure of information will be deemed "official" for purposes of arguing that it has been publicly disclosed where the disclosure is made by "someone other than the agency," Frugone, 169 F.3d at 774.  See also Executive Order 12958, as amended, § 1.1(b) ("[c]lassified information shall not be declassified automatically as a result of any unauthorized disclosure of identical or similar information."); Unclass. Decl. ¶ 73.  Applying this principle, the courts have soundly and consistently rejected arguments that information has been officially publically disclosed because of its release in press reports.  See Knopf, 509 F.2d at 1370 (unofficial revelations and/or speculation in the press does not constitute official disclosure); Military Audit Project, 656 F.2d at 743 (same).  Even disclosure by Congress does not constitute official public disclosure by the Agency.  For example, in Earth Pledge, 988 F. Supp. at 625, the court concluded that a reference in a Congressional report to diplomatic cables exchanged between "CIA headquarters in Washington, DC and a CIA station in the capital city of the Dominican Republic" did not require the CIA to acknowledge or confirm the same information where the Agency explained in its ex parte, in camera declarations that harm would result "should [the station] in fact exist."  The court deferred to the CIA's determination that release of the information by the Agency could disrupt foreign relations and that "public disclosure would destroy the future usefulness of this

station, should it in fact exist." Id. at 628; see also Fitzgibbon, 911 F.2d at 765-66 (CIA could refuse to disclose classified information pertaining to alleged existence of CIA installation even if previously reported in congressional committee report); Salisbury, 690 F.2d at 971 ("bare discussions by this court and the Congress of NSA's methods generally cannot be equated with disclosure by the agency itself of its methods of information gathering."). Also, books written by former CIA officials in their personal capacities are not official and documented disclosures by the CIA itself for purposes of determining whether information has been publicly disclosed by the government. Afshar, 702 F.2d at 1133-34 (such "books [are not] an official and documented disclosure. . . . These books, frequently written in the first person, are received as the private product of their authors, like any other memoirs, and are accorded such respect as their content seems to deserve."); Phillippi v. CIA, 655 F.2d 1325, 1330-31 (D.C. Cir. 1981) (noting that, despite disclosure of information in memoir by former CIA Director, "the 'cat is not out of the bag.' There may be much left to hide, and if there is not, that itself may be worth hiding." (internal citation omitted)).

Furthermore, limited or inadvertent disclosures by the Agency are not deemed to be official public disclosures of information that is otherwise properly classified. For example, in Students Against Genocide, 50 F. Supp.2d 20, plaintiffs argued that the State Department could not protect a document that the State Department determined would "tend to reveal classified sources and methods" because the information was previously shared by the then-U.N. Representative with representatives of other nations at a meeting of the U.N. Security Council. The court found that any such limited disclosure did not place the information in the public domain, and that plaintiffs "cannot simply substitute their judgment for the United States

-29-

government's judgment that additional disclosure would be harmful." Id. at 24; see also Van

Atta v. Defense Intelligence Agency, No. Civ. A 87-1508, 1988 WL 73856, at *2 (D.D.C. July 6,

1988) ("The government's decision to share information with a foreign power does not open that

information to public scrutiny or undermine the reasons for nondisclosure.").  Even information

that has been inadvertently disclosed by the government can be protected where the government

demonstrates in its declarations that further release would jeopardize national security.  See

Carlisle Tire & Rubber Co v. U.S. Customs Serv., 663 F.2d 210, 219 (D.C. Cir. 1980) (deferring

to determination in affidavits of U.S. Customs Service officials that "serious adverse

consequences" would result from further release of document subject to "inadvertent and limited

disclosure" in reading room of Customs Service).  Agencies must consider "international and

domestic circumstances" in their assessment of the nature or degree of harm caused by the

disclosure of certain  information. See Baez v. U.S. Dep't of Justice, 647 F.2d 1328, 1334 (D.C.

Cir. 1980).

Similarly, courts have acknowledged the current geopolitical climate in various cases

granting deference to agency evaluations of the harm to national security that may result from

certain disclosures of information at, or concerning, a particular time.  See Center for Nat'l Sec.

Studies, 331 F.3d at 928 (explaining need for deference to agency's classification decision due

to, inter alia, fact that "America faces an enemy just as real as its former Cold War foes, with

capabilities beyond the capacity of the judiciary to explore."); Schlesinger v. CIA, 591 F. Supp.

60, 68 (D.D.C. 1984) ("Conditions in Central America are extremely sensitive *today*, and any

information about *past* covert activity by the United States in this area could have harmful

effects of precisely the sort enumerated in [the government's affidavit].") (emphasis added).

-30-

Courts recognize that there is a critical difference between speculation about classified information by the media or general public and the release of certain classified information by a former CIA employee who foreign intelligence agents may know to have been in a position to know the information as true. Ms. Dorn explains in her declaration that serious harm could result from the publication and distribution of certain information in the context of plaintiff's memoirs. See, e.g., Class. Decl. ¶ 114-118, 122-124. As the Fourth Circuit stated in the context of a prepublication review case involving a book by a former CIA employee:

> It is one thing for a reporter or author to speculate or guess that a thing may be so or even, quoting undisclosed sources, to say that it is so; it is quite another thing for one in a position to know of it officially to say that it is so. The reading public is accustomed to treating reports from uncertain sources as being of uncertain reliability, but it would not be inclined to discredit reports of sensitive information revealed by an official of the United States in a position to know of what he spoke.

Knopf, 509 F.2d at 1370. The Knopf court emphasized that former employees could not publish classified information that appeared in press accounts and elsewhere if it had not been released by the Agency in an official and documented disclosure:

> It is true that others may republish previously published [press] material, but such republication by strangers to it lends no additional credence to it. [Plaintiffs] are quite different, for their republication of the material would lend credence to it, and, unlike strangers referring to earlier unattributed reports, they are bound by formal agreements not to disclose such information.

Id. Thus, it is of no moment that a source to which plaintiff refers is a book written by former CIA officials and/or material precleared by the CIA for publication: as discussed supra, courts have repeatedly found that none of these transforms the publication of information into an official disclosure by the Agency. See, e.g., Afshar, 702 F.2d at 1133-34; Schlesinger, 591 F. Supp. at 68.

**2.     Plaintiff Cannot Demonstrate the Elements of Official Release by the Government into the Public Domain**

None of the information in plaintiff's memoirs that the Agency has identified as classified has been officially publicly released by the CIA into the public domain.  Unclass. Decl. ¶¶ 72-73, 79; Class. Decl ¶¶ 110-125.  To the extent that information in certain sources relates to the same general subject matter as some information that the plaintiff seeks to publish, the information in those public sources do not include officially disclosed information, and generally either pertain to a different time period or do not contain the same level of specificity or detail as plaintiff's draft manuscript.  See Class. Decl. ¶¶ 110-125;  Unclass. Decl. ¶¶ 72-79. Accordingly, plaintiff cannot satisfy *any* of the three elements of official release by the government (here, the CIA) into the public domain.  See Fitzgibbon, 911 F.2d at 765 (citing Afshar, 702 F.2d at 1133).

## CONCLUSION

Because the disputed information in plaintiff's manuscript is properly classified, as set

forth in the government's classified and unclassified declaration,[11] plaintiff does not have a First

Amendment right to publish it.  For all the reasons set forth above, this Court should grant

Defendant's Motion for Summary Judgment.

Dated:  April 28, 2006

                                        Respectfully submitted,

                                        PETER D. KEISLER
                                        Assistant Attorney General

                                        KENNETH L. WAINSTEIN
                                        United States Attorney


                                        _____/s/ Steven Y. Bressler_____
                                        VINCENT M. GARVEY
                                        STEVEN Y. BRESSLER D.C. Bar #482492
                                        Attorneys, U.S. Department of Justice
                                        Civil Division, Federal Programs Branch
                                        Post Office Box 883
                                        Washington, DC  20044
                                        (202) 514-4781

                                        Attorneys for Defendant

---

[11]  Department of Justice ("DOJ") regulations require undersigned counsel to ensure the Court's cooperation in protecting the classified declaration presented for its ex parte, in camera review.  See 28 C.F.R. § 17.17(a)(2), (c).  A DOJ Security Officer will brief Chambers in camera and ex parte as necessary for the sole purpose of providing information on the logistics of security arrangements and will remain available to provide full and complete information to the Court and its personnel regarding pertinent safeguarding and storage requirements for the classified declaration.  The classified declaration will be delivered separately upon request of the Court to a secure facility in the Courthouse for this Court's ex parte, in camera review.  The classified declaration is being delivered to a secure DOJ storage facility for the DOJ Security Officer, pending delivery to the Court.