UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

GARY BERNSTEN                          *
                                       *
            Plaintiff,                 *
                                       *
            v.                         *          Civil Action No. 05-1482 (CKK)
                                       *
CENTRAL INTELLIGENCE AGENCY            *
                                       *
            Defendant.                 *
*    *    *    *    *    *    *    *    *    *    *    *

PLAINTIFF'S OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT[1]

This case presents a threat to the vitality of First Amendment rights among former
and current employees of the government, as well as its contractors, arising from the
defendant Central Intelligence Agency's improper misclassification of information that is
contained in the plaintiff Gary Bernsten's book Jawbreaker, The Attack on Bin Laden
and Al-Qaeda: A Personal Account by the CIA's Key Field Commander (Crown
Publishers: 2005).

The ability of the CIA to inhibit First Amendment rights extends only to that
information that is properly classified. The dissemination or publication of unclassified
information, which is all the manuscript contains, cannot be blocked by the government.
This case represents yet another effort by the CIA to crack down on openness, intimidate
its former and current employees and prevent the free flow of information that pertains to
its activities, no matter how embarrassing or revealing it might be.

> Excessive secrecy has significant consequences for the national interest
> when, as a result, policymakers are not fully informed, government is
> not held accountable for its actions, and the public cannot engage in
> informed debate. This remains a dangerous world; some secrecy is vital

---

[1] As part of a voluntary agreement the undersigned counsel, who has not executed a
secrecy agreement in this matter, submitted this document to the CIA for classification
review. The filing of this document with the Court signifies that no classified information
is contained therein, or that it has been appropriately redacted.

> to save lives, bring miscreants to justice, protect national security, and
> engage in effective diplomacy. Yet as Justice Potter Stewart noted in his
> opinion in the Pentagon Papers case, when everything is secret, nothing
> is secret. Even as billions of dollars are spent each year on government
> secrecy, the classification and personnel security systems have not
> always succeeded at their core task of protecting those secrets most
> critical to the national security. The classification system, for example,
> is used too often to deny the public an understanding of the
> policymaking process, rather than for the necessary protection of
> intelligence activities and other highly sensitive matters.

Report of The Commission on Protection on Protecting and Reducing Government

Secrecy xxi (GPO, 1997).[2]

One of the central purposes of the First Amendment is to allow publication to serve as

both a critical source of information for the public as well as an important government

watchdog. The CIA has prevented the publication of portions of Bernsten's book by

unreasonably asserting classification determinations that are known to be unjustified,

particularly since much of the same text was previously approved for publication by the

CIA. Such conduct violates the rights of free speech guaranteed by the First Amendment

of the Constitution of the United States.

Moreover, the CIA cannot lawfully prevent Bernsten' attorney, who holds the

appropriate "limited security access approval", from reviewing the unredacted copy of

his client's manuscript, as well as the related substantive submissions he has drafted, in

order

---

[2] The Government's primary classification expert testified to Congress last year that overclassification remains a serious problem. See e.g. Statement of J. William Leonard, Director, Information Security Oversight Office, National Archives & Records Administration, Before the Committee on Government Reform, Subcommittee on National Security, Emerging Threats, and International Relations, U.S. House of Representatives, March 2, 2005 ("it is my view that the Government classifies too much information"), available at *http://reform.house.gov/UploadedFiles/ISOO%20Leonard%20testimony%20final%203-2-05%20hearing.pdf*.

to assist in this classification challenge.[3] The CIA's actions to prevent this from occurring smacks of nothing less than retaliation against Bernsten, and his counsel, for the exercising of his First Amendment rights.

## ARGUMENT

To support a motion for summary judgment, it must be demonstrated that there are no genuine issues existing as to any material fact and that the moving party is entitled to judgment as a matter of law. See Fed.R.Civ.P. 56(c). A Court considering a motion for summary judgment must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The movants bear "the initial responsibility of informing the district court of the basis for their motion and identifying those portions of the record which show lack of a genuine issue." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). In order to overcome a summary judgment motion, the nonmoving party must designate "specific facts showing that there is a genuine issue for trial." Id. at 324; Fed.R.Civ.P. 56(e).

The necessary proof that must be produced is not precisely measurable, but must show "'sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" First Nat'l Bank of Arizona v. Cities Service Co., Inc., 391 U.S. 253, 289 (1968).  If the Court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment must be denied.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

---

[3] The term "limited security access approval" is one which the CIA uses to reference the type of access provided to private attorneys who handle CIA cases involving classified information. The term, however, does not exist in any statutory, regulatory or Executive Order provision. Based on a National Agency Check, or NAC, private attorneys are essentially granted interim Secret clearances. The undersigned counsel has had access to classified CIA information for more than a decade. Although no secrecy agreement has been executed by counsel in this case, the undersigned would certainly be amenable to doing so if access were to be ensured.

## I.   THIS COURT MUST ENSURE BERNSTEN'S CONSTITUTIONAL RIGHTS ARE PROTECTED

This case arises in a posture significantly different from a request for release of CIA information under the Freedom of Information Act ("FOIA").  In a FOIA case, an individual seeks to compel release of documents in the Government's possession.  Here, by contrast, Bernsten wishes publicly to disclose information that he already possesses, and the CIA has ruled that his secrecy agreement forbids disclosure.

This difference between seeking to obtain information and seeking to disclose information already obtained raises Bernsten's constitutional interests in this case above the constitutional interests held by a FOIA claimant. As a general rule, citizens have no first amendment right of access to traditionally nonpublic government information. See e.g., Houchins v. KQED, Inc., 438 U.S. 1, 8-9 (1978)(plurality opinion); Saxbe v. Washington Post Co., 417 U.S. 843, 849 (1974); Pell v. Procunier, 417 U.S. 817, 831-32 (1974). A litigant seeking release of government information under FOIA, therefore, relies upon a statutory entitlement – as narrowed by statutory exceptions – and not upon his constitutional right to free expression.

"In this case, however, [Bernsten] wishes to publish information he possesses, and the CIA wishes to silence him. Although neither the CIA's administrative determination nor any court order in this case constitutes a prior restraint in the traditional sense upon [Bernsten] or any other party, the entire scheme of prepublication review is designed for the purpose of preventing publication of classified information. [Bernsten] therefore has a strong first amendment interest in ensuring that CIA censorship of his [manuscript] results from a proper classification of the censored portions." McGehee v. Casey, 718 F.2d 1137, 1142, 1147-48 (D.C.Cir. 1983). Cf. Alfred A. Knopf, Inc. v. Colby, 509 F.2d

1362, 1367 (4th Cir.)("the deletion items should be suppressed only if they are found to be both classified and classifiable under the Executive Order"), cert. denied, 421 U.S. 992 (1975).

At the outset it should be made clear that Bernsten does not challenge the existence of or the requirement to adhere to a prepublication review process. In Snepp v. United States, 444 U.S. 507 (1980)(per curiam), the Supreme Court held that the CIA could, consistent with the First Amendment, recover damages for breach of a secrecy agreement under which a former employee promised to submit CIA-related writings to the CIA for prepublication clearance. The Court found the secrecy agreement to be "a reasonable means for protecting" the "secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." Id. at 509 n.3.[4] In Snepp, the former employee published CIA-related information without submitting his manuscript for prepublication review.  The ruling in Snepp, therefore, did "not depend upon whether [Snepp's] book actually contained classified information….The Government simply claimed that … Snepp should have given the CIA an opportunity to determine whether the material he proposed to publish would compromise classified information or sources." Id. at 511.

---

[4] In its basic essence the secrecy agreements typically executed by CIA Officers such as Bernsten mandate agreement to submit for review any material "I contemplate disclosing publicly or that I have actually prepared for public disclosure, either during my employment...or at any time thereafter, prior to discussing it or showing it to anyone who is not authorized to have access....I further agree that I will not take any steps toward public disclosure until I have received written permission to do so from the Central Intelligence Agency." CIA Secrecy Agreement, Form 368, cited in Hedley, John Hollister, *Reviewing the Work of CIA Authors: Secrets, Free Speech, and Fig Leaves*, Studies in Intelligence (Spring 1998)(citations omitted), available online at *https://www.cia.gov/csi/studies/spring98/Secret.html*.

In this case, by contrast, Bernsten adhered to his secrecy agreement. He submitted his manuscript for prepublication review, and deleted portions of his book in accordance with the CIA's orders. The CIA does not assert otherwise, nor has it taken any remedial action against Bernsten for any of his conduct. The dispute presented here is the constitutionality of the CIA's substantive application of its classification decisions, and its interference with Bernsten's constitutional rights to communicate with counsel.

Bernsten's secrecy agreement applies only when he seeks to publish "classified information" that "has come or shall come to [his] attention by virtue of [his] connection with the Central Intelligence Agency." McGehee, 718 F.2d at 1142. As the D.C. Circuit has noted, secrecy agreements, such as the ones Bernsten' executed, do not extend to "unclassified materials or to information obtained from public sources." Id. The government may not censor such material, "contractually or otherwise." United States v. Marchetti, 466 F.2d 1309, 1313 (4th Cir.), cert. denied, 409 U.S. 1063 (1972). "The government has no legitimate interest in censoring unclassified materials. Moreover, when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated." McGehee, 718 F.2d at 1141. Accord Snepp, 444 U.S. at 513 n.8 ("if in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned"). See also Stillman v. CIA et al., 319 F.3d 546, 548 (D.C.Cir. 2003)(if information not classified properly, manuscript can be published).

The governing document concerning the CIA's classification decisions is Executive Order 13,292, which President Bush issued in March 2003 (amending Executive Order

12,958 that dated back to 1995). Pursuant to § 1.4 of the Order, information shall not be

considered for classification unless it concerns:

> (a) military plans, weapons systems, or operations;
> (b) foreign government information;
> (c) intelligence activities (including special activities), intelligence
>     sources or methods, or cryptology;
> (d) foreign relations or foreign activities of the United States, including
>     confidential sources;
> (e) scientific, technological, or economic matters relating to the national
>
>     security, which includes defense against transnational terrorism;
> (f) United States Government programs for safeguarding nuclear
>     materials or facilities;
> (g) vulnerabilities or capabilities of systems, installations,
>     infrastructures, projects, plans, or protection services relating to the
>     national security, which includes defense against transnational
>     terrorism; or
> (h) weapons of mass destruction.

Agencies may not classify information to "conceal violations of law, inefficiency, or

administrative error," "prevent embarrassment to a person, organization, or agency," or

"prevent or delay the release of information that does not require protection in the interest

of the national security." Id. at § 7 (a). Nor can they reclassify information once that

information has been properly declassified unless certain procedural requirements have

been met.[5] The CIA has failed to meet those requirements in this case.

---

[5] Section 1.7 (c) of Executive Order 13292 governs the specific requirements where
information may be reclassified after declassification. They include when:
> (1) the reclassification action is taken under the personal authority of the
> agency head or deputy agency head, who determines in writing that the
> reclassification of the information is necessary in the interest of the national
> security; (2) the information may be reasonably recovered; and (3) the
> reclassification action is reported promptly to the Director of the
> Information Security Oversight Office.

The CIA has also failed to abide by its own regulations governing the citation to unclassified sources. For example, Section 2(i) of its 1995 PRB regulations, which govern its review of Bernsten's manuscript, states:

> Where information contained in material intended for nonofficial publication is available to the author from classified sources and also independently from open sources, the author may be permitted to republish the information if he or she can cite an adequate open source publication and if republication of the information by that author at the time of review will not cause additional damage to the national security through authoritative confirmation of previous publications.

As discussed below, and within Bernsten's separate document submitted for *in camera*, *ex parte* review, see Exhibit "1", numerous instances existed where Bernsten was willing to cite to open source material, even when it concerned his own actions. Yet the CIA decried this information as classified.

**A.  Due Process Fairness Dictates That This Court Needs To Review Bernsten's "Classified" Submission**

In order to properly respond to the CIA's Motion for Summary Judgment Bernsten was instructed by counsel to prepare a rebuttal to the CIA's classification decisions that asserted portions of his book Jawbreaker contained classified information. Rule 56 (f) Declaration of Mark S. Zaid, Esq. at ¶6 (dated September 25, 2006)("Zaid Rule 56(f) Decl."), attached at Exhibit "1". This document contains substantive analysis as to why the CIA's classification decisions are not justified. A copy of the document is being provided to the Court for *in camera*, *ex parte* review as Exhibit "2".

As the undersigned counsel understands it, the substance of the document primarily, but not necessarily solely, addresses the fact that much of the redacted text in Jawbreaker has appeared elsewhere in Agency-approved publications and should therefore be considered unclassified. Zaid Rule 56(f) Decl. at ¶6. It is the exact type of document that

the D.C. Circuit anticipated would be submitted to and reviewed by this Court as part of its Constitutional deliberations into the present dispute.[6]

The D.C. Circuit has twice provided guidance to the district courts on how to handle prepublication classification challenges; first in McGehee and more recently in Stillman. As the Circuit originally stated in McGehee:

> Because the present case implicates first amendment rights, however, we feel compelled to go beyond the FOIA standard of review for cases reviewing CIA censorship pursuant to secrecy agreements. While we believe courts in securing such determinations should defer to CIA judgment as to the harmful results of publication, they must nevertheless satisfy themselves from the record, *in camera* or otherwise, that the CIA in fact had good reason to classify, and therefore censor, the materials at issue. Accordingly, the courts should require that CIA explanations justify censorship with reasonable specificity, demonstrating a logical connection between the deleted information and the reasons for classification. These should not rely on a "presumption of regularity" if such rational explanations are missing. We anticipate that *in camera* review of affidavits, followed if necessary by further judicial inquiry, will be the norm. *Moreover, unlike FOIA cases, in cases such as this both parties know the nature of the information in question. Courts should therefore strive to benefit from "criticism and illumination by [the] party with the actual interest in forcing disclosure."*

719 F.2d at 1148-49 (citations omitted)(emphasis added). It then noted in Stillman that the "district court should first inspect the manuscript and consider any pleadings and declarations filed by the Government, as well as any materials filed by Stillman, who describes himself an 'expert in classification and declassification.'" 319 F.3d at 548-49.

This review will not involve the need to "second-guess CIA judgments on matters in which the judiciary lacks the requisite expertise." McGehee, 719 F.2d at 1149. There will be little, if any, substantive classification decisions in this case that this Court does not

---

[6] Thus, the CIA's self-serving and belittling comment that this document is "unnecessary and irrelevant", and that neither the opinions of Bernsten or his counsel should be accorded absolutely "no weight whatsoever", should be discarded. Memorandum of Points and Authorities in Support of Defendant's Motion for Summary Judgment at 13 (filed April 28, 2006)("Def's Memo").

possess the requisite level of expertise to rule upon.[7] In any event, "while the CIA's tasks include the protection of the national security and the maintenance of the secrecy of sensitive information, the judiciary's tasks include the 'protection of individual rights. Considering that 'speech concerning public affairs is more than self-expression; it is the essence of self-government,' and that the line between information threatening to foreign policy and matters of legitimate public concern is often very fine, courts must assure themselves that the reasons for classification are rational and plausible ones." Id. (citations omitted).

In the landmark *Pentagon Papers* case, Justice Brennan wrote that "[t]he entire thrust of the Government's claim throughout these cases has been that publication of the material sought to be enjoined 'could,' or 'might,' or 'may' prejudice the national interest in various ways. But the First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences may result." New York Times Co. 403 U.S. at 725 (1971).[8]

_____

[7] The CIA frequently cites to generic references asserting that this Court lacks the knowledge to substantively assess its classification decisions. E.g. Def's Memo at 11-12. Cf. New York Times Co. v. United States, 403 U.S. 713 (1971)(per curiam) (permitting publication of Pentagon Papers despite government's claim that they were "top secret"); Haig v. Agee, 453 U.S. 280, 289 (1981)(President's plenary power over foreign relations, "like every other government power, must be exercised in subordination to the applicable provisions of the Constitution."), quoting United States v. Curtiss-Wright Export Corp., 299 U.S. 304, 320 (1936). Of course, in addition to having handled numerous cases involving classified information, this Court also happens to currently chair the Foreign Intelligence Surveillance Court and possesses unique ability to engage in substantive determinations involving allegedly classified information.

[8] Justice Brennan added that "[e]ven if the present world situation were assumed to be tantamount to a time of war, or if the power of presently available armament would justify in peacetime the suppression of information that would set in motion a nuclear holocaust, in neither of these actions has the Government presented or even alleged that publication of items from or based upon the material at issue would cause the happening of an event of that nature....Thus, only governmental allegation and proof that publication must inevitably, directly, and immediately cause the occurrence of an event kindred to imperiling the safety of a transport already at sea can support even the issuance of an interim restraining order. In no event may member conclusion be sufficient: for if the

> When the government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured." It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.

United States et al. v. National Treasury Employees Union et al., 513 U.S. 454, 475 (1995).[9]

However, the intent of Bernsten's document was, of course, to be utilized by counsel and not directly submitted to the Court for its review, particularly when counsel has not been able to review it himself and has little to no idea what might be contained therein. Neither the attorneys for the Justice Department nor the CIA have any "need-to-know" the contents of Bernsten's document. There is no rational basis as to how their need to review that document could outweigh the undersigned's own as part of this litigation challenge process.[10] More importantly, as set forth below, in its current state the document is clearly privileged.

---

Executive Branch seeks judicial aid in preventing publication, it must inevitably submit the basis upon which that aid is sought to scrutiny by the judiciary." New York Times Co., 403 U.S. at 726 (Brennan, J., concurring).

[9] "As Justice Brandeis reminded us, a 'reasonable' burden on expression requires a justification far stronger than mere speculation about serious harms. 'Fear of serious injury cannot alone justify suppression of free speech and assembly. Men feared witches and burnt women...To justify suppression of free speech there must be reasonable grounds to fear that serious evil will result if free speech is practiced.'" National Treasury Employees Union, 513 U.S. at 475, quoting Whitney v. California, 274 U.S. 357, 376 (Brandeis, J., concurring).

[10] "If disclosure to one more person truly carries an unacceptable risk of inadvertent disclosure, government counsel's access here has no more justification than would plaintiff's counsel's." Stillman, 209 F.Supp.2d 229 (D.D.C. 2002), rev'd on other grounds, 319 F.3d 546 (D.C.Cir. 2003).

**1. Bernsten's Document Constitutes A Privileged Attorney-Client Communication And Attorney-Work Product And Must Not Be Shared With Government Counsel**

Bernsten's document is protected by the attorney-work product privilege as it was prepared by Bernsten for his counsel to assist in this legal challenge.[11] It additionally constitutes an attorney-client communication as it was to be provided by Bernsten, as the client, to his counsel.[12]

The CIA would not permit Bernsten to provide a copy of this document to his undersigned counsel, at least not before it underwent a classification review, on the basis

---

[11] The attorney work-product privilege is intended to promote a fair and efficient adversarial system by protecting "the attorney's thought processes and legal recommendations" from the prying eyes of his or her opponent. Genentech, Inc. v. United States Int'l Trade Comm'n, 122 F.3d 1409, 1415 (Fed. Cir. 1997)(citations omitted); accord Hickman v. Taylor, 329 U.S. 495, 511-14 (1947)("Proper preparation of a client's case demands that he assemble information, sift what he considers to be the relevant from the irrelevant facts, prepare his legal theories and plan his strategy without undue and needless interference. . . . Were such materials open to opposing counsel on mere demand, much of what is now put down in writing would remain unwritten . . ."). It can protect "documents and tangible things" prepared in anticipation of litigation that are both non-privileged and relevant. Fed.R.Civ.P. 26(b)(3). Unlike the attorney-client privilege, which protects all communication whether written or oral, work-product immunity protects documents and tangible things, such as memorandums, letters and e-mails. See generally Judicial Watch, Inc. v. Dep't of Justice, 432 F.3d 366 (D.C. Cir. 2005).

[12] The attorney-client privilege is the oldest of the privileges for confidential communications known to the common law. Upjohn Co. v. United States, 449 U.S. 383, 389 (1981); Hunt v. Blackburn, 128 U.S. 464, 470 (1888). The privilege exists to encourage "full and frank communication between attorneys and their clients." Upjohn, 449 U.S. at 389. The Supreme Court has long recognized that the privilege is "founded upon the necessity, in the interests and administration of justice, of the aid of persons having knowledge of the law and skilled in its practice, which assistance can only be safely and readily availed of when free from the consequences or the apprehension of disclosure." Hunt, 128 U.S. at 470. The scope of the attorney-client privilege is guided by "the principles of the common law" ... as interpreted by the courts ... in the light of reason and experience. Fed.Rule Evid. 501. Traditionally, the privilege applies to confidential communications between the client and his attorney made in order to obtain legal advice. Fisher v. United States, 425 U.S. 391, 403 (1976); 3 Jack B. Weinstein & Margaret A. Berger, Weinstein's Federal Evidence, § 503.10 (Joseph M. McLaughlin, ed., Matthew Bender 2d ed. 1997).

that counsel has, assuming it was considered classified, no "need-to-know" its contents. The fact that Roy Krieger, who was previously acting as Bernsten's counsel, had signed a secrecy agreement and that the undersigned was willing to do so was irrelevant to the CIA. The CIA does not wish to allow any exchange of information between client and counsel that would assist either in challenging its determinations. Zaid Rule 56(f) Decl. at ¶7.

Based on the CIA's position, the undersigned arranged for Bernsten to submit his document to the CIA for a classification review. This would allow counsel to at least utilize and rely upon the unredacted portions of the document in drafting Bernsten's opposition brief. However, it may very well be that only some or even none of the information within the draft document would have been utilized in any final filing with the Court. This was a decision that the undersigned counsel was unable to reach due, as stated below, to the CIA's refusal to provide a copy to him.

In or around late August/early September 2006, the undersigned had Bernsten contact his CIA security officer, Thomas Schmittle, and receive instructions on how to submit his documentation. The CIA acknowledged receiving the document no later than September 12, 2006. On several occasions the undersigned notified his CIA security officer that he would need Bernsten's document returned to him with sufficient time to be able to draft his opposition brief. Id. at ¶8.

On September 20, 2006, the undersigned received a letter from the Justice Department counsel currently handling this case indicating that it was "highly unlikely" that he will be provided with a copy of Bernsten's document. Id, at ¶9, Exhibit "A". The letter also noted that the Justice Department was willing to assist in arranging for this Court to review an unredacted copy of the document as part of its deliberations.

Neither Bernsten nor the undersigned counsel has authorized the document's release or waived the privilege. All that has taken place is mandatory compliance with a legal requirement to submit the document to security officials within the CIA. The undersigned

counsel has been provided with explicit assurances from the CIA that none of its litigation attorneys are involved in the classification review process, nor are any submitted documents shared outside of that process. On September 25, 2006, the undersigned counsel notified the Justice Department of Bernsten's position in order to make proper arrangements for the document to be provided to the Court's security officers for this Court's *in camera*, *ex parte* review. Id. at ¶¶10-11, Exhibit "B".

Until this Court orders otherwise, Bernsten's document should remain privileged and unavailable to the CIA or its attorneys.

**B.  Bernsten's Document Demonstrates That The CIA's Classification Decisions Were Unlawful And Extinguished Or Inappropriately Limited His First Amendment Rights**

Were Bernsten's document have been available to the undersigned counsel, it would have been analyzed and presented here. Due to the CIA's retaliatory actions this is not possible.[13] See Exhibit "2".

**II.  THE CIA HAS ACTED IN BAD FAITH WITH ITS CLASSIFICATION DECISIONS**

The CIA explicitly recognizes that its judgments can be called into question, and indeed even "second-guess[ed]" when bad faith is evident. Def's Memo at 6, citing McGehee, 718 F.2d 1148-49.

---

[13] The CIA's declarant, Marilyn A. Dorn, specifically highlights a comparison between Bernsten's book and that of another former CIA official Gary Schroen. Declaration of Marilyn A. Dorn at ¶¶74-75 (dated April 28, 2006), attached to Def's Memo. This comparison is significantly important to this dispute, however the undersigned counsel is unable to comment further without access to Bernsten's factual submission that has been "classified" by the CIA.

**A. CIA's Former Executive Director Specifically Informed Bernsten That The CIA Would Intentionally Target Him And Trample His First Amendment Rights Thereby Evidencing Bad Faith And Justifying Discovery**

The PRB, despite possessing the requisite authority to render decisions as to what information must be withheld in a manuscript, regularly defers its decision-making authority to other components of the CIA. In Bernsten's case this has led to serious concerns regarding the integrity of the classification review process. As Bernsten detailed in his sworn declaration submitted as part of this case:

> 8. With all of this as background, then CIA Executive Director Kyle (Dusty) Foggo asked for me and an aide to CIA Director Goss to dine together at the Capital Grille. The purpose of the dinner was to discuss my desired retirement and persuade me not to resign. During the course of the evening I explained my reasons for wanted to depart. Mr. Foggo expressed his desire to fix the personnel system at CIA and offered to place me at a University through the officer in residence program. I explained that I had submitted an outside activity form regarding my intention to write a book on the Afghan War. Mr. Foggo stated that Director Goss wanted no more books published by current or former CIA officials.
>
> 9. Mr. Foggo stated "we will have no more books. I will redact the shit out of your book so no one will want to read it." Upon hearing this statement I argued that multiple former Directors and hundreds of other officers had written books and that I was more than willing to follow the rules to accomplish this. In fact, I added that Gary Schroen had recently had published his book <u>First In: An Insider's Account of How the CIA Spearheaded the War on Terror in Afghanistan</u> (Presido Press: 2005), wherein he dedicated several chapters to me calling me "Gary 2". Mr. Foggo responded "don't bother leaving to write a book I will have it redacted until nothing is left."[14]

---

[14] Mr. Foggo apparently was successful. Coincidentally the very first online book review posted on *www.Amazon.com* for <u>Jawbreaker</u> by James Monroe of Los Angeles, California, states under the title "Incomplete, heavily censored":

> It is well written, has great pace, and has enough new information to make things interesting. But it is unfair to call this a complete book - there isn't a whole lot of new information here, when considering the other sources available in print and online. Why is that? Redactions! There are redactions on every page, sometimes slicing a sentence in half, sometimes removing 5-6 pages of information. For some reason, almost all information on supplies and funding the Northern and Eastern Alliance was redacted, ALL information on

See Declaration of Gary Bernsten at ¶¶8-9 (dated September 25, 2006), attached at Exhibit "3" ("Bernsten Decl.").

If comments such as these, especially when coming from the third-ranking person at CIA, does not constitute possible "bad faith", then Bernsten does not know what the term could mean. In fact, the PRB, after its review of Bernsten's book, only sought to redact a total of five pages of information. It was only after the manuscript was sent to the CIA's Directorate of Operations and Mr. Foggo that all of a sudden approximately seventy pages were designated as classified. Mr. Foggo's power at the time had apparently been exercised. Id. at ¶¶12-13.

Bernsten should be permitted to explore through discovery the extent to which, if any, Mr. Foggo had on his review process before the Court considers granting the CIA's Motion. Zaid Rule 56(f) Decl. at ¶20.

## III. THE INFORMATION IN BERNSTEN'S MANUSCRIPT HAS BEEN OFFICIALLY RELEASED BY THE CIA INTO THE PUBLIC DOMAIN

Bernsten takes no issue with the pronouncement that he lacks a First Amendment right to publish classified information. As the CIA notes, thirty years ago the Fourth Circuit Court of Appeals opined in a prepublication challenge case that:

> [Plaintiff] retains the right to speak and write about the CIA and its operations, and to criticize it as any other citizen may, but he may not disclose classified information obtained by him during the course of his employment which is not already in the public domain.

---

interrogation of prisoners, almost all information on direct action. Perhaps most frustrating was the nearly total redaction of Mr. Bernstens criticism; which to me was half the point of the book.

Marchetti, 466 F.2d at 1317. In what is regarded as sequel litigation, the Fourth Circuit in

Knopf v. Colby, 509 F.2d at 1370, seemingly addressed the meaning of "public domain"

and held that classified information obtained by the CIA "was not in the public domain

unless there had been official disclosure of it."

Though the D.C. Circuit has never addressed this issue in the context of a First

Amendment prepublication challenge, it has applied a "public domain" test in the FOIA

context (and presumably the test would be similar if not identical, though Bernsten does

not concede this would be the case).[15] Courts apply three criteria in analyzing whether a

piece of information is in the public domain: (1) the information at issue must be as

specific as the information that has been publicly disclosed; (2) the disputed information

must exactly match the information publicly disclosed; and (3) the information sought to

be released must already have been publicly released through "an official and

documented disclosure." See Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir. 1990),

citing Afshar v. Dep't of State, 702 F.2d 1125, 1133 (D.C. Cir. 1983).

### A. Manuscripts Approved For Release Through The CIA's PRB Process Should Be Considered Official And Documented Disclosures

The CIA asserts that:

> books written by former CIA officials in their personal capacities are not
> official and documented disclosures by the CIA itself for purposes of
> determining whether information has been publicly disclosed by the
> government. Afshar, 702 F.2d at 1133-34 (such "books [are not] an
> official and documented disclosure. . . . These books, frequently written in
> the first person, are received as the private product of their authors, like
> any other memoirs, and are accorded such respect as their content seems
> to deserve."); Phillippi v. CIA, 655 F.2d 1325, 1330-31 (D.C. Cir. 1981)
> (noting that, despite disclosure of information in memoir by former CIA

---

[15] And of course we must keep mindful of that fact that this dispute arises from
established First Amendment protections and rises above that of a pure statutory right
such as exists under FOIA. McGehee, 718 F.2d at 1142.

> Director, "the 'cat is not out of the bag.' There may be much left to hide,
> and if there is not, that itself may be worth hiding." (internal citation
> omitted)).

This pronouncement, based primarily on case law from nearly 25 years ago, simply does not take into account the reality of the PRB process as it exists today. To say that the PRB classification review process is not "official" and that the determinations do not specifically assess the classification status of certain information is a farce.

Information that proceeds through a PRB classification review process are specifically assessed as to whether the contents are classified or unclassified. If the information is classified, it cannot be published and the author is so notified. If the information is unclassified, it can be published and, again, the author is so notified. The CIA cannot pick and choose on which occasions it desires to allow one former CIA employee to publish a fact, and then restrict another employee from publishing the same information. Yet this is exactly what it is doing to Bernsten and numerous others.[16]

Bernsten initially submitted his manuscript to the PRB for classification review on May 18, 2005. Defendant's Statement of Undisputed Facts at ¶7 (filed April 28, 2006). Revisions were submitted on June 27, 2005. Id. at ¶9. The PRB completed its review and initially returned the document with redactions on August 23, 2005. Id. at ¶10. Following a meeting with the PRB on August 29, 2005, Bernsten submitted further revisions between August 31, 2005 and September 2, 2005. Id. at ¶11. The final PRB response was issued on October 18, 2005. Id. at ¶12.

---

[16] Bernsten is not addressing whether press reports, inadvertent disclosures or even official disclosures from outside the CIA (at a level lower than the Vice President) are to be considered or can serve as official releases by the CIA. Def's Memo at 28-30.  In this section he is focusing entirely and specifically on PRB authorized releases.

The PRB process in Bernsten's case, therefore, encompassed two separate set of regulations governing its conduct. The current PRB regulations went into effect on July 22, 2005. The prior regulations were issued on March 14, 1995, and are the relevant governing authority to be applied to Bernsten's document. Either way, the result is the same. The PRB's actions constitute an official and documented release of unclassified information.

The CIA's regulations make it quite clear that what is being done is a classification evaluation. The authority for the PRB review process states:

> The National Security Act of 1947, as amended; the CIA Act of 1949, as amended; and Executive Order 12333 require the Director of Central Intelligence to protect intelligence sources and methods from unauthorized disclosure. Executive Order 12356 requires protection of classified information from unauthorized disclosure. Employees and others who have been authorized access to information the public disclosure of which could harm the national security incur special obligations to protect such information. These obligations have been embodied in secrecy agreements.

See Exhibit "4" at ¶2(a). This language entirely pertains to classified information. Every sentence refers to authority to protect classified information. A casual read of the regulations supports the conclusion, particularly given that it is well-established that the CIA cannot prevent a former employee from publishing unclassified information, that the scope and exercising of authority relates solely to the PRB's determinations and issuances as to what is or is not "classified". Other examples include:

> It is the Agency's policy to adopt and implement all lawful measures to protect from unauthorized disclosure information which, if disclosed, could damage the national security, and to ensure that individuals given access to such information understand and comply with their obligations not to disclose it. Prior review by the Agency of material intended for

nonofficial publication[17] is a key component of efforts to prevent unauthorized disclosures. The purpose of prepublication review is twofold: to assist individuals in meeting their obligations and to ensure that information damaging to the national security is not disclosed inadvertently.

Id. at ¶2(b)(2).

Revelation of information damaging to the national security to any person not authorized to receive it is prohibited.

Id. at ¶2(c)(2).

The Chair will ensure that appropriate reviewers are assigned to review submitted material. If the reviewers unanimously decide that it is unobjectionable under the standards and criteria listed above, the Chair will notify the author through the appropriate channels.

Id. at ¶2(e)(2).

The Agency may deny permission for nonofficial publication of any information obtained during the course of employment or other services with the CIA that has not been placed in the public domain by the U.S. Government and if disclosure reasonably could be expected to harm the national security interests of the United States.

Id. at ¶2(i)(1).

Prepublication review allows the Agency to determine whether material contemplated for nonofficial publication contains information which, if disclosed, could harm national security, and gives the Agency an opportunity to prevent the public disclosure of such information.

Id. at ¶2(j)(1).

---

[17] The CIA defines "nonofficial publication" as a "work prepared by the author as a private individual, not as a government employee or contractor acting in an official capacity." See Exhibit "4" (1995 CIA PRB Regs) at 8. That the CIA flippantly asserts that information submitted by former employees constitutes "nonofficial publication" by itself should not be permitted to end the discussion. The issue is classified vs. unclassified, not "official" vs. "unofficial".

All of the language and buzz words reproduced above speak to the same thing: classified information. There is no other possible interpretation.

Additionally, Section (j) addresses what might occur were the individual to commit a "breach" of the CIA PRB regulations (and ergo his/her secrecy agreement). The possibility that criminal penalties are available is very clearly articulated. The *only* opportunity for the Government to impose criminal penalties upon a former employee with respect to their publications would be if they revealed classified information. Therefore, it further demonstrates that any information contained within a PRB approved manuscript <u>must</u> be considered unclassified and available for use.

This argument should come as no surprise as the D.C. Circuit recognized what Bernsten is advocating nearly twenty-five years ago in a prepublication review case when it openly, and indeed casually, noted that "the entire scheme of prepublication review is designed for the purpose of preventing publication of classified information." <u>McGehee</u>, 718 F.2d at 1142. This language says it all.

**B.    The PRB Chairman Possesses Actual Authority To Bind The CIA With His Pronouncements**

The CIA's regulations also make it explicitly clear that the PRB Chairman's statements are binding upon the Agency. Section 2(d)(7) states:

> Persons preparing material for nonofficial publication are invited at any stage to discuss their plans with the Chair, PRB, the PRB legal adviser, or an authorized representative specifically designated for this purpose. The views of the Agency may be given only by one of these individuals. Anyone acting in reliance on views expressed by any person other than such authorized Agency representative must assume responsibility for the consequences of that action.

The PRB Chair also possesses authority to render unilateral decisions under certain circumstances. Id. at ¶2(e)(3).

The PRB rendered decisions in Bernsten's case that are not reflected in the "public" record presented by the CIA. Among them is the fact that the PRB's review of the Jawbreaker manuscript resulted in only five total pages of redactions. The PRB explicitly shared this information with Bernsten. Bernsten Decl. at ¶12. But then Mr. Foggo became involved and suddenly there were seventy pages of redactions imposed upon Bernsten.

Discovery should be permitted to determine the extent to which the PRB, which possesses actual authority to render decisions, had cleared portions of the manuscript prior to the retaliation exacted upon Bernsten by Agency officials. Zaid Rule 56(f) Decl. at ¶21.

### C.  Information Approved For Release By The President, Vice President and CIA Director Are Considered Official And Documented Disclosures

In addition to books published, following approval by the CIA's PRB, by former CIA officials, Bernsten relied upon other public comments made by President George Bush, Vice President Dick Cheney and then CIA Director George Tenet. See Amended Complaint at ¶12 (filed December 5, 2005). Most notably among the sources for these official comments was Bush At War by Washington Post editor Bob Woodward and Ghost Wars by former Washington Post editor Steve Coll.[18]

---

[18] In fact, Gary Schroen, in his official CIA capacity, briefed Woodward and Coll and provided information which was redacted from Bernsten's manuscript. Bernsten Decl. at ¶12. This would be yet another avenue for discovery in order to determine the extent to which the CIA had authorized, but is now hiding from this Court, official disclosures that would permit Bernsten to publish information. Zaid Decl. at ¶22.

There can be no dispute that, as a matter of law, President Bush, Vice President Cheney and CIA Director George Tenet can declassify information by simply speaking it. Certainly a conscious decision to provide details to reporters constitutes an official disclosure that binds the CIA, and thereby permits Bernsten to utilize that information without the CIA's interference. See Executive Orders 12,958, 12,968 & 13,292.

Bernsten further addresses these books and the information contained therein in his "classified" submission. Exhibit "2".

**D. The CIA Is Estopped From Preventing Bernsten From Publishing Information Previously Approved By The CIA's PRB Or Released By The CIA Director Or President And Vice President Of The United States Given That These Officials Were Exercising Actual Authority As To What Constituted Unclassified Information**

The CIA is bound by the pronouncements of its officials within the PRB. The PRB has actual authority to issue decisions as to what information is or is not considered to be classified. Bernsten relied upon the assurances provided to other authors, most notably Gary Schroen who authored First In: An Insider's Account of How the CIA Spearheaded the War on Terror in Afghanistan, that the information contained in previously approved manuscripts contained unclassified information.

The doctrine of equitable estoppel is not, in itself, either a claim or a defense. It is "an equitable doctrine invoked to avoid injustice in particular cases." Heckler v. Community Health Services, 467 U.S. 51, 59 (1984). It is also a means of precluding a litigant from asserting an otherwise available claim or defense against a party who has detrimentally relied on that litigant's conduct. See generally 3 J. POMEROY, EQUITY JURISPRUDENCE § 804, at 189 (5th ed. 1941); Note, *Equitable Estoppel of the Government*, 79 COLUM. L. REV. 551, 552 (1979). Thus, a plaintiff seeking the benefit

23

of equitable estoppel must have some claim, sounding in equity or in law, that otherwise entitles it to prevail against the defendant.

The circumstances in which the government may be estopped from asserting a claim or a defense are not well-defined, but "it is well settled that the Government may not be estopped on the same terms as any other litigant." Heckler, 467 U.S. at 60 (footnote and citations omitted). Although the Supreme Court has apparently never expressly applied the doctrine against the government, and regards as open the question whether the government may be estopped under any circumstances, see id.; Lyng v. Payne, 476 U.S. 926 (1986); but see United States v. Lazy FC Ranch, 481 F.2d 985, 988 (9th Cir. 1973) (suggesting that Supreme Court applied "rationale" of equitable estoppel against the government in Moser v. United States, 341 U.S. 41 (1951)), the D.C. Circuit has said that "the fundamental principle of equitable estoppel applies to government agencies, as well as private parties." ATC Petroleum, Inc. v. Sanders, 860 F.2d 1104, 1111 (D.C.Cir.1988), quoting Investors Research Corp. v. SEC, 628 F.2d 168, 174 n.34 (D.C.Cir. 1980)(citing 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE §§ 17.01-17.04 (1958 & Supp.).

That being said, this Circuit has additionally noted that "despite the doctrine's flexibility in disputes between private parties, its application to the government must be rigid and sparing." ATC Petroleum, 860 F.2d at 1111; Rann v. Chao, 346 F.3d 192, 197 (D.C.Cir. 2003).

> The case for estoppel against the government must be compelling, and will certainly include proof of each of the traditional elements of the doctrine – "'false representation, a purpose to invite action by the party to whom the representation was made, ignorance of the true facts by that party, and reliance,' as well as . . . 'a showing of an injustice . . . and lack of undue damage to the public interest.'"

24

International Org. of Masters, Mates & Pilots v. Brown, 698 F.2d 536, 551 (D.C.Cir. 1983), quoting Hoeber v. District of Columbia Redevelopment Land Agency, 483 F. Supp. 1356, 1365-66 (D.D.C. 1980), aff'd mem., 672 F.2d 894 (D.C.Cir. 1981). Put another way, in order to succeed a plaintiff's claim of estoppel must demonstrate the essential elements of such a claim which requires a showing that: (1) there was a "definite" representation to the party claiming estoppel; (2) the party relied on its adversary's conduct to his detriment; and (3) the reliance on the representation was "reasonable." Graham v. SEC, 222 F.3d 994, 1007 (D.C.Cir. 2000), quoting Heckler, 467 U.S. at 59.

At least one judge in this District has made it clear that there are definitely circumstances in which an agency may be "bound by the representations of its employees to members of the public." Hertzberg v. Veneman, 273 F. Supp.2d 67 (D.D.C. 2003), citing Office of Personnel Management v. Richmond, 496 U.S. 414, 421, 423 (1990); ATC Petroleum, Inc., 860 F.2d at 1111; Grumman Ohio Corp. v. Dole, 776 F.2d 338, 347 (D.C. Cir. 1985). "With respect to the representations of agency employees, this standard has been interpreted to require that 'government agents engage -- by commission or omission -- in misrepresentation or concealment, or, at least, behave in ways that have or will cause an egregiously unfair result.'" Hertzberg, 273 F.Supp.2d at 83, quoting Grumman Ohio Corp., 776 F.2d at 347 (quoting General Accounting Office v. General Accounting Office Personnel Appeals Board, 698 F.2d 516, 526 n.57 (D.C. Cir. 1983)).

Bernsten relied upon official unclassified disclosures made by other former CIA officials, which were cleared by the CIA as unclassified, and the PRB, as well as those condoned by the highest level officials of the United States Government. Bernsten Decl.

25

at ¶12; see also Exhibit "4" at Sec. 2(d)(7). As a result, the CIA is estopped from preventing Bernsten from publishing that information upon which he relied upon as unclassified.

**IV.   THE COURT SHOULD NOT ACCEDE TO ANY REQUEST BY THE CIA TO RESOLVE THE CLASSIFICATION ISSUES *EX PARTE* AND INSTEAD PERMIT BERNSTEN' COUNSEL'S ACCESS TO AT LEAST THE WITHHELD PORTIONS OF THE MANUSCRIPT AND THE CIA'S DECLARATIONS IN ORDER TO FILE A SUPPLEMENTAL BRIEF**

Bernsten's counsel has not had access to either the underlying unredacted manuscript or Bernsten's substantive classification submission. The CIA has prevented Bernsten from communicating these documents to his counsel. Additionally, the CIA has refused to provide Bernsten or his counsel access to its alleged "classified" declarations that purport to support its classification decisions. [19]

As a factual matter, Bernsten's counsel has little to no idea what is at issue. Zaid Rule 56(f) Decl. at ¶3 Because of this fact counsel cannot provide either a substantive legal or factual analysis to this Court. The undersigned will not sanctify or give any impression that he concedes the legitimacy of this process by even attempting to address the assertions contained in the CIA's declarant (Ms. Dorn)'s declaration. All counsel can truly do is comment upon the CIA's own legal analysis of the classification process itself. In effect, Bernsten is on his own with respect to the most important aspects of this case which are very much factually driven.

Unless this Court believes it can find for Bernsten based on the present submissions it would, respectfully, constitute an unconstitutional infringement of his First Amendment rights to keep his counsel in the dark and require Bernsten to awkwardly fumble around without legal guidance and allow that to be the basis for a judicial decision. Therefore,

---

[19] This despite the fact that in another prepublication review decision, the D.C. Circuit noted that a background check on the undersigned counsel that was ordered by the District Court to determine whether counsel could be trusted with access to a classified manuscript "found that Mr. Zaid was trustworthy." Stillman v. CIA et al., 319 F.3d 546, 548 (D.C.Cir. 2003).

this Court should require the CIA to allow Bernsten's counsel, upon executing the appropriate secrecy agreement, access to the underlying unredacted manuscript, Bernsten's substantive submission and even possibly the CIA's "classified" declarations.

Courts across this country have recognized an individual's First Amendment interest in communicating with an attorney. See e.g. Denius v. Dunlap, 209 F.3d 944, 953-954 (7th Cir. 2000); Jacobs v. Schiffer, 204 F.3d 259 (D.C. Cir. 2000); DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990); Martin v. Lauer, 686 F.2d 24, 32-33 (D.C. Cir. 1982); Cipriani v. Lycoming County Housing Authority, 177 F. Supp. 2d 303, 323-324 (M.D.Pa. 2001).

These holdings are buttressed by long-standing Supreme Court precedent that recognizes a constitutional right of unfettered access to counsel. The First Amendment prohibits, for example, the government from interfering with collective action by individuals to seek legal advice and retain legal counsel. See United Transp. Union v. State Bar of Mich., 401 U.S. 576, 585-86 (1971); United Mine Workers of Am. v. Illinois State Bar Ass'n, 389 U.S. 217, 221-22 (1967); Brotherhood of R.R. Trainmen v. Virginia, 377 U.S. 1, 6 (1964); NAACP v. Button, 371 U.S. 415, 429-30 (1963). So too, logically, is an individual's ability to consult with counsel on legal matters constitutionally grounded. See Bates v. State Bar of Ariz., 433 U.S. 350, 376 n.32 (1977); see also Trainmen, 377 U.S. at 7 ("A State could not ... infringe in any way the right of individuals and the public to be fairly represented in lawsuits....").

Furthermore, the right to obtain legal advice applies equally to legal representation acquired for any purpose. See United Mine Workers, 389 U.S. at 223; Button, 371 U.S. at

419-20. That is, the First Amendment protects the right of an individual or group to consult with an attorney on *any* legal matter. Dunlap, 209 F.3d at 954.

The First Amendment interest in speaking freely to counsel is "interwoven" with the fundamental and constitutionally protected right of access to the courts. Martin, 686 F.2d at 32. Without the right of access to the courts, "all other legal rights would be illusory." Id., citing Adams v. Carlson, 488 F.2d 619, 630 (7th Cir. 1973). Meaningful access to the courts is contingent on the ability of an attorney to give sound legal advice, and "restrictions on speech between attorneys and their clients directly undermine the ability of attorneys to offer sound legal advice." Id. See also Porter v. Califano, 592 F.2d 770, 780 (5th Cir. 1979)("Meaningful access to the courts is a fundamental right of citizenship in this country."). Clients have an undeniable right to retain counsel to ascertain their legal rights. See Potashnick v. Port City Construction Co., 609 F.2d 1101, 1117-19 (5th Cir.), cert. denied, 449 U.S. 820 (1980).

## A. The Right To Counsel Under The First Amendment Includes Access To Classified Information

Not long ago the issue of counsel access to an allegedly classified manuscript was a contested matter in this Circuit for the first time in 20 years. Stillman, 319 F.3d 546.[20] This decision, and that of the underlying District Court opinion, speak for themselves and serve as the guide to this Court as to the appropriate process in addressing the issue of counsel access.

At the District Court level, the Honorable Emmet G. Sullivan issued a detailed 106 page opinion as to why he believed the First Amendment required the defendants, which included the CIA, to provide a cleared counsel for Stillman with access to the allegedly

---

[20] Bernsten' counsel also served as counsel for Stillman.

classified portions of the manuscript at issue in that case. <u>Stillman</u>, *passim*. Ultimately Judge Sullivan concluded that he "will not allow the government to cloak its violations of plaintiff's First Amendment rights in a blanket of national security." 209 F.Supp.2d at 231.[21]

The D.C. Circuit reversed. It noted that the District Court had "abused its discretion by unnecessarily deciding that a plaintiff has a first amendment right for his attorney to receive access to classified information where such access is needed to assist the court in resolving the plaintiff's challenge to the classification." <u>Stillman</u>, 319 F.3d at 548. The "abuse" arose, according to the Circuit panel, because Judge Sullivan "did not wait to evaluate the pleadings and affidavits to be submitted by the Government in defense of its classification decision." Id. at 548-49.

Not surprisingly, the CIA has submitted declarations to this Court to be viewed *in camera* and *ex parte*. Indeed, Bernsten was also forced, without the assistance of counsel, to submit certain raw materials *in camera* and *ex parte* in order for this Court to consider substantive arguments. After reviewing the defendants' submissions, this Court should respectfully "consider whether its need for [Bernsten' counsel's] assistance outweighs the concomitant intrusion upon the Government's interest in national security" and rule it does thereby ordering the CIA to permit counsel's access to the documents.

---

[21] <u>See also</u> Declaration of R. James Woolsey (dated March 13, 2002)("In order to permit a lawful challenge to an agency's classification decisions, an author's attorney, if holding the appropriate security access, must be provided unfettered access to the writing in question (as well as access to his client) and any agency declarations submitted in support of the classification decisions."), attached at Exhibit "5".

The publicly available documents fail to contain any specific references to the withheld information, at least nothing that enables a proper response. Neither Bernsten nor his counsel has been permitted access to the defendants' classified declarations. While Bernsten is certainly aware of the portions of his manuscript the CIA still considers classified, he cannot share that information with his counsel so that articulated legal and factual arguments can be submitted to this Court. Thus, we are once again where the <u>Stillman</u> case left off.

> Therefore, we remand this case to the district court to determine first whether it can resolve the classification ex parte. The district court should first inspect the manuscript and consider any pleadings and declarations filed by the Government, as well as any materials filed by [Bernsten], who describes himself an "expert in classification and declassification." The court should then determine whether it can, consistent with the protection of [Bernsten's] first amendment rights to speak and to publish, and with the appropriate degree of deference owed to the Executive Branch concerning classification decisions, resolve the classification issue without the assistance of defense counsel. If not, then the court should consider whether its need for such assistance outweighs the concomitant intrusion upon the Government's interest in national security. Only then should it decide whether to enter an order granting Mr. Zaid access to the manuscript and, if similarly necessary, to the Government's classified pleadings and affidavits. If the court enters such an order, then the Government may appeal and we will have to resolve the constitutional question.

<u>Stillman</u>, 319 F.3d at 548-49. The Constitutional question needs to be formally decided, and this is the perfect opportunity to address it by having this Court enter an Order similar to that issued by Judge Sullivan in <u>Stillman</u>.

## <u>CONCLUSION</u>

As John Hollister Hedley, the CIA's former PRB Chairman, once wrote:

> In prepublication reviews, we have to show we know the difference between what truly is sensitive and what is not. We do not earn respect just by saying "no," but neither do we earn respect just by giving away information. Our unique role is to judge whether a denial of disclosure

would stand up in court--whether we could make a compelling case in a
court of law that specific damage to US national security would result. We
can have it both ways: we can protect that which needs to be protected,
while being forthcoming about intelligence activities in a way that can
help educate, inform, enlighten, and even entertain the general public.
That is the cost of doing business in this free society we help to preserve;
trying to have it both ways is a challenge that comes with the territory.

*https://www.cia.gov/csi/studies/spring98/Secret.html.*

The CIA has failed to live up to this standard. For the foregoing reasons, the CIA's

Motion should be denied.

Date:   October 2, 2006

Respectfully submitted,

/s/

_____

Mark S. Zaid, Esq.
DC Bar #440532
Mark S. Zaid, P.C.
1920 N Street, N.W.
Suite 300
Washington, D.C. 20036
(202) 454-2809
ZaidMS@aol.com

Attorney for Plaintiff