UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____
                                   )
DANNY B. STILLMAN,                 )
                                   )
         Plaintiff,                )
                                   )
     v.                            )    Civ. No. 01-1342 (EGS)
                                   )
CENTRAL INTELLIGENCE AGENCY,       )
*et al.,*                          )
                                   )
         Defendants.               )
_____)

## MEMORANDUM OPINION

Plaintiff Danny Stillman, a former employee of Los Alamos National Laboratory ("LANL"), wrote a book about China's nuclear weapons program. As a condition of his employment at LANL and as a condition of various affiliations Stillman maintained with the United States government after his retirement from LANL, Stillman signed several nondisclosure agreements that required him to submit materials to the government for prepublication review to determine whether such materials contain classified information. Stillman now challenges the classification determinations made by the Central Intelligence Agency ("CIA"), Defense Intelligence Agency ("DIA"), and Department of Defense ("DoD") regarding his manuscript. Stillman claims that these agencies have imposed unconstitutional prior restraints on the publication of his manuscript in violation of the First Amendment. In his complaint, Stillman also asserted a claim under the

Administrative Procedures Act ("APA") challenging the delay in reviewing his manuscript.

Pending before the Court is defendants' motion to dismiss Stillman's APA claim and defendants' motion for summary judgment as to Stillman's First Amendment Claims.  After careful consideration of the motions, responses and replies thereto, the applicable law, *in camera* submissions, and the entire record, defendants' motion to dismiss and motion for summary judgment are **granted** and judgment shall be entered in favor of defendants and against the plaintiff.

I.  **BACKGROUND**

Stillman served as an employee at LANL[1] from 1965 to 1993. Declaration of Anna Parks ("Parks Decl.") ¶ 4, Ex. A to Defs.' Mot. for Summ. J.  For many of those years, he managed intelligence programs at LANL.  *Id*.; Declaration of Danny B. Stillman ("Stillman Decl.") ¶ 2, Ex. A to Pl.'s Opp'n.  After his official retirement in October 1993, Stillman worked from February 1994 to September 1995 as a LANL Laboratory Associate, which is a casual appointment.  Parks Decl. ¶ 4.  Stillman received compensation for this position.  *Id*.  After his retirement, Stillman also served as a guest scientist affiliated

---

[1] The University of California manages and operates LANL under a contract with the Department of Energy ("DOE").  Parks Decl. ¶ 1.  LANL is charged with ensuring the safety and reliability of the United States' nuclear stockpile and with reducing threats to U.S. security.  *Id*.

with the Nonproliferation and International Security Division of LANL.  *Id*. ¶ 5.  He signed six different guest scientist agreements between 1995 and 2001.  *Id*.; Second Declaration of Danny B. Stillman ("Second Stillman Decl.") ¶ 2, Ex. B to Pl.'s Opp'n.  According to Stillman, he did not receive compensation from LANL for his work as a guest scientist.  Second Stillman Decl. ¶ 3.  Finally, Stillman also served as a contract employee with LANL and its subcontractor Galaxy Computer Services, Inc. at various times since 1995.  Parks Decl. ¶ 6.

Throughout his employment at and affiliation with LANL, Stillman was granted security clearances.  *See* Declaration of Sharon E. Klafke ("Klafke Decl.") ¶ 3.  As a condition of obtaining and maintaining these security clearances, Stillman signed nondisclosure agreements by which he agreed not to divulge any classified information to which he had access and to submit any materials which may contain classified material to the government for review prior to publication.  *See* Secrecy Agreements and Sensitive Compartmented Information Nondisclosure Agreements signed by Stillman, Ex. C to Defs.' Mot. for Summ J.

During his employment and affiliation with LANL and while maintaining security clearances, Stillman made nine separate trips to China between 1990 and 1999.  Stillman Decl. ¶ 5; Fifth Declaration of Danny B. Stillman ("Fifth Stillman Decl.") ¶ 3.  In China, Stillman visited nuclear weapons facilities and test

3

sites and engaged in extensive discussions with Chinese scientists, government officials, and nuclear weapons designers. Stillman Decl. ¶ 5.  Stillman's first three trips to China occurred when he was still a full-time employee at LANL.  *Id*. ¶ 6.  The fourth through ninth trips occurred after Stillman's retirement.  Fifth Stillman Decl. ¶ 3.  However, Stillman admits that an agency of the United States government voluntarily reimbursed him for his airfare to and from China for the fourth through sixth trips.  Stillman Decl. ¶ 7.  Stillman also admits voluntarily meeting with and providing a trip report to a representative of a United States government agency after each of his nine trips to China.  *Id*. ¶ 9.

   Based on his experiences in China, Stillman wrote a book entitled *Inside China's Nuclear Weapons Program*.  *Id*. ¶ 10.  He submitted his manuscript to DIA and DOE for prepublication review in January 2000.  *Id*. ¶ 12.  In October 2000, Stillman was informed that the DOE, DoD, and CIA did not want any part of his manuscript published.  In June 2001, Stillman filed a lawsuit against DOE, DoD, DIA, and CIA, challenging their classification decision.  *Id*. ¶ 18.  Soon after Stillman filed the lawsuit, the government released the majority of the manuscript for publication.  *Id*.  However, the government claims that twenty-three passages still remain classified and, therefore, should not be published.  Defs.' Mot. for Summ. J. at 8.

## II.  DISCUSSION

Defendants move to dismiss Stillman's APA claim and move for summary judgment on his First Amendment claims.  For the reasons discussed below, the Court grants defendants' motion to dismiss and grants defendants' motion for summary judgment.

### A.  Standard of Review

A motion to dismiss pursuant to Federal Rule of Civil Procedure 12(b)(1) presents a threshold challenge to the Court's jurisdiction.  *Haase v. Sessions*, 835 F.2d 902, 906 (D.C. Cir. 1987).  The Court may resolve a Rule 12(b)(1) motion based solely on the complaint, or if necessary, may look beyond the allegations of the complaint to affidavits and other extrinsic information to determine the existence of jurisdiction.  *See id.* at 908; *Herbert v. Nat'l Acad. of Sci.*, 974 F.2d 192, 197 (D.C. Cir. 1992).  The Court must accept as true all the factual allegations contained in the complaint, but the plaintiff bears the burden of proving jurisdiction by a preponderance of the evidence.  *Bennett v. Ridge*, 321 F. Supp. 2d 49, 51-52 (D.D.C. 2004).

Summary judgment should be granted only if the moving party has shown that there are no genuine issues of material fact and that the moving party is entitled to judgment as a matter of law.  *See* Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Waterhouse v. Dist. of Columbia*, 298 F.3d 989, 991

(D.C. Cir. 2002). In determining whether a genuine issue of material fact exists, the Court must view all facts in the light most favorable to the nonmoving party. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). The nonmoving party's opposition, however, must consist of more than mere unsupported allegations or denials and must be supported by affidavits or other competent evidence setting forth specific facts showing that there is a genuine issue for trial. Fed. R. Civ. P. 56(e); *see* Celotex Corp., 477 U.S. at 324.

**B.   APA Claim**

In his complaint, Stillman alleged a violation of the APA based on defendants' unreasonable delay in "issuing a final and timely decision regarding the proper classification level of Stillman's manuscript." Compl. ¶ 54. In his prayer for relief, Stillman seeks an order requiring the defendants "to immediately issue written decisions regarding their respective positions on the publication of Stillman's manuscript." *Id*. at 18. The defendant agencies have already issued their final classification decisions. *See* Declaration of H.J. McIntyre ("McIntyre Decl.") ¶ 18.

Under Article III of the Constitution, federal courts are courts of limited jurisdiction that can only decide "'actual, ongoing controversies.'" *Clarke v. United States*, 915 F.2d 699, 700-01 (D.C. Cir. 1990) (en banc) (quoting *Honig v. Doe*, 484 U.S.

6

305, 317 (1988)). Even if an action poses a live controversy when filed, the mootness doctrine requires "a federal court to refrain from deciding it if 'events have so transpired that the decision will neither presently affect the parties' rights nor have a more-than-speculative chance of affecting them in the future.'" *Clarke*, 915 F.2d at 701 (quoting *Transwestern Pipeline Co. v. FERC*, 897 F.2d 570, 575 (D.C. Cir. 1990)).

In this case, Stillman's APA claim is moot because there is no further relief that this Court can provide as to that claim. Stillman has already received the final classification decision that he sought from the defendant agencies. Accordingly, this Court lacks subject matter jurisdiction over Stillman's APA claim and dismisses it as moot under Rule 12(b)(1) of the Federal Rules of Civil Procedure.

  **C. First Amendment Claims**

In his complaint, Stillman asserts two First Amendment claims. First, Stillman alleges that the defendant agencies lack lawful authority to prohibit him from publishing information he obtained as a private citizen and not as a result of his employment at LANL or his signing of a secrecy agreement. Second, Stillman challenges the classification decision itself, claiming that the defendants have failed to show that his right to publish is outweighed by a substantial government interest. Both of these claims fail.

### 1. Scope of government's authority

Stillman argues that the government cannot as a matter of law prevent publication of any information obtained by Stillman outside the scope of his employment and with no direct nexus to any of his secrecy agreements, regardless of whether the information is classified. Stillman tries to draw a distinction between information obtained during his first three trips to China while still employed for LANL and information obtained during his fourth through ninth trips to China, which occurred after his retirement. Stillman admits that he retained security clearances and was subject to secrecy agreements before and after his retirement from LANL and during each trip to China. Stillman also does not dispute that he was either a contract employee of or an affiliate under contract with the United States government during his fifth through ninth trips to China, even though he claims that his trips had nothing to do with his affiliation with the government.[2]  He argues instead that the information he obtained on the fourth through ninth trips was not obtained

---

[2] It is not clear whether Stillman's fourth trip to China in November 1993 occurred while he was under contract with the government. The trip appears to have occurred immediately after his official retirement from LANL. However, Stillman does admit that a United States government agency paid for the costs of his airfare to and from China for his fourth, fifth and sixth trips. *See* Stillman Decl. ¶ 7. Moreover, from the Court's review of the classified passages in Stillman's manuscript and government declarations explaining the nature of classification, the Court is not aware of any allegedly classified passages that are directly and exclusively connected with Stillmans's fourth trip.

within the course of employment nor does it fall within the scope of any secrecy agreement he signed.[3]

The Court is not willing to read Stillman's secrecy agreements so narrowly.[4] First, the agreements that Stillman signed while still employed at LANL contain incredibly broad language requiring Stillman to protect classified information both during and after employment with the United States government. *See*, *e.g.*, Secrecy Agreement (Sept. 8, 1981), Ex. C to Def.'s Mot. to Dismiss and Mot for Summ. J. ("Def.'s Mot.") ("I agree that I will never divulge, publish, or reveal either by word, conduct, or any other means [classified] information or intelligence unless specifically authorized to do so by an authorized representative of the U.S. government."); *id*. ("I understand that this agreement will remain binding upon me even

---

[3] Plaintiff does not dispute that any classified information he obtained before his retirement from LANL in 1993 was obtained within the course of his employment and subject to nondisclosure agreements. Some of the information in the twenty-three passages of Stillman's manuscript that the government deems classified was obtained by Stillman prior to 1993. Because, as discussed in more detail below, the Court agrees that all twenty-three passages are properly classified, this information cannot be disclosed.

[4] The Court recognizes, however, that any secrecy agreement which purports to prevent disclosure of unclassified information would contravene First Amendment rights. *See United States v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir. 1972) ("We would decline enforcement of the secrecy oath signed when he left the employment of the CIA to the extent that it purports to prevent disclosure of unclassified information, for, to that extent, the oath would be in contravention of his First Amendment rights.").

after the termination of my relationship with the U.S. Government."). Second, Stillman continued to sign secrecy agreements even after his retirement in which he again agreed not to reveal classified information. *See*, *e.g.*, Security Termination Agreement (Feb. 15, 1995), Ex. C to Def.'s Mot. ("I shall not reveal to any person . . . classified information of which I have gained knowledge except as authorized by law, regulations of the Department of Energy, or in writing by officials of the Department of Energy empowered to grant permission for such disclosure."); Security Acknowledgment (Dec. 8, 1995), Ex. C to Def.'s Mot. ("I shall not reveal to any person . . . classified information of which I gain knowledge as a result of my employment, assignment, or duties, except in accordance with official instructions and regulations of DOE or except as may be hereafter authorized by officials empowered to grant such authority.").

In addition to secrecy agreements, Stillman also signed several Sensitive Compartmented Information ("SCI") Nondisclosure Agreements both during and after his employment. As part of these agreements, he consented to prepublication review of any works that may contain classified information. He also acknowledged that "all information to which [he] may gain access by signing [the] Agreement is now and will remain the property of the United States Government unless and until otherwise

10

determined by an appropriate official or final ruling of a court of law." SCI Nondisclosure Agreement (May 20, 1996). Ex. C to Def.'s Mot.[5]

Stillman does not challenge the prepublication review requirement to which he agreed by virtue of his security clearances. The Supreme Court has already decided that a prepublication review requirement imposed on a government employee with access to classified information is not an unconstitutional prior restraint. *See Snepp v. United States*, 444 U.S. 507, 510 (1980). In upholding the prepublication review requirement, the Supreme Court recognized that "[t]he Government has a compelling interest in protecting both the secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." *Id*.

Courts have uniformly held that current and former government employees have no First Amendment right to publish properly classified information to which they gain access by virtue of their employment. *See McGehee v. Casey*, 718 F.2d 1137, 1143 (D.C. Cir. 1983) ("[T]he CIA censorship of 'secret' information contained in former agents' writings and obtained by former agents during the course of CIA employment does not

---

[5] Other SCI Nondisclosure Agreements signed by Stillman throughout his employment and affiliation with the government contain nearly identical provisions.

violate the first amendment."); *United States v. Marchetti*, 466 F.2d 1309, 1317 (4th Cir. 1972) ("Marchetti retains the right to speak and write about the CIA and its operations, and to criticize it as any other citizen may, but he may not disclose classified information obtained by him during the course of his employment which is not already in the public domain."); *see also Snepp*, 444 U.S. at 510 n.3 ("[E]ven in the absence of an express [secrecy] agreement -- the CIA could have acted to protect substantial government interests by imposing reasonable restrictions on employee activities that in other contexts might be protected by the First Amendment."). The Court finds that the same logic that prevents current and former employees from revealing classified information obtained by them during the course of their employment prevents individuals who maintain a security clearance and contract with the government as either an employee or affiliate from disclosing classified information obtained while under such a contract and bound by a secrecy agreement.[6] To hold otherwise would jeopardize the secrecy of classified information that the government has a legitimate and compelling interest in protecting. *See Dep't of the Navy v.*

---

[6] The Court is also persuaded by the government's *in camera* submissions that but for Stillman's high-level security clearances with the government and its contractors and the secrecy agreements he signed, Stillman would not have had access to or obtained the classified information that he is now attempting to disclose in his manuscript.

*Egan*, 484 U.S. 518, 527 (1988) ("This Court has recognized the Government's 'compelling interest' in withholding national security information from unauthorized persons in the course of executive business.").

### 2. Classification decision

Finding that Stillman does not have the right to publish classified information to which he gained access during his trips to China, the Court now turns to the question of whether the twenty-three passages in Stillman's manuscript have been properly classified. "If the Government classified the information properly, then Stillman simply has no first amendment right to publish it." *Stillman v. CIA*, 319 F.3d 546, 548 (D.C. Cir. 2003). In making the determination whether the information was properly classified, the Court has reviewed Stillman's manuscript, detailed *ex parte*, *in camera* affidavits from various government officials, and public source documentation the government claims that Stillman submitted in order to try to demonstrate that the passages the government is refusing to clear for publication are not classified. *See McGehee*, 718 F.2d at 1149 ("We anticipate that *in camera* review of affidavits, followed if necessary by further judicial inquiry, will be the norm."); *Stillman*, 319 F.3d at 548 (same).

The Court recognizes that the government is entitled to substantial deference in its classification decisions. *See,*

*e.g., Salisbury v. United States*, 690 F.2d 966, 973 (D.C. Cir. 1982) (finding that a classification decision "is a matter as to which the agency has a large measure of discretion"); *McGehee*, 718 F.2d at 1149 ("[J]udicial review of CIA classification decisions, by reasonable necessity, cannot second-guess CIA judgment on matters in which the judiciary lacks expertise."). The deference given to the government stems from the recognition that the government's ability to maintain secrecy is essential and the recognition that the government is in the best position to judge the harm that would result from disclosure. *See United States v. Curtiss-Wright Export Corp.*, 299 U.S. 304, 320 (1936) ("Secrecy in respect of information gathered by [the President's agents] may be highly necessary, and the premature disclosure of it productive of harmful results."); *Egan*, 484 U.S. at 529 (finding that judgments as to the harm that would result from disclosure of certain information "must be made by those with the necessary expertise in protecting classified information"). The Court is also mindful that due to the "mosaic-like nature of intelligence gathering, . . . what may seem trivial to the uninformed[] may appear of great moment to one who has a broad view of the scene and may put the questioned information in context." *McGehee*, 718 F.2d at 1148-49 (internal quotation marks and citations omitted).

Despite this high level of deference, the Court will not just rubber stamp the government's classification decision. To uphold the government's classification decision, the Court must satisfy itself "from the record, *in camera* or otherwise, that the [government agencies] in fact had good reason to classify, and therefore censor, the materials at issue." *Id*. at 1148. The Court will not rely on any "presumption of regularity" if rational explanations are missing. *Id*. at 1148-49.

After reviewing *in camera* detailed affidavits from officials at several government agencies who seek to classify this information, and after reviewing the manuscript and public source documents provided to the government by Stillman, the Court concludes that the government has properly classified the twenty-three disputed passages in Stillman's manuscript. The affidavits provided by officials from the Central Intelligence Agency, Department of Defense and Defense Intelligence Agency give the Court reason to believe that the censored portions of Stillman's manuscript could reasonably be expected to cause serious damage to national security, create a serious risk to intelligence sources and methods, and/or cause significant strategic and diplomatic setbacks to the United States. The Court also is convinced that the disputed passages contain information that is not in the public domain. Accordingly, the Court upholds the

classification decisions of the federal government and denies Stillman's First Amendment claims.

### III. CONCLUSION

For the foregoing reasons, the Court **grants** the government's Motion to Dismiss and Motion for Summary Judgment and directs the Clerk to enter judgment against the plaintiff and in favor of the defendants. An appropriate Order accompanies this Memorandum Opinion.

**Signed:    Emmet G. Sullivan**
**United States District Judge**
**March 30, 2007**