# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                        )
GARY BERNSTEN,                          )
                                        )
                    Plaintiff,          )
                                        )
             v.                         )        Civil Action No. 1:05cv01482-CKK
                                        )
THE CENTRAL                             )
INTELLIGENCE AGENCY,                    )
                                        )
                    Defendant.          )
_____)


**EXHIBIT 1 TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

**UNCLASSIFIED DECLARATION OF MARILYN A. DORN**

UNITED STATES DISTRICT COURT
DISTRICT OF COLUMBIA

GARY BERNTSEN,                    )
                                  )
            Plaintiff,            )
                                  )  Civ. No. 05-1482(CKK)
      v.                          )
                                  )
CENTRAL INTELLIGENCE AGENCY,      )
                                  )
            Defendant.            )
_____ )

**UNCLASSIFIED DECLARATION**
**OF MARILYN A. DORN, INFORMATION REVIEW OFFICER,**
**CENTRAL INTELLIGENCE AGENCY**

**INTRODUCTION**

I, MARILYN DORN, hereby declare and say:

1.    I am the Information Review Officer (IRO) for the
National Clandestine Service (NCS) of the Central
Intelligence Agency (CIA).  After serving 18 months as
Associate IRO, I was appointed to my current position on
1 August 2003.  I have held operational and executive
positions with the CIA since 1980.

2.    The NCS is the organization within the CIA
responsible for the CIA's worldwide clandestine
intelligence activities involving human sources and assets.
The NCS is responsible for conducting the CIA's foreign
intelligence and counterintelligence activities; conducting
special activities, including covert action authorized by
the President; conducting liaison with foreign intelligence

and security services; serving as the repository for
foreign counterintelligence information; supporting
clandestine technical collection; and coordinating CIA
support to the Department of Defense, particularly during
wartime operations.

3.   As NCS/IRO, I am responsible for the review of
documents containing information originated by the NCS or
otherwise implicating NCS interests. As part of my
official duties, I ensure that the release of NCS
information is proper and does not jeopardize CIA
interests, personnel or facilities, or intelligence
activities, sources or methods.

4.   As a senior CIA official and under a written
delegation of authority pursuant to Executive Order 12958,
§ 1.3(c), as amended,[1] I hold original classification
authority at the TOP SECRET level. Therefore, I am
authorized to conduct classification reviews and to make
original classification and declassification decisions.

5.   Through the exercise of my official duties, I have
become familiar with the above-captioned litigation and the
manuscript Plaintiff submitted to the CIA for

---

[1]   Executive Order 12958 was amended by Executive Order 13292.  See
Exec. Order No. 13292, 68 Fed. Reg. 15315 (Mar. 25, 2003).  All
citations to Exec. Order No. 12958 are to the Order as amended by Exec.
Order No. 13292.  See Exec. Order No. 12,958, 3 C.F.R. 333 (1995),
reprinted as amended in 50 U.S.C.A. § 435 note at 165 (Supp. 2005).

prepublication review, pursuant to his secrecy agreement.
I make the following statements based upon my personal
knowledge, and information made available to me in my
official capacity.

6.    I have carefully reviewed Plaintiff's manuscript
to determine what information could be approved for
publication.  I have also personally reviewed the portions
of the manuscript that the CIA has declined to approve for
publication.  In sum, after carefully reviewing the version
of the manuscript Plaintiff submitted between 31 August
2005 and 2 September 2005, I have determined that the
manuscript may only be released with redactions, because it
contains information that is currently and properly
classified pursuant to Executive Order 12958, as amended,
as its disclosure reasonably could be expected to cause
serious damage to the national security.  I identified
specific information in Plaintiff's manuscript as
classified based on the Executive Order criteria for
classification, not for the CIA to obtain a litigation
advantage in any proceeding, or to avoid embarrassment to
any person, organization, or agency.  Moreover, I have
determined that CIA has approved for publication all
unclassified CIA information that could reasonably be
segregated from the classified information in Plaintiff's

3

manuscript, and that the release of any additional information from the manuscript reasonably could be expected to cause serious damage to the national security.

7.   I am submitting this unclassified declaration to explain generally the rationale for the CIA's determinations that Plaintiff's manuscript contains classified information, and to describe the harm to the national security interests of the United States that could reasonably be expected to result from the disclosure of the classified information at issue in the manuscript.  This declaration gives as much explanation for the classification of the information as is possible in a public document.  A more comprehensive, classified declaration has been filed for this Court's in camera, ex parte review.  As outlined in more detail in Part I below, neither Plaintiff nor his counsel is authorized to have access to the classified declaration provided to the Court. In addition, the classified declaration must be stored in accordance with government-approved security procedures when not in the personal custody of an authorized holder.

8.   As set forth more fully in Part IV below, Plaintiff's manuscript reveals intelligence sources, methods and activities, foreign government information, and information impacting U.S. foreign relations.  I have

4

determined that public disclosure of any additional
information reasonably could be expected to cause serious
damage to national security by depriving the United States
of critical intelligence information, endangering the
safety and lives of those individuals who work for and with
the CIA, and undermining the CIA's ability to collect
intelligence information and to conduct intelligence
operations in support of the national security of the
United States.

9.    Accordingly, the information that the CIA has
required Plaintiff to delete from his manuscript is
classified at the SECRET level, and contains information
from a special access program,[2] and Plaintiff may not,
consistent with the terms of his secrecy agreement, publish
his manuscript with this information.

10.    This unclassified Declaration is divided into
five parts.    Part I describes the limits on who may be
provided access to the classified information involved in
this case.    Part II describes Plaintiff's secrecy
agreement, the prepublication review process, and the

---

[2] Plaintiff's manuscript contains information that is protected in a
"Special Access Program."    In particular, the manuscript contains
information protected through the special access program known as the
"HUMINT Control System" or "HCS."    HCS protects information that would
tend to reveal the identity of a clandestine human intelligence source,
or of an individual assisting the CIA in a human intelligence activity.

5

administrative history of this litigation. Part III sets
out the relevant statutory and Executive Order authorities
that permit the CIA to protect from disclosure the
information contained in Plaintiff's manuscript. Part IV
describes the categories of classified information revealed
in the manuscript and outlines the damage to national
security that reasonably could be expected to result if
this information is publicly disclosed. Part V of this
declaration explains to the Court that the classified
information contained in Plaintiff's manuscript has not
been officially disclosed by the CIA and, consequently, is
not declassified.

## I.   Access to Classified Information

11.    As mentioned above, both Plaintiff's manuscript
and the classified declaration provided to the Court for in
camera, ex parte review contain information that is
properly classified pursuant to the requirements of
Executive Order 12958, as amended, and applicable CIA
regulations. Neither Plaintiff nor his counsel is
authorized to have access to the classified declaration
provided to the Court for in camera, ex parte review.  The
classified declaration contains detailed, classified
explanations of the CIA's decision to redact certain
information from Plaintiff's manuscript. These

6

explanations are, in some cases, even more sensitive than the classified material in the manuscript itself, and, in all cases, the explanations provide information that Plaintiff and Plaintiff's counsel are not authorized to receive.

12. Access to classified information is governed by Section 4.1 of Executive Order 12958, as amended, which sets forth three requirements for access to classified information, one of which is that an individual have a need-to-know the classified information. Need-to-know is defined in Section 6.1(z) of Executive Order 12958, as amended, as a "determination made by an authorized holder of classified information in order to perform or assist in a lawful and authorized governmental function." A need-to-know assessment is not based on whether the information at issue is relevant to this case, an issue that is within in the province of the courts. Instead, it is the CIA's responsibility to determine need-to-know in order to fulfill the Director of the Central Intelligence Agency's Executive Order duties and to protect the CIA's intelligence sources and methods.

13. The CIA has determined that providing Plaintiff and his counsel access to the classified information in this declaration is not necessary "to perform or assist in

7

a lawful or authorized governmental function." Although
Plaintiff previously had access to certain classified
information in the course of his CIA employment, he is no
longer a CIA employee and no longer has official access to
classified information. An employee, former employee, or
attorney does not create the need-to-know classified
information merely by filing a lawsuit. Nor does
Plaintiff's counsel's limited security approval for access
to certain classified information regarding his client's
former covert relationship with the CIA, or the fact that
his client formerly had access to classified information in
the course of his CIA employment, give him a need-to-know
the information in the classified declaration or in
Plaintiff's classified manuscript. Neither Plaintiff's
prior access to the classified information in his
manuscript, nor Plaintiff's counsel's prior limited access
to certain other classified information, entitles them to
access to a declaration that provides a detailed
explanation of other, additional classified facts and
circumstances that underlie and justify the CIA's
classification decision. Because neither Plaintiff nor his
counsel has a need-to-know the classified information in
the declaration, they may not have access to the classified
declaration.

8

## II.  BACKGROUND

### A.  Berntsen's Secrecy Agreement

14.  As a condition of employment in a position of special confidence and trust relating to the national security, and in consideration of being given access to information that is classified in accordance with Executive Order 12958, as amended, and other information which, if disclosed in an unauthorized manner, would jeopardize foreign intelligence activities of the United States Government, all CIA employees are required to sign a "Secrecy Agreement" that obligates them to protect this information from unauthorized disclosure.  The agreement applies both during employment with the CIA and at all times thereafter.  Plaintiff Gary Berntsen signed such a secrecy agreement with the CIA at the time of his employment in 1982.  This agreement is Exhibit 1 to this unclassified declaration.

15.  Specifically, Plaintiff agreed never to disclose information or material "obtained . . . in the course of . . . employment or other service with the Central Intelligence Agency" that is classified, that he knows, or has reason to know, should be classified, or that identifies any person or organization who has or has had a

relationship with the United States government that the government has taken affirmative measures to conceal.

16.   In furtherance of the secrecy agreement's nondisclosure provision, the agreement also contains a requirement that all current and former employees submit material that contains any mention of intelligence data or activities to the CIA for review before public disclosure of the material.  Current and former employees must also receive written permission from the CIA before taking any steps toward public disclosure.  The section provides:

> As a further condition of the special confidence and trust reposed in me by the [CIA], I hereby agree to submit for review by the [CIA] all information or materials . . . which contain any mention of intelligence data or activities, or contain data which may be based upon information classified pursuant to Executive Order, which I contemplate disclosing publicly or which I have actually prepared for public disclosure, either during my employment or other service with the [CIA] or at any time thereafter prior to discussing it with or showing it to anyone who is not authorized to have access to it.  I further agree that I will not take any steps toward public disclosure until I have received written permission to do so from the [CIA].

This prepublication review requirement extends, but is not limited, to books, academic journal articles, magazine articles, newspaper columns, letters to the editor, book reviews, screenplays, speeches, interviews, testimony, court filings, and other written or oral disclosures.

10

Prior to approval for publication, such materials and information shall not be disclosed to any other person.

17. Plaintiff's secrecy agreement notes that the purpose of this requirement is to allow the CIA to determine whether the materials intended for public disclosure contain information that the employee is required to protect. In signing the secrecy agreement, Plaintiff also indicated that he understood that the CIA would respond to his requests for prepublication review within "a reasonable time."

## B. The Prepublication Review Process

18. The CIA's Publications Review Board (PRB) is the CIA body charged with reviewing, coordinating, and formally approving in writing all proposed intelligence-related materials intended for publication or public dissemination. It is the CIA's policy to adopt and implement all lawful measures to protect from unauthorized disclosure information that, if disclosed, could damage the national security, and to ensure that individuals given access to such information understand and comply with their obligation not to disclose it. Prior review by the CIA of

11

material intended for nonofficial publication[3] is a key component of efforts to prevent unauthorized disclosures.

19. The purpose of prepublication review by the PRB is twofold: to assist individuals in meeting their secrecy agreement obligations and to ensure that information damaging to the national security is not disclosed. In conducting prepublication review of manuscripts by former CIA employees, the PRB identifies information for deletion or revision only to the extent necessary to protect information the disclosure of which could reasonably be expected to harm national security. The PRB -- which reviews hundreds of submissions each year -- does not redact material simply because it is critical, uncomplimentary, or incorrect. For current employees and contractors, before allowing publication, the CIA also considers whether publication of the information could impair the author's performance of his or her job duties, interfere with the authorized functions of the CIA, or have an adverse effect on the foreign relations of the United States. Even when an author demonstrates that classified information is publicly available or was written by a co-author, the PRB must make a case-by-case determination of

---

[3] Nonofficial publication is a work prepared by the author acting as a private individual, not as a government employee or contractor in an official capacity.

12

the classification of the information based on a variety of factors, including the status and background of the author. If the author's position (or former position) is such that his or her publication of the information would tend to confirm the accuracy of the material, the CIA retains the right to disallow an author from publishing open-source information or information contributed by a co-author. Furthermore, to ensure that all information damaging to the national security is protected, all current and former CIA employees and contractors are required to obtain written approval from the PRB prior to publication.

20.    In reviewing materials for publication, the PRB seeks to respond to requests for prepublication review in a reasonable amount of time. The PRB handles relatively short, time sensitive submissions, such as op-ed pieces or letters to the editor, as expeditiously as practicable. Although the PRB attempts to complete review of other nonofficial publications within 30 days of receipt, lengthy or complex submissions that involve intelligence sources and methods may require a longer time period for review.

## C. Administrative History

21.    Pursuant to the requirements of his secrecy agreement, Plaintiff Gary Berntsen submitted a book manuscript for prepublication review on 18 May 2005. This

13

manuscript concerned Plaintiff's activities at the CIA in
multiple areas of the world, and spanned the years 1998 to
2001.

22.   At the time of the submission, Plaintiff was a
current, covert employee of the CIA.  The CIA therefore
began its review of Plaintiff's manuscript, which was in
excess of 400-pages, considering both whether disclosure of
the material would harm national security and whether it
would interfere with Plaintiff's performance of his job
responsibilities or the authorized functions of the CIA and
whether it would have an adverse effect on the foreign
relations of the United States.  At his request,
Plaintiff's cover was lifted and rolled back on 12 June
2005.[4]  This change in employment status altered the
standards governing the CIA's review of his manuscript.

23.   On 27 June 2005, Plaintiff submitted a rewrite
of five of the chapters in his manuscript.  On 25 July
2005, he submitted a series of photos and maps for the
book.  Three days later, he instituted this lawsuit.

---

[4] The lifting of Plaintiff's cover allowed him to acknowledge his
employment with the CIA.  The rolling back of his cover allowed him to
acknowledge that he was a CIA employee from 1982 to 2005.  Removing
Plaintiff's cover means Plaintiff's association with CIA is no longer
classified, standing by itself.  It does not give Plaintiff carte
blanche to discuss his CIA career or allow Plaintiff to reveal any
classified information.  Nor does a cover roll back serve in any way to
negate the terms of Plaintiff's secrecy agreement that require him to
submit written materials about intelligence activities to the PRB
before public disclosure.

14

24.     The CIA completed its review of Plaintiff's
manuscript and returned the manuscript to him with
redactions, as well as a chart outlining what information
the CIA had redacted, on 23 August 2005.  The letter sent
to Plaintiff noted: "[Y]ou must submit any galley proofs of
the final manuscript as it will appear in book form, so we
can verify that the text as published is the same as the
text we approved.  You may not publish until we have
finished reviewing the galleys and given you written
permission."

25.     After receiving the CIA's response, Plaintiff
sought a meeting with the PRB.  On 29 August 2005,
Plaintiff met with the PRB for almost eight hours to give
his position on the classified material in the manuscript.
On 30 August 2005, Plaintiff submitted a four-page
memorandum to the PRB contesting the CIA's classification
of some of the material in his manuscript.  Plaintiff
subsequently resubmitted his manuscript for review in
installments from 31 August 2005 to 2 September 2005.
Plaintiff's rewritten manuscript included some of the
revisions required by the PRB, included notes to the PRB in
the text of the manuscript, and added new material.
Several of the additions in the rewritten manuscript were

15

new references to information that Plaintiff had agreed to redact in other portions of his manuscript.

26. CIA completed its review of Plaintiff's rewritten manuscript, and returned the manuscript with classified information redacted, on 18 October 2005. The PRB's letter again reminded Plaintiff that he was required to submit galley proofs of the final manuscript, and that he was not authorized to publish "until [CIA] ha[s] finished reviewing the galleys and given you written permission."

27. Plaintiff published Jawbreaker, The Attack on Bin Laden and Al-Qaeda: A Personal Account by the CIA's Key Field Commander on 27 December 2005. Contrary to Plaintiff's secrecy agreement obligations, as outlined in the letters described above and CIA's internal regulations, Plaintiff neither resubmitted his galley proofs for review, nor received written permission to publish his manuscript in its final form.

## III. STATUTORY AND EXECUTIVE ORDER AUTHORITIES

### A. Statutes

#### 1. The National Security Act of 1947

28. Section 102A(i) of the National Security Act of 1947, as amended, codified at 50 U.S.C. § 403-1(i), requires the Director of National Intelligence (DNI) to protect intelligence sources and methods from unauthorized

16

disclosure.[5]  The Act also requires the Director of the
Central Intelligence Agency (DCIA) to minimize the risks to
those involved in the collection of human intelligence, 50
U.S.C. § 403-4a(d)(3).  As NCS/IRO, I work with both the
DNI and the DCIA to implement these statutory
responsibilities with respect to National Clandestine
Service information.

### 2.  Central Intelligence Agency Act of 1949

29.   In addition to the National Security Act's
mandate to protect intelligence sources and methods,
Section 6 of the Central Intelligence Agency Act of 1949,
as amended, 50 U.S.C. § 403g, exempts the CIA from the
provisions of any law requiring the publication or
disclosure of the organization, functions, names, official
titles, salaries, or numbers of personnel employed by the
CIA.

30.   The aforementioned statutory protections for
intelligence sources and methods and other CIA-specific
information are separate and distinct from any executive
order safeguards for protecting classified national
security information.

---

[5] Section 102A(i)(1) of the Intelligence Reform and Terrorism Prevention
Act of 2004, 50 U.S.C. § 403-1(i), conferred upon the DNI the authority
to protect intelligence sources and methods.

## B. Executive Order 12958

31. Executive Order 12958, as amended, prescribes a uniform system for classifying and protecting national security information. Executive Order 12958, as amended, defines "national security" as "national defense or foreign relations of the United States" and defines "information" as "any knowledge that can be communicated or documentary material, regardless of its physical form or characteristics, that is owned by, produced by or for, or is under the control of the United States Government." Information may be originally classified under the Executive Order only if it (a) is owned by, produced by or for, or is under the control of the U.S. Government; (b) falls within one or more of the categories of information set forth in section 1.4 of the Executive Order; and (c) is classified by an original classification authority who determines that its unauthorized disclosure reasonably could be expected to result in damage to the national security that the original classification authority can identify or describe. E.O. 12958, § 1.1, as amended.

32. In this case, I have determined that certain information contained in Plaintiff's manuscript is properly classified under the above guidelines. Plaintiff learned or obtained the classified information at issue in his

18

manuscript as the result of his CIA employment; therefore, the CIA retains the authority to control access to it.

33. Under Section 1.4 of Executive Order 12958, as amended, information can be considered for classification if it concerns one of eight categories. The information at issue here falls within at least three of the eight categories: foreign government information (§ 1.4(b)); intelligence activities (including special activities), intelligence sources or methods, or cryptology (§ 1.4(c)); and/or foreign relations or foreign activities of the United States, including confidential sources (§ 1.4(d)).

34. Finally, as NCS/IRO I hold original classification authority, and I have determined that the unauthorized disclosure of certain information in Plaintiff's manuscript could reasonably be expected to cause serious damage to national security, as described in Part IV below. In addition, the information in the manuscript contains some classified information that must be handled with the HUMINT Control System. Therefore, I have determined that the information is properly classified at the SECRET level, and must be handled within HCS channels.

19

## IV. THE CLASSIFIED INFORMATION IN PLAINTIFF'S MANUSCRIPT AND THE HARM THAT WOULD RESULT FROM DISCLOSURE

35. The primary mission of the CIA is to collect and analyze, for the President and other U.S. Government policymakers, otherwise unavailable information about foreign governments, foreign individuals, and entities such as terrorist organizations whose actions and interests may impact the foreign policy and national security interests of the United States. It is critical that the CIA succeed in this mission if the President and his senior advisors are to make well-informed decisions on matters of vital importance to the nation's security. As NCS/IRO, I am responsible for ensuring that the release of NCS information does not jeopardize this flow of intelligence information to policymakers, or endanger other CIA intelligence sources and methods, personnel, or facilities.

36. Often, it is not obvious from the face of a document why the disclosure of certain information could cause damage to the national security. The potential damage from disclosure can only be assessed in a broader context, with an understanding of the origin of the information, information that has previously been released, and current circumstances. Each piece of data that the CIA obtains makes up a piece of a mosaic of intelligence

20

information that informs the conduct of U.S. national
security policy. Sometimes, the release of even small bits
of information, when combined with other leaked, stolen, or
publicly available information, can provide our adversaries
with valuable insights into CIA intelligence activities.
Even disclosure of pieces of the intelligence puzzle that
seem innocuous on their own may together provide a damaging
framework within which to assemble other pieces and gain a
picture of the whole. Putting together the pieces of
intelligence is one of the primary methods employed by all
intelligence services to discern the activities in which a
hostile government or group is engaged, what interests it
has, and its possible future objectives. Indeed, the CIA
has an entire component -- the Directorate of Intelligence
-- dedicated to the mission of collecting seemingly
disparate pieces of information and assembling them into a
coherent picture of a foreign intelligence target's
activities and intentions.

37. Assessing the harm that could result from
disclosure of information is also not an intuitive process.
The harm from unauthorized disclosures may be swift and
obvious: foreign partners terminate their relationship
with the CIA, sources are captured or killed, foreign
countries remove CIA officers from the country, or

21

clandestine activities are discovered and consequently abandoned. The harm may also be more subtle: foreign partners may not provide their most sensitive and useful information to the United States, possible sources may choose not to cooperate with the CIA, or hostile intelligence services or terrorist groups may thwart CIA's collection efforts or provide misinformation. Often, the CIA does not know, and will never know, the intelligence and opportunities that were lost due to unauthorized disclosures. Thus, the CIA must do its best to prevent unauthorized disclosures to prevent this harm to the national security.

38. As part of the prepublication review of Plaintiff's manuscript and in preparing this declaration, I carefully reviewed Plaintiff's entire manuscript. This review process required careful scrutiny not only of each word or phrase but also of the context in which statements are made; the review is more art than science. As the individual responsible for protecting information originating within the NCS, I must endeavor to safeguard classified information that can be inferred or deduced from other, seemingly innocuous information in the manuscript.

39. The redactions and deletions made to the manuscript Plaintiff submitted between 31 August 2005 and 2

22

September 2005 fall within the following categories of
information:

A) information about CIA's relationships and
communications with foreign liaison services;

B) information that identifies or could lead to
the identification of CIA sources;

C) information that includes details of specific
clandestine activities;

D) information that identifies CIA employees;

E) descriptions of CIA's internal structure and
administration;

F) information that identifies or otherwise
acknowledges the existence of covert CIA facilities;
and

G) Plaintiff's comments to the PRB in the
manuscript as to the classification of specific
information.

40. I have determined that the above classified CIA
information, concerning intelligence sources, methods,
foreign relations, and foreign government information, is
properly classified pursuant to Sections 1.4(b), 1.4(c) and
1.4(d) of Executive Order 12958, as amended. As discussed
in greater detail below, disclosure of the classified

23

information in Plaintiff's manuscript reasonably could be
expected to cause serious damage to national security.

## A. Liaison Relationships

41. A "liaison relationship" is a cooperative and
secret relationship between the CIA and a government unit
of a foreign country. Most, but not all, CIA liaison
relationships are with another country's intelligence or
security service. Liaison relationships between the CIA
and other foreign intelligence services or entities are
initiated and continued only on the basis of a mutual
understanding that the existence and/or details of such
liaison arrangements will be kept in the utmost secrecy.

42. Liaison relationships are extremely sensitive.
Some services with which the CIA maintains a liaison
relationship are hostile towards, and maintain political
agendas at odds with, other services with which CIA has a
liaison relationship. Other services require secrecy
because cooperation with the United States has little or no
public support in their country. Maintaining relationships
with the CIA is politically risky for individuals in these
services. Publicly disclosing the existence of an
intelligence relationship or the extent to which a foreign
government is cooperating with and sharing intelligence
with the CIA could embarrass the foreign government or

24

aggravate internal political dissent in that country. This
could have serious negative consequences for the foreign
government and negatively affect its diplomatic relations
with the United States. It also could damage CIA's liaison
relations with the country's intelligence services. This,
in turn, could lead to the CIA having less access to
intelligence needed to ensure U.S. policymakers are fully
informed.

43. The CIA has limited resources to conduct its
intelligence mission, including a limited amount of case
officers, stations, and money. Liaison relationships with
foreign intelligence services offer the United States a
kind of force-multiplier for its intelligence collection
activities. Intelligence services with which the CIA has a
close or robust liaison relationship will provide the CIA
with the intelligence reported by many of its own
intelligence sources.

44. Therefore, through liaison relationships, the CIA
can gather and disseminate intelligence information to
United States national security and foreign policy
decisionmakers that is critical to informed decision-
making, but which the CIA would be unable to obtain through
its own resources. The closer and more trusting the
liaison relationship, the greater the sharing of

information. The more hesitant or untrusting a liaison
relationship, the more reluctant and miserly the sharing.
For intelligence collection, it is of the utmost importance
that liaison relationships be maintained, and, if possible,
strengthened.

45. Exposing the existence of a liaison relationship,
the information exchanged, or particular liaison
activities, can damage or destroy that relationship. Such
a disclosure is a breach of the trust on which the
relationship is based, and often leads to a less robust
relationship or even a termination of the relationship
altogether. Moreover, revealing information shared with
the CIA by a liaison service places that service's sources
and officers at risk, making future intelligence gathering
-- and sharing -- substantially more dangerous, and,
therefore, less likely. Additionally, when a liaison
relationship is damaged for any reason, one predictable
response is for the foreign service to demand that the CIA
remove one or more officers from the country and/or to step
up harassment activities directed at CIA officers. This
could complicate CIA intelligence operations, possibly
shutting down or greatly curtailing operations, resulting
in a reduction or elimination of intelligence.

46. More broadly, if the CIA appears unable or unwilling to keep its foreign liaison relationships secret, other relationships or understandings with foreign intelligence or security services could be jeopardized as well. These outcomes would present substantially increased burdens (and therefore increase the threat to national security) for US intelligence gathering. The United States relies upon strong relations with foreign government services to provide vital information on its intelligence and law enforcement targets.

47. For all of the reasons outlined above, the CIA must protect against the disclosure of information that could damage and possibly destroy liaison relationships. Those concerns animate section 1.1(c) of Executive Order 12958, as amended, which notes that the unauthorized disclosure of foreign government information, defined as information "provided to the United States Government by a foreign government or governments . . . with the expectation that the information, the source of the information, or both, are to be held in confidence," is presumed to cause damage to the national security. See Executive Order, 6.1(r)(1).

48. CIA's coordination with certain foreign liaison services, and the details concerning that coordination, are

and must remain national secrets. This information must be protected from disclosure under both the National Security Act of 1947 and Section 6 of the CIA Act of 1949, because it would reveal intelligence sources and methods; disclosure would reveal the liaison partners with whom CIA has a relationship and the way CIA personnel use that relationship to obtain intelligence information and engage in intelligence activities. This information also implicates the foreign relations of the United States, involves foreign government information, and is part of intelligence activities, methods and sources, all of which make it appropriate for classification under sections 1.4(b), 1.4(c) and 1.4(d) of Executive Order 12958, as amended. Because disclosure of the information in Plaintiff's manuscript relating to liaison relationships may significantly reduce the information that the CIA can collect and make available to policy makers, this disclosure will seriously harm the national security. This information is therefore classified at the SECRET level.

## B.   CIA Intelligence Sources

49.   To obtain intelligence information, the CIA relies on a variety of types of intelligence sources, including human sources working for either the United States or the intelligence and security services of foreign

28

countries. Intelligence sources can be expected to furnish information and provide assistance only when confident that they are protected from exposure by the absolute secrecy surrounding their relationship with CIA. In other words, intelligence sources must be certain that the CIA can and will do everything in its power to prevent the public disclosure of their association with the CIA. This is true for all sources, even those whom the CIA ultimately determines are not credible. In the case of a foreign national abroad who has contacted or been cooperating with the CIA, usually without the knowledge of his government or the group on whom he has been reporting, the consequences of public disclosure (even if the source never provided useful information) are often swift and far-ranging, from economic reprisals to possible harassment, imprisonment, or even death. The target government or terrorist group may take retaliatory action against that person or his surviving family and friends. This fact is true even if the intelligence source is no longer actively cooperating with the CIA. In many cases, the very nature of the information or activity necessarily tends to reveal the source because of the limited number of individuals who have had access to it. If such information is disclosed, the source may be perpetually vulnerable to discovery and

retribution. Even more importantly, it places in realistic
jeopardy every individual with whom the foreign national
has had contact.

50. Moreover, the release of information that would
or could identify an actual or potential intelligence
source could seriously weaken the CIA's ability to recruit
other potential sources. Potential future sources would be
understandably reluctant to take a chance on even
attempting to cooperate with the CIA if they believed that
the CIA would disclose that contact. The CIA itself has a
primary interest in keeping the identities of its sources
secret, not only to protect the safety of the source, but
also to demonstrate to other sources and potential sources,
that CIA can be trusted to preserve the secrecy of the
relationship. If a potential source has any doubts about
the ability of CIA to preserve secrecy, that is, if he
learns that the identity of another source was compromised
by the CIA, his desire to cooperate with CIA would likely
disappear. The loss of such clandestine intelligence
sources, and the accompanying loss in critical intelligence
which they provide, would have serious effects upon the
national security of this country.

51. I take great care in protecting human sources
from unauthorized disclosure for another reason beyond the

preservation of the intelligence collection capability of
the United States.  Covert cooperation with U.S.
intelligence is an inherently dangerous venture.
Individuals put a great deal at risk by cooperating with
CIA officers.  In many areas of the world, those
individuals put not only themselves, but also their
families and associates at risk of death, imprisonment,
injury, financial ruin, or harassment.  Such persons
deserve our most vigilant protection for placing themselves
in peril for the benefit of the United States.

52.  Because the disclosure of source-identifying
information would reduce the flow of intelligence
information both by potentially eliminating those
particular sources, and by preventing other potential
sources from cooperating with the CIA, this disclosure is
reasonably likely to cause serious damage to the national
security of the United States.  Clandestine intelligence
source information is also information that the
intelligence community is statutorily obligated to protect
under the National Security Act of 1947, and information
that is properly classified under section 1.4(c) and 1.4(d)
of Executive Order 12958, as amended.  Accordingly, such
information is properly classified at the SECRET level and
must be protected from disclosure.

31

## C.   Intelligence Activities and Methods: Details of Operations

53.   Plaintiff's manuscript includes details of a variety of clandestine activities. Disclosure of these details of CIA's covert activities would allow foreign nations and terrorist organizations, the targets of our efforts, to change their procedures, thwarting our efforts by closing down windows of collection, and reducing the likelihood of success of future operations. Disclosure could therefore force the CIA to begin anew our approaches to the acquisition of this sought after intelligence.

54.   Details about the way CIA gathers its intelligence information can provide valuable information to our adversaries in their efforts to undermine the United States and to counter the CIA's mission. Even small details give information that can be put together to form a fuller picture of the CIA's capabilities and intentions, and can be used to counter those intentions. Hostile intelligence services and terrorist organizations glean important information by piecing together dozens of ostensibly insignificant details.

55.   The information in Plaintiff's manuscript relating to covert intelligence activities would be of material assistance to those who seek to detect, prevent,

32

or damage U.S. intelligence operations. Information about how CIA personnel conducts intelligence activities, as well as the details of those activities, are both statutorily protected under Section 6 of the CIA Act of 1947 and the National Security Act of 1947, and properly classified under section 1.4(c) of Executive Order 12958, as amended. Because revealing the details of clandestine activities and the information received from such activities could seriously jeopardize future intelligence operations, disclosure of this information would cause serious harm to the national security. This information is therefore classified at the SECRET level.

**D.   Identification of CIA Employees**

56.   The CIA does not routinely disclose the identity and affiliation of its employees, regardless of whether or not they are under cover. Such employees may have in the past served under cover or in sensitive positions or operations, may be doing so now, or may do so in the future. Revelation of their affiliation with CIA could compromise past, present, or future intelligence operations or activities, identify them as targets for recruitment by hostile intelligence services, impair the usefulness of such individuals to the CIA, or place their lives, the lives of members of their families, and the lives of

33

intelligence sources they have worked with, in jeopardy. Although CIA personnel face risk as part of their jobs, the CIA attempts to minimize that risk by protecting information that could identify CIA officers.

57.   Disclosure of information that serves to identify covert CIA officers could jeopardize the safety of those officers.   It also poses a risk to the families and colleagues of those officers, as well as officials of foreign governments and other foreign nationals with whom they have been involved, wittingly or unwittingly, and who could be linked to the covert officer.   In addition, disclosure could jeopardize the security of intelligence operations in which such officers participate, and reveal past operations in which such officers participated, thereby associating them with other covert personnel. Further, identification of one's CIA affiliation decreases the professional effectiveness of covert officer and diminishes his or her usefulness in intelligence operations.   It becomes difficult, if not impossible in some cases, to assign an officer to sensitive overseas postings once his or her CIA affiliation has been disclosed.   Thus, not only could an officer's career be significantly impaired by such disclosure, but the negative consequences for CIA's ability to accomplish its mission

would be significant. It is very time-consuming and
expensive to recruit, hire, vet, and train a covert CIA
intelligence officer. The CIA and the American people can
realize their greatest return from this investment when an
officer's cover remains intact and that officer can be
assigned to the most challenging assignments. When an
officer's utility is compromised because his or her cover
is exposed, that officer cannot be replaced overnight.

58. Under the CIA Act of 1949, the CIA is
specifically exempted from having to disclose the names,
official titles, or functions of CIA personnel, some of the
precise information at issue here. Likewise, the National
Security Act of 1947 obligates the intelligence community
to protect from unauthorized disclosure information that
would reveal intelligence sources or methods, such as the
way the CIA protects its officers from public affiliation
with the CIA, and requires the DCIA to minimize the risks
to those involved in the collection of human intelligence,
such as the individuals at issue here. Thus, information
that tends to identify any CIA employee must be protected
from disclosure. This information is also properly
classified under section 1.4(c) of Executive Order 12958,
as amended, because the cover protections given to covert
officers to protect their clandestine activities are

35

intelligence methods and activities. Because of the security risk to CIA intelligence operations, CIA officers, and CIA officers' families, friends, and associates, disclosure of information that could potentially identify CIA employees reasonably could be expected to cause serious damage to national security. This information is therefore classified at the SECRET level.

## E. CIA's Internal Structure and Administration

59. Plaintiff's manuscript also reveals information about the administration and internal structure of the CIA. Each of these pieces of information provides insight into the organization and functions of the CIA, which are statutorily protected from disclosure. Moreover, details about how the CIA conducts its business can provide valuable information to our adversaries in their efforts to undermine the United States and to counter the CIA's mission.

60. Foreign intelligence services and terrorist organizations have as one of their fundamental defensive missions the discovery of what the CIA is focusing its efforts on and how it is doing so. A primary vehicle for that effort is scouring the public sector for intelligence information that has been released, leaked to the press, or otherwise finds its way into publication. We know that

36

foreign intelligence services and terrorist organizations have the capacity and the ability to gather information from myriad sources, analyze it and deduce means to defeat the CIA's collection efforts and operational activities by piecing together disparate and even seemingly unimportant details. Accordingly, the CIA must withhold a full spectrum of information about how the CIA performs its functions, how operations are staffed, approved, and directed, and how resources are allocated because such information could reasonably be expected to assist hostile intelligence services and terrorist organizations to the detriment of the United States. Without the vigilant protection of such information, the CIA would quickly become ineffective, if not impotent.

61. Disclosure of information about the CIA's focus, administration, and level of resources and capabilities could reasonably be expected to cause serious harm to the national security of the United States by impairing the CIA's ability to collect intelligence information, engage in intelligence operations and recruit sources of intelligence information. This information relates to intelligence activities, sources and methods, which is an appropriate category for classification under section 1.4(c) of Executive Order 12958, as amended. This

37

information is also properly protected under the CIA Act of
1949 as the organization, functions, official titles, or
the numbers of personnel employed by the CIA, and under the
protection afforded by the National Security Act of 1947 to
intelligence sources and methods.  This information is
properly classified at the SECRET level and must be
protected from disclosure.

**F.   CIA Covert Facilities**

62.  Plaintiff's manuscript also contains classified
information revealing the existence or location of
unacknowledged CIA field installations.  The CIA has a
number of unacknowledged field installations abroad, the
purpose of which is to facilitate the foreign intelligence
activities of the CIA.  The CIA has not publicly
acknowledged the existence of any of the covert facilities
referenced in Plaintiff's manuscript.

63.  CIA's covert facilities are necessary for the
operational and foreign intelligence gathering activities
critical to the CIA's mission to provide intelligence
information to the President and other policymakers in the
United States Government.  These installations facilitate
CIA's clandestine activities throughout the world.  Among
other things, covert CIA facilities allow CIA officers
operating under cover to collect intelligence from sources

and cooperating individuals and to engage in covert
intelligence activities and operations at the direction of
the President.

64.   Public disclosure of the existence or locations
of these covert installations could reasonably be expected
to cause serious damage to the national security of the
United States for a variety of reasons.  The citizens of a
foreign country often consider having a CIA covert facility
on their soil to be an affront to their national
sovereignty.  Confirmation of a covert CIA presence in its
country could not only cause the host country acute public
embarrassment but could also pressure that country into
terminating or severely limiting its relationship with the
CIA.  The result could be that CIA's intelligence
collection and operations in that country would be crippled
or dramatically curtailed, potentially impairing the
national security of the United States.   Especially at a
time, like now, when the United States is trying to
encourage nations to assist in the war on terrorism, this
public disclosure could also seriously damage future
cooperation.

65.  A foreign government, even if friendly,
confronted with a public disclosure that a covert CIA
installation existed and operated on its soil, could also

39

bow to public opinion and order all CIA personnel out of the country. The result could be that CIA's intelligence collection and operations in that country would be crippled or dramatically curtailed, potentially impairing the national security of the United States.

66. In addition, revealing the existence of a covert CIA installation could result in the identification of personnel working in the facility which would further damage the CIA's intelligence and operational capabilities. Any individual known to have contact with such personnel would be subjected to scrutiny and his or her contacts with identified CIA personnel analyzed by the counterintelligence branches of the foreign government's intelligence services, which could reasonably be expected to result in the exposure of U.S. sources and operations.

67. The revelation of the location of a CIA covert facility also makes that facility a likely target of terrorist interest. Quite simply, in a world in which the United States is deemed by many people to be an enemy that must be destroyed, to disclose the existence of an CIA covert facility is to increase significantly the risk that the CIA personnel —- and other individuals within the vicinity of the CIA facility —- will be the target of terrorist attack.

68.    In sum, the exposure of CIA covert facilities
could reasonably be expected to harm the CIA's intelligence
information-gathering mission, endanger intelligence
sources and methods, and potentially disrupt or impede U.S.
foreign relations.   Information that tends to reveal the
existence and location of CIA covert facilities therefore
is properly classified under section 1.4(c) and 1.4(d) of
Executive Order 12958, as amended, and must be protected
under Section 6 of the CIA Act of 1949 and section 102A(i)
of the National Security Act of 1947.   Because exposure of
covert CIA facilities could reasonably be expected to cause
serious damage to the national security of the United
States, information in Plaintiff's manuscript that reveals
the existence and location of CIA covert facilities is
properly classified at the SECRET level.

## G.    Comments to the PRB

69.    During the PRB process, Plaintiff asked the CIA
to reconsider some of its classification decisions.
Plaintiff included approximately 80 comments discussing the
classification of specific information and other possible
sourcing in the text of the final draft of the manuscript
he provided to the PRB.   Because these comments both
identify classified information and highlight what
information the CIA initially identified as coming from

41

classified sources, their disclosure has the potential to harm the national security by revealing the underlying classified information. CIA therefore identified these comments as classified and redacted them from the manuscript returned to Plaintiff.

70. Even for those sections in which the PRB allowed release of certain information based on Plaintiff's comments, the comments help to identify the topics, or series of topics, about which the CIA collects intelligence and upon which CIA focuses its methods and resources. The United States, like every other country or organization, even terrorist organizations, has limited resources. The disclosure of potential U.S. intelligence targets would provide information to those organizations, particularly foreign intelligence services and terrorist organizations, who attempt to monitor CIA activity, about how the CIA is allocating its resources and what topics are of interest to the CIA. Public exposure of this information would make it easier for the targets to array counterintelligence and security resources most efficiently to frustrate CIA efforts.

71. As Plaintiff's comments reveal intelligence sources, methods, and activities, they are properly classified under section 1.4(c) of Executive Order 12958,

42

as amended, and must be protected under the National
Security Act of 1947 and Section 6 of the CIA Act of 1949.
Because of the harm that could reasonably be expected to
result from disclosure of Plaintiff's comments, those
sections are properly classified at the SECRET level.

## III. THE CLASSIFIED INFORMATION AT ISSUE IN THIS LITIGATION HAS NOT BEEN OFFICIALLY DISCLOSED BY THE CIA

72.     The CIA has not officially disclosed any of the
classified information that the PRB required Plaintiff to
remove from his manuscript. Below I discuss certain
sources of information of which I am aware and explain why
none of these sources constitutes official public
disclosure by the CIA of the specific classified
information in Plaintiff's manuscript.

73.     Throughout the PRB process, Plaintiff protested
that information in his manuscript was not classified
because CIA had previously allowed the release of similar
information or types of information. This misunderstands
classification requirements. The CIA's determination that
disclosure of one piece of information will not harm the
national security is not an assessment of whether any other
piece of information will harm the national security.
Declassification of one piece of information does not
require declassification of all similar types of

43

information.  Thus, the issue is not whether the CIA has previously disclosed similar information, but whether the exact classified information in Plaintiff's manuscript has previously been officially disclosed.

**A.  Gary Schroen's Book First In**

74.   Plaintiff's predecessor in Afghanistan in 2001, Gary Schroen, also wrote a book purporting to describe his experiences.  This book, titled First In: An Insider's Account of How the CIA Spearheaded the War on Terror in Afghanistan, was published in June 2005.  Although Schroen's book does not constitute an official publication by the CIA because Schroen did not prepare the book as part of his official duties, Schroen's book did go through the prepublication review process.  Because there is some overlap between the subject matter and events in Schroen's book and Plaintiff's manuscript, I feel it is important to distinguish Schroen's book from the disclosures in Plaintiff's manuscript.

75.   Like Plaintiff's book, Schroen's book purports to describe CIA operations in Afghanistan and contacts with Afghan allies, including Plaintiff's arrival in Afghanistan and his subsequent activities.  Schroen's book, however, was not an official disclosure by the CIA, nor does it reveal the specific classified information that Plaintiff

44

was required to redact from his manuscript. Accordingly,

publication of Scrhoen's book does not preclude

classification of the disputed portions of Plaintiff's

manuscript.

## B. Press Reports and Other Disclosures

76. Pursuant to section 1.1(b) of Executive Order

12958, as amended, "classified information shall not be

declassified automatically as a result of any unauthorized

disclosure of identical or similar information." Likewise,

under section § 3.1(c) of Executive Order 12958, as

amended, information may be declassified only by act of an

officer with original classification authority from the

agency that originated the information. Thus, the

publication of information which may be derived from, or

contained in, classified information does not declassify

the source information.

77. Because U.S. operations in Afghanistan were

followed closely in the press, there are a wide variety of

articles that purport to discuss CIA's activities in

Afghanistan and the role of Afghan opposition groups.

Likewise, a number of journalists and other individuals

have written books about the conflict in Afghanistan, or

other facts mentioned in Plaintiff's manuscript. None of

the information in those reports constitutes official

45

disclosure by the CIA of any of the information in Plaintiff's manuscript. Thus, these disclosures do not impact the classification of Plaintiff's manuscript.

78.   Even if identical information appeared in the press, as a former covert officer of the CIA, Plaintiff's discussion of the same information has a different impact. In a free society, such as ours, press speculation is one of the realities the CIA faces that complicates, and sometimes completely defeats, U.S. intelligence collection activities. Although the statements of a former CIA employee do not constitute "official acknowledgement" by the CIA, Plaintiff's position as a former covert CIA employee lends a level of credibility to his statements about CIA activities that renders such statements much more damaging to the national security than press speculation. If CIA allowed current or former CIA employees who are in a position to know whether press reports are accurate to comment on those underlying reports, CIA would appear to be confirming those reports, albeit unofficially. Failure to prevent that confirmation could reasonably be expected to harm national security by compounding the damage of press speculation regarding classified information.

79.   With respect to the classified information in Plaintiff's manuscript, I have determined that the details

46

Plaintiff provided in his manuscript have not been officially acknowledged or officially released and, therefore, remain properly classified.

## CONCLUSION

80.    In conclusion, it is my considered judgment that the discrete pieces of information that the CIA has required Plaintiff to remove from his manuscript are properly classified.  Publication of this information would tend to reveal clandestine intelligence sources and methods and would jeopardize the CIA's ability to collect intelligence information and to conduct intelligence operations and activities in support of the national security and foreign policy of the United States. Furthermore, disclosure of this information could reasonably be expected to cause serious damage to the national security of the United States.

* * * * *

I declare under penalty of perjury that the foregoing is true and correct.

Executed on this ___ day of April, 2006.

Marilyn A. Dorn
Information Review Officer
National Clandestine Service
Central Intelligence Agency

47

# Exhibit 1

SECRECY AGREEMENT

1. I, _Gary Berntsen_ (print full name), hereby agree to accept as a prior condition of my being employed by, or otherwise retained to perform services for, the Central Intelligence Agency, or for staff elements of the Office of the Director of Central Intelligence (hereinafter collectively referred to as the "Central Intelligence Agency"), the obligations contained in this agreement.

2. I understand that in the course of my employment or other service with the Central Intelligence Agency I may be given access to information which is classified in accordance with the standards set forth in Executive Order 12065 as amended or superseded, or other applicable Executive Order, and other information which, if disclosed in an unauthorized manner, would jeopardize foreign intelligence activities of the United States Government. I accept that by being granted access to such information I will be placed in a position of special confidence and trust and become obligated to protect the information from unauthorized disclosure.

3. In consideration for being employed or otherwise retained to provide services to the Central Intelligence Agency, I hereby agree that I will never disclose in any form or any manner any of the following categories of information or materials, to any person not authorized by the Central Intelligence Agency to receive them:

a. information which is classified pursuant to Executive Order and which I have obtained during the course of my employment or other service with the Central Intelligence Agency;

b. information, or materials which reveal information, classifiable pursuant to Executive Order and obtained by me in the course of my employment or other service with the Central Intelligence Agency but which, because of operational circumstance or oversight, is not formally marked as classified in accordance with such Executive Order and which I know or have reason to know has not been publicly acknowledged by the Agency;

c. information obtained by me in the course of my employment or other service with the Central Intelligence Agency that identifies any person or organization that presently has or formerly has had a relationship with a United States foreign intelligence organization, which relationship the United States Government has taken affirmative measures to conceal.

4. I understand that the burden will be upon me to learn whether information or materials within my control are considered by the Central Intelligence Agency to fit the descriptions set forth in paragraph 3, and whom the Agency has authorized to receive it.

5. As a further condition of the special confidence and trust reposed in me by the Central Intelligence Agency, I hereby agree to submit for review by the Central Intelligence Agency all information or materials including works of fiction which contain any mention of intelligence data or activities, or contain data which may be based upon information classified pursuant to Executive Order, which I contemplate disclosing publicly or which I have actually prepared for public disclosure, either during my employment or other service with the Central Intelligence Agency or at any time thereafter, prior to discussing it with or showing it to anyone who is not authorized to have access to it. I further agree that I will not take any steps toward public disclosure until I have received written permission to do so from the Central Intelligence Agency.

6. I understand that the purpose of the review described in paragraph 5 is to give the Central Intelligence Agency an opportunity to determine whether the information or materials which I contemplate disclosing publicly contain any information which I have agreed not to disclose. I further understand that the Agency will act upon the materials I submit and make a response to me within a reasonable time.

7. I understand that all information or materials which I may acquire in the course of my employment or other service with the Central Intelligence Agency which fit the descriptions set out in paragraph 3 of this agreement are and will remain the property of the United States Government. I agree to surrender all materials reflecting such information which may have come into my possession or for which I am responsible because of my employment or other service with the Central Intelligence Agency, upon demand by an appropriate official of the Central Intelligence Agency, or upon the conclusion of my employment or other service with the Central Intelligence Agency.

8. I agree to notify the Central Intelligence Agency immediately in the event that I am called upon by judicial or congressional authorities to testify about, or provide, information which I have agreed herein not to disclose.

9. I understand that nothing contained in this agreement prohibits me from reporting intelligence activities which I consider to be unlawful or improper directly to the Intelligence Oversight Board established by the President or to any successor body which the President may establish. I recognize that there are also established procedures for bringing such matters to the attention of the Agency's Inspector General or to the Director of Central Intelligence. I further understand that any information which I may report to the Intelligence Oversight Board continues to be subject to this agreement for all other purposes and that such reporting does not constitute public disclosure or declassification of that information.

10. I understand that any breach of this agreement by me may result in the Central Intelligence Agency taking administrative action against me, which can include temporary loss of pay or termination of my employment or other service with the Central Intelligence Agency. I also understand that if I violate the terms of this agreement, the United States Government may institute a civil proceeding to seek compensatory damages or other appropriate relief. Further, I understand that the disclosure of information which I have agreed herein not to disclose can, in some circumstances, constitute a criminal offense.

11. I understand that the United States Government may, prior to any unauthorized disclosure which is threatened by me, choose to apply to any appropriate court for an order enforcing this agreement. Nothing in this agreement constitutes a waiver on the part of the United States to institute a civil or criminal proceeding for any breach of this agreement by me. Nothing in this agreement constitutes a waiver on my part of any possible defenses I may have in connection with either civil or criminal proceedings which may be brought against me.

12. In addition to any other remedy to which the United States Government may become entitled, I hereby assign to the United States Government all rights, title, and interest in any and all royalties, remunerations, and emoluments that have resulted or will result or may result from any divulgence, publication or revelation of information by me which is carried out in breach of paragraph 5 of this agreement or which involves information prohibited from disclosure by the terms of this agreement.

13. I understand and accept that, unless I am provided a written release from this agreement or any portion of it by the Director of Central Intelligence or the Director's representative, all the conditions and obligations accepted by me in this agreement apply both during my employment or other service with the Central Intelligence Agency, and at all times thereafter.

14. I understand that the purpose of this agreement is to implement the responsibilities of the Director of Central Intelligence, particularly the responsibility to protect intelligence sources and methods, as specified in the National Security Act of 1947, as amended.

15. In any civil action which may be brought by the United States Government for breach of this agreement, I understand and agree that the law of the Commonwealth of Virginia shall govern the interpretation of this agreement.

16. Each of the numbered paragraphs and lettered subparagraphs of this agreement is severable. If a court should find any of the paragraphs or subparagraphs of this agreement to be unenforceable, I understand that all remaining provisions will continue in full force.

17. I make this agreement in good faith, and with no purpose of evasion.

_____
Signature

_____
Date

The execution of this agreement was witnessed by the undersigned, who accepted it on behalf of the Central Intelligence Agency as a prior condition of the employment or other service of the person whose signature appears above.

## WITNESS AND ACCEPTANCE:



Signature

Printed Name

Date