# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

GARY BERNSTEN              *
                          *
      Plaintiff,          *
                          *
           v.             *        Civil Action No. 05-1482 (CKK)
                          *
CENTRAL INTELLIGENCE AGENCY *
                          *
      Defendant.          *
*    *    *    *    *    *    *    *    *    *    *    *

## PLAINTIFF'S OPPOSITION TO DEFENDANT'S
## MOTION FOR SUMMARY JUDGMENT [1](end note)

This case presents a threat to the vitality of First Amendment rights among former and current employees of the government, as well as to its contractors, arising from the defendant Central Intelligence Agency's ("CIA") improper misclassification of information that is contained in Plaintiff Gary Bernsten's book Jawbreaker, The Attack on Bin Lauden and Al-QAEDA: A Personal Account by the CIA's Key Field Commander (Crown Publishers: 2005).

The ability of the CIA to inhibit First Amendment rights extends only to that information that is properly classified. The dissemination or publication of unclassified information, which is all the manuscript contains, cannot be blocked by the government. This case represents yet another effort by the CIA to crack down on openness, intimidate its former and current employees and prevent the free flow of information that pertains to its activities, no matter how embarrassing or revealing it might be.

> Excessive secrecy has significant consequences for the national interest when, as a result, policymakers are not fully informed, government is not held accountable for its actions, and the public cannot engage in informed debate. This remains a dangerous world; some secrecy is vital to save lives, bring miscreants to justice, protect national security, and engage in effective diplomacy. Yet as Justice Potter Stewart noted in his opinion in the Pentagon Papers

> case, when everything is secret, nothing is secret. Even as
> billions of dollars are spent each year on government
> secrecy, the classification and personnel security systems
> have not always succeeded at their core task of protecting
> those secrets most critical to the national security. The
> classification system, for example, is used too often to deny
> the public an understanding of the policymaking process,
> rather than for the necessary protection of intelligence
> activities and other highly sensitive matters.

Report of The Commission on Protection or Protecting and Reducing Government Secrecy

(GPO, 1997).

One of the central purposes of the First Amendment is to allow publication to serve as both a

critical source of information for the public as well as an important government watchdog. The

CIA has prevented the publication of portions of the book by unreasonably asserting

classification determinations that are known to be unjustified. Such conduct violates the rights of

free speech guaranteed by the First Amendment of the Constitution of the United States.

Moreover, the CIA cannot lawfully prevent Bernsten' attorney, who holds the appropriate

security clearance, from reviewing the unredacted copy of his client's manuscript in order to

assist in this classification challenge.

## ARGUMENT

To support a motion for summary judgment, it must be demonstrated that there are no

genuine issues existing as to any material fact and that the moving party is entitled to judgment

as a matter of law. See Fed.R.Civ.P. 56(c). A Court considering a motion for summary judgment

must view all the facts in the light most favorable to the nonmoving party and give that party the

benefit of all reasonable inferences that can be drawn from the facts. Matsushita Elec. Indus. Co.

v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The movants bear "the initial responsibility of

informing the district court of the basis for their motion and identifying those portions of the

record which show lack of a genuine issue." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).

In order to overcome a summary judgment motion, the nonmoving party must designate

"specific facts showing that there is a genuine issue for trial." Id. at 324; Fed.R.Civ.P. 56(e).

The necessary proof that must be produced is not precisely measurable, but must show "'sufficient evidence supporting the claimed factual dispute ... to require a jury or judge to resolve the parties' differing versions of the truth at trial.'" First Nat'l Bank of Arizona v. Cities Service Co., Inc., 391 U.S. 253, 289 (1968). If the Court can conclude that a reasonable trier of fact could return a verdict for the nonmovant, then summary judgment must be denied. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

## I.    PLAINTIFF POSSESSES A CONSTITUTIONAL RIGHT TO PUBLISH HIS UNCLASSIFIED INFORMATION

This case arises in a posture significantly different from a request for release of CIA information under the Freedom of Information Act ("FOIA"). In a FOIA case, an individual seeks to compel release of documents in the government's possession. Here, by contrast, Plaintiff wishes publicly to disclose information that he already possesses, and the CIA has ruled that his secrecy agreement forbids disclosure.

This difference between seeking to obtain information and seeking to disclose information already obtained raises Bernsten's constitutional interests in this case above the constitutional interests held by a FOIA claimant. As a general rule, citizens have no first amendment right of access to traditionally nonpublic government information. See e.g., Houchins v. KQED, Inc., 438 U.S. 1, 8-9 (1978)(plurality opinion); Saxbe v. Washington Post Co., 417 U.S. 843, 849 (1974); Pell v. Procunier, 417 U.S. 817, 831-32 (1974). A litigant seeking release of government information under FOIA, therefore, relies upon a statutory entitlement – as narrowed by statutory exceptions – and not upon his constitutional right to free expression.

"In this case, however, [Bernsten] wishes to publish information he possesses, and the CIA wishes to silence him. Although neither the CIA's administrative determination nor any court order in this case constitutes a prior restraint in the traditional sense upon [Bernsten] or any other party, the entire scheme of prepublication review is designed for the purpose of preventing publication of classified information. [Bernsten] therefore has a strong first amendment interest in ensuring that CIA censorship of his [manuscript] results from a proper classification of the censored portions." McGehee v. Casey, 718 F.2d 1137, 1142, 1147-48 (D.C.Cir. 1983). Cf. Alfred A. Knopf, Inc. v. Colby, 509 F.2d 1362, 1367 (4th Cir.) cert. denied, 421 U.S. 992 (1975) ("the deletion items should be suppressed only if they are found to be both classified and classifiable under the Executive Order").

At the outset it should be made clear that Bernsten does not challenge the existence of or the requirement to adhere to a prepublication review process. In Snepp v. United States, 444 U.S. 507 (1980)(per curiam), the Supreme Court held that the CIA could, consistent with the First Amendment, recover damages for breach of a secrecy agreement under which a former employee promised to submit CIA-related writings to the CIA for prepublication clearance. The Court found the secrecy agreement to be "a reasonable means for protecting" the "secrecy of information important to our national security and the appearance of confidentiality so essential to the effective operation of our foreign intelligence service." Id. at 509 n.3. In Snepp, the former employee published CIA-related information without submitting his manuscript for prepublication review.  The ruling in Snepp, therefore, did "not depend upon whether [Snepp's] book actually contained classified information….The Government simply claimed that … Snepp should have given the CIA an opportunity to determine whether the material he proposed to publish would compromise classified information or sources." Id. at 511.

-4-

In this case, by contrast, Bernsten adhered to his secrecy agreement. He submitted his manuscript for prepublication review, and deleted portions of his book in accordance with the CIA's orders. The CIA does not assert otherwise, nor has it taken any remedial action against Bernsten for his conduct. The dispute presented here is the constitutionality of the CIA's substantive application of its classification decisions, and its interference with Bernsten's constitutional rights to communicate with counsel.

Bernsten's secrecy agreement applies only when he seeks to publish "classified information" that "has come or shall come to [his] attention by virtue of [his] connection with the Central Intelligence Agency." McGehee, 718 F.2d at 1142. As the D.C. Circuit has noted, secrecy agreements, such as the ones Bernsten' executed, do not extend to "unclassified materials or to information obtained from public sources." Id. The government may not censor such material, "contractually or otherwise." United States v. Marchetti, 466 F.2d 1309, 1313 (4th Cir.), cert. denied, 409 U.S. 1063 (1972). "The government has no legitimate interest in censoring unclassified materials. Moreover, when the information at issue derives from public sources, the agent's special relationship of trust with the government is greatly diminished if not wholly vitiated." McGehee, 718 F.2d at 1141. Accord Snepp, 444 U.S. at 513 n.8 ("if in fact information is unclassified or in the public domain, neither the CIA nor foreign agencies would be concerned"). See also Stillman, 319 F.3d at 548 (if information not classified properly, manuscript can be published).

## II. THE DENIAL OF ACCESS BY CLEARED COUNSEL TO THE CLASSIFIED MANUSCRIPT AND THE CLASSIFIED DECLARATION OF MARILYN A. DORN OBSTRUCTS PLAINTIFF'S RIGHT TO EFFECTIVE ASSISTANCE OF COUNSEL.

Although undersigned counsel is familiar with the content of the redacted portions of Plaintiff's manuscript, he has not read it word-for-word and is therefore unable to effectively refute CIA's classification of the redacted material. Even more to the point, he has not read the classified submission of his own client, nor the *ex parte*, classified Declaration of Maryland A. Dorn. This renders undersigned counsel unable to provide effective assistance to Plaintiff in challenging the redactions.

### A. Everyone Has the Right to Effective Assistance of Counsel

Everyone, even a prisoner, "ha[s] the Constitutional right to petition the Government for redress of their grievances, which includes a reasonable right of access to the courts." Hudson v. Palmer, 468 U.S. 517, 523 (1984), *citing,* Johnson v. Avery, 393 U.S. 483 (1969); *see, also,* California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972); NAACP v. Button, 371 U.S. 415, 429 (1967). "'The right to sue and defend in the Courts'...[is] one of the privileges of citizenship guaranteed by the Constitution. Chambers v. Baltimore & Ohio Rail Co., 207 U.S. 142 (1907). Access to the courts must be "adequate, effective and meaningful." Bounds v. Smith, 430 U.S. 817, 822 (1977). "Meaningful access to the courts is a fundamental right of citizenship in this country. Indeed, all other rights would be illusory without it. Thus, while private litigants must ordinarily pay their own legal fees, they have an undeniable right to retain counsel to ascertain their legal rights" (internal citations omitted). Martin v. Lauer, 686 F.2d 24, 32 (D.C.Cir1982); *see, also,* Jacobs v. Schiffer, 47 F. Supp.2d 16, 20-24 &n. 8

(D.D.C.1999), *rev'd on different grounds* 204 F.3d 261 (D.C.Cir.2000);[1] McCuin v. Texas

Power & Light Co., 714 F.2d 1255, 1262 (5th Cir. 1983). Swekel v. City of River Rouge, 119

F.3d 1259, 1262 (6th Cir. 1997) ("[I]f a party engages in actions that effectively cover up

evidence and this action renders a plaintiff's...court remedy ineffective, they have violated his

right of access to the courts."); Vasquez v. Hernandez, 60 F.3d 325, 328 (7th Cir. 1995) (When

state actors impede the right to access the courts, a Constitutional violation occurs.); Legal Aid

Society of Hawaii v. Legal Services Corp., 961 F.Supp. 1402, 1409 (D.Ha.1997) (Freedom of

association coupled with the right of meaningful access to the courts provides First Amendment

protection from government's intentional interference with the confidential relationship between

lawyers and clients); Odone v. Croda Intern, PLC, 170 F.R.D. 66, 69 (D.D.C.1997). On these

commonsense  principles, this Circuit has previously invalidated an agency requirement that

employees divulge oral consultations with counsel, as this would operate to inhibit "frank

discussions." Martin, 686 F.2d at 27-34.[2]

Plaintiff has an undeniable right of access to the courts in order to file and properly prosecute

the instant litigation. Connate to this right is the right to receive effective assistance of counsel,

which Defendant has obstructed by denying cleared counsel the opportunity to read the classified

portions of the manuscript. Plaintiff and submitting a classified *ex parte* Declaration. Therefore

---

[1] The Circuit ruling affirmed the District Court's ruling in favor of plaintiff, but held that
the Government's position denying plaintiff access to the documents and information was
*substantially unjustified* for purposes of an award of attorneys fees under the Equal Access to
Justice Act. 204 F.3d at 264-65.

[2] Although the holding in Martin did not extend to permit the physical disclosure of
documents themselves, the information at issue was FOIA-exempt personnel information, not
classified information for which counsel held the appropriate security clearance.

Plaintiff cannot respond to facts essential to Defendant's Motion and it should therefore be denied under Rule 56(f), Fed.R.Civ.Proc.

Bernsten's counsel has not had access to either the underlying unredacted manuscript or Bernsten's substantive classification submission. The CIA has prevented Bernsten from communicating these documents to his counsel. Additionally, the CIA has refused to provide Bernsten or his counsel access to its alleged "classified" declarations that purport to support its classification decisions.

As a factual matter, Bernsten's counsel has little to no idea what is at issue. Because of this fact counsel cannot provide either a substantive legal or factual analysis to this Court. The undersigned will not sanctify or give any impression that he concedes the legitimacy of this process by even attempting to address the assertions contained in the CIA's declarant (Ms. Dorn's) declaration. All counsel can truly do is comment upon the CIA's own legal analysis of the classification process itself. In effect, Bernsten is on his own with respect to the most important aspects of this case which are very much factually driven.

Unless this Court believes it can find for Bernsten based on the present submissions it would, respectfully, constitute an unconstitutional infringement of his First Amendment rights to keep his counsel in the dark and require Bernsten to awkwardly fumble around without legal guidance and allow that to be the basis for a judicial decision. Therefore,  this Court should require the CIA to allow Bernsten's counsel access to the underlying unredacted manuscript, Bernsten's substantive submission and the CIA's "classified" declarations. Courts across this country have recognized an individual's First Amendment interest in communicating with an attorney. See, e.g. Denius v. Dunlap, 209 F.3d 944, 953-954 (7th Cir. 2000); Jacobs v. Schiffer, 204 F.3d 259 (D.C. Cir. 2000); DeLoach v. Bevers, 922 F.2d 618, 620 (10th Cir. 1990); Martin v. Lauer, 686

F.2d 24, 32-33 (D.C. Cir. 1982); Cipriani v. Lycoming County Housing Authority, 177 F. Supp.
2d 303, 323-324 (M.D.Pa. 2001).

These holdings are buttressed by long-standing Supreme Court precedent that recognizes a
constitutional right of unfettered access to counsel. The First Amendment prohibits, for example,
the government from interfering with collective action by individuals to seek legal advice and
retain legal counsel. See United Transp. Union v. State Bar of Mich., 401 U.S. 576, 585-86
(1971); United Mine Workers of Am. v. Illinois State Bar Ass'n, 389 U.S. 217, 221-22 (1967);
Brotherhood of R.R. Trainmen v. Virginia, 377 U.S. 1, 6 (1964); NAACP v. Button, 371 U.S.
415, 429-30 (1963). So too, logically, is an individual's ability to consult with counsel on legal
matters constitutionally grounded. See, Bates v. State Bar of Ariz., 433 U.S. 350, 376 n.32
(1977); see also Trainmen, 377 U.S. at 7 ("A State could not ... infringe in any way infringe
in any way the right of individuals and the public to be fairly represented in lawsuits....").

Furthermore, the right to obtain legal advice applies equally to legal representation acquired
for any purpose. See United Mine Workers, 389 U.S. at 223; Button, 371 U.S. at 27. That is, the
First Amendment protects the right of an individual or group to consult with an attorney on any
legal matter. Dunlap, 209 F.3d at 954. The First Amendment interest in speaking freely to
counsel is "interwoven" with the fundamental and constitutionally protected right of access to
the courts. Martin, 686 F.2d at 32. Without the right of access to the courts, "all other legal rights
would be illusory." Id., citing Adams v. Carlson, 488 F.2d 619, 630 (7th Cir. 1973). Meaningful
access to the courts is contingent on the ability of an attorney to give sound legal advice, and
"restrictions on speech between attorneys and their clients directly undermine the ability of
attorneys to offer sound legal advice." Id.; See also Porter v. Califano, 592 F.2d 770, 780 (5th
Cir. 1979)("Meaningful access to the courts is a fundamental right of citizenship in this
country."). Clients have an undeniable right to retain counsel to ascertain their legal rights. See

Potashnick v. Port City Construction Co., 609 F.2d 1101, 1117-19 (5th Cir.), cert. denied, 449 U.S. 820 (1980).

### B.  The Right To Counsel Under The First Amendment Includes Access To Classified Information

Not long ago the issue of counsel access to an allegedly classified manuscript was a contested matter in this Circuit for the first time in 20 years. Stillman, 319 F.3d 546. This decision, and that of the underlying District Court opinion, speak for themselves and serve as the guide to this Court as to the appropriate process in addressing the issue of counsel access.

At the District Court level, the Honorable Emmet G. Sullivan issued a detailed 106 page opinion as to why he believed the First Amendment required the defendants, which included the CIA, to provide a cleared counsel for Stillman with access to the allegedly classified portions of the manuscript at issue in that case. Stillman, passim. Ultimately Judge Sullivan concluded that he "will not allow the government to cloak its violations of plaintiff's First Amendment rights in a blanket of national security." 209 F.Supp.2d at 231.[3]

The D.C. Circuit reversed. It noted that the District Court had "abused its discretion by unnecessarily deciding that a plaintiff has a First Amendment right for his attorney to receive access to classified information where such access is needed to assist the court in resolving the plaintiff's challenge to the classification." Stillman, 319 F.3d at 548. The "abuse" arose, according to the Circuit Panel, because Judge Sullivan "did not wait to evaluate the pleadings

---

[3] See also Declaration of R. James Woolsey (dated March 13, 2002)("In order to permit a lawful challenge to an agency's classification decisions, an author's attorney, if holding the appropriate security access, must be provided unfettered access to the writing in question (as well as access to his client) and any agency declarations submitted in support of the classification decisions."), attached at Exhibit "5".

and affidavits to be submitted by the Government in defense of its classification decision." Id. at 548-49.

Not surprisingly, the CIA has submitted declarations to this Court to be viewed in camera and ex parte. Indeed, Bernsten was also forced to submit, without access to counsel, certain raw materials in camera and ex parte in order for this Court to consider substantive arguments. After reviewing the Government's submissions, this Court should respectfully "consider whether its need for [Bernsten's counsel's] assistance outweighs the concomitant intrusion upon the Government's interest in national security," and rule that it does. Thereby ordering the CIA to permit counsel's access to the documents.

The publicly available documents fail to contain any specific references to the withheld information, at least nothing that enables a proper response. Neither Bernsten nor his counsel has been permitted access to the defendants' classified declarations. While Bernsten is certainly aware of the portions of his manuscript the CIA still considers classified, he cannot share that information with his counsel so that articulated legal and factual arguments can be submitted to this Court. Thus, we are once again where the Stillman case left off.

Therefore, we remand this case to the district court to determine first whether it can resolve the classification ex parte. The district court should first inspect the manuscript and consider any pleadings and declarations filed by the Government,

as well as any materials filed by [Bernsten], who describes himself an "expert in classification and declassification." The court should then determine whether it can, consistent with the protection of [Bernsten's] first amendment rights to speak and to publish, and with the appropriate degree of deference owed to the Executive Branch concerning classification decisions, resolve the classification issue without the assistance of defense counsel. If not, then the court should consider whether its need for such assistance outweighs the concomitant intrusion upon the Government's interest in national security. Only then should it decide whether to enter an order granting undersigned counsel access to the manuscript and, if similarly necessary, to the Government's classified pleadings and affidavits. If the court enters such an order, then the Government may appeal and we will have to resolve the constitutional question.

Stillman, 319 F.3d at 548-49. The Constitutional question needs to be formally decided, and this is the perfect opportunity to address it by having this Court enter an Order similar to that issued by Judge Sullivan in Stillman.

**III.    ALL OF BERNSTENS SUBMISSIONS, INCLUDING THOSE PROVIDED IN DECEMBER 2004 AND SEPTEMBER 2005, ARE UNCLASSIFIED AND CIA MUST PROVIDE DETAILED ARTICULATION TO THE CONTRARY**

The D.C. Circuit has twice provided guidance to the district courts on how to handle prepublication classification challenges first in McGehee and more recently in Stillman. As the Circuit originally stated in McGehee:

Because the present case implicates first amendment rights, however, we feel compelled to go beyond the FOIA standard of review for cases reviewing CIA censorship pursuant to secrecy agreements. While we believe courts in securing such determinations should defer to CIA judgment as to the harmful results of publication, they must nevertheless satisfy themselves from the record, *in camera* or otherwise, that the CIA in fact had good reason to classify, and therefore censor, the materials at issue. *Accordingly, the courts should require that CIA explanations justify censorship with reasonable specificity, demonstrating a logical connection between the deleted information and the reasons for classification. These should not rely on a "presumption of regularity" if such rational explanations are missing.* We anticipate that *in camera* review of affidavits, followed if necessary by further judicial inquiry, will be the norm. Moreover, unlike FOIA cases, in cases such as this both

> parties know the nature of the information in question. Courts should therefore strive to benefit from "criticism and illumination by [the] party with the actual interest in forcing disclosure."

719 F.2d at 1148-49 (citations omitted)(emphasis added); accord Stillman, 319 F.3d at 548-49.

This review will not involve the need to "second-guess CIA judgments on matters in which the judiciary lacks the requisite expertise." McGehee, 719 F.2d at 1149. There will be little, if any, substantive classification decisions in this case that this Court does not possess the requisite level of expertise to rule upon. In any event, "while the CIA's tasks include the protection of the national security and the maintenance of the secrecy of sensitive information, the judiciary's tasks include the 'protection of individual rights.  Considering that 'speech concerning public affairs is more than self-expression; it is the essence of self-government,' and that the line between information threatening to foreign policy and matters of legitimate public concern is often very fine, courts must assure themselves that the reasons for classification are rational and plausible ones." Id. (citations omitted).

In the landmark *Pentagon Papers* case, Justice Brennan wrote that "[t]he entire thrust of the Government's claim throughout these cases has been that publication of the material sought to be enjoined 'could,' or 'might,' or 'may' prejudice the national interest in various ways. But the First Amendment tolerates absolutely no prior judicial restraints of the press predicated upon surmise or conjecture that untoward consequences may result." New York Times Co. 403 U.S. at 725 (1971).

> When the government defends a regulation on speech as a means to redress past harms or prevent anticipated harms, it must do more than simply "posit the existence of the disease sought to be cured." It must demonstrate that the recited harms are real, not merely conjectural, and that the regulation will in fact alleviate these harms in a direct and material way.

-13-

<u>United States et al. v. National Treasury Employees Union et al.</u>, 513 U.S. 454, 475 (1995).

The governing document concerning the CIA's classification decisions is Executive Order 13292, which President Bush issued in March 2003 (amending Executive Order 12958 that dated back to 1995). Pursuant to § 1.4 of the Order, information shall not be considered for classification unless it concerns:

> military plans, weapons systems, or operations;
>
> foreign government information;
>
> intelligence activities (including special activities), intelligence sources or methods, or cryptology;
>
> foreign relations or foreign activities of the United States, including confidential sources;
>
> scientific, technological, or economic matters relating to the national
>
> security, which includes defense against transnational terrorism;
>
> United States Government programs for safeguarding nuclear
>
> materials or facilities;
>
> vulnerabilities or capabilities of systems, installations,
>
> infrastructures, projects, plans, or protection services relating to the national security, which includes defense against transnational terrorism; or

(h) weapons of mass destruction.

Agencies may not classify information to "conceal violations of law, inefficiency, or administrative error," "prevent embarrassment to a person, organization, or agency," or "prevent or delay the release of information that does not require protection in the interest of the national security." <u>Id</u>. at § 7 (a). Nor can they reclassify information once that information has been

properly declassified unless certain procedural requirements have been met. The CIA has failed

to meet those requirements in this case. See Zaid Decl. at *passim*.

### IV.    THE CIA HAS ACTED IN BAD FAITH WITH ITS CLASSIFICATION DECISIONS

The CIA explicitly recognizes that its judgments can be called into question, and

indeed even "second-guess[ed]" when bad faith is evident. McGehee, 718 F.2d

1148-49.

*CIA's former executive director specifically informed Bernsten that the CIA*

*would intentionally target him and trample his first amendment rights, thereby*

*evidencing bad faith and justifying discovery.*

The PRB, despite possessing the requisite authority to render decisions as to what

information must be withheld in a manuscript, regularly defers its decision-making

authority to other components of the CIA. In Bernsten's case this has led to serious

concerns regarding the integrity of the classification review process. As Bernsten detailed

in his sworn declaration submitted as part of this case:

> 8.    With all of this as background, then CIA Executive Director Kyle (Dusty) Foggo asked for me and an aide to CIA Director Goss to dine together at the Capital Grille. The purpose of the dinner was to discuss my desired retirement and persuade me not to resign. During the course of the evening I explained my reasons for wanted to depart. Mr.

-15-

Foggo expressed his desire to fix the personnel system at CIA and offered to place me at a University through the officer in residence program. I explained that I had submitted an outside activity form regarding my intention to write a book on the Afghan War.

9.    Mr. Foggo stated that Director Goss wanted no more books published by current or former CIA officials. Mr. Foggo stated "we will have no more books. I will redact the shit out of your book so no one will want to read it." Upon hearing this statement I argued that multiple former Directors and hundreds of other officers had written books and that I was more than willing to follow the rules to accomplish this. In fact, I added that Gary Schroen had recently had published his book First In: An Insider's Account of How the CIA Spearheaded the War on Terror in Afghanistan (Presido Press: 2005), wherein he dedicated several chapters to me calling me "Gary 2". Mr. Foggo responded "don't bother leaving to write a book I will have it redacted until nothing is left."[4]

If comments such as these, especially when coming from the third-ranking person at

CIA, does not constitute possible "bad faith", then Bernsten does not know what the term

could mean. In fact, the PRB, after its review of Bernsten's book, only sought to redact a

_____

[4] Mr. Foggo apparently was successful. Coincidentally the very first online book review posted on *www.Amazon.com* for Jawbreaker by James Monroe of Los Angeles, California, states under the title "Incomplete, heavily censored":It is well written, has great pace, and has enough new information to make things interesting. But it is unfair to call this a complete book - there isn't a whole lot of new information here, when considering the other sources available in print or online. Why is that? Redactions! There are redactions on every page, sometimes slicing a sentence in half, sometimes removing 5-6 pages of information. For some reason, almost all information on supplies and funding the Northern and Eastern Alliance was redacted, ALL information on names of Northern and Eastern Alliance were redacted, though most were in Mr. Schroen's Book. See Declaration of Gary Bernsten at ¶¶8-9 (dated September 25, 2006), attached at Exhibit "3" ("Bernsten Decl.").

total of five pages of information. It was only after the manuscript was sent to the CIA's

Directorate of Operations and Mr. Foggo that all of a sudden approximately seventy

pages were designated as classified. Mr. Foggo's power at the time had apparently been

exercised. Id. at ¶¶12-13.

Bernsten should be permitted to explore through discovery the extent to which, if

any, Mr. Foggo had on his review process before the Court considers granting the CIA's

Motion. Rule 56(f).

## V.    THE INFORMATION IN BERNSTEN'S MANUSCRIPT HAS BEEN OFFICIALLY RELEASED BY THE CIA INTO THE PUBLIC DOMAIN

Bernsten takes no issue with the pronouncement that he lacks a First Amendment

right to publish classified information. As the CIA notes, thirty years ago the Fourth

Circuit Court of Appeals opined in a prepublication challenge case that: "[Plaintiff]

retains the right to speak and write about the CIA and its operations, and to criticize it as

any other citizen may, but he may not disclose classified information obtained by him

during the course of his employment which is not already in the public domain."

Marchetti, 466 F.2d at 1317. In what is regarded as sequel litigation, the Fourth Circuit in

-17-

Knopf v. Colby, 509 F.2d at 1370, seemingly addressed the meaning of "public domain" and held that classified information obtained by the CIA "was not in the public domain unless there had been official disclosure of it."

Though the D.C. Circuit has never addressed this issue in the context of a First Amendment prepublication challenge, it has applied a "public domain" test in the FOIA context (and presumably the test would be similar if not identical, though Bernsten does not concede this would be the case).[5] Courts apply three criteria in analyzing whether a piece of information is in the public domain: (1) the information at issue must be as specific as the information that has been publicly disclosed; (2) the disputed information must exactly match the information publicly disclosed; and (3) the information sought to be released must already have been publicly released through "an official and documented disclosure." See Fitzgibbon v. CIA, 911 F.2d 755, 765 (D.C. Cir. 1990), citing Afshar v. Dep't of State, 702 F.2d 1125, 1133 (D.C. Cir. 1983).

---

[5] And of course we must keep mindful of that fact that this dispute arises from established First Amendment protections and rises above that of a pure statutory right such as exists under FOIA. McGehee, 718 F.2d at 1142.

A.    **Manuscripts Approved For Release Through The CIA's PRB Process Should Be Considered Official And Documented Disclosures**

The CIA asserts that:

> books written by former CIA officials in their personal capacities are not official and documented disclosures by the CIA itself for purposes of determining whether information has been publicly disclosed by the government. Afshar, 702 F.2d at 1133-34 (such "books [are not] an official and documented disclosure. . . . These books, frequently written in the first person, are received as the private product of their authors, like any other memoirs, and are accorded such respect as their content seems to deserve."); Phillippi v. CIA, 655 F.2d 1325, 1330-31 (D.C. Cir. 1981) (noting that, despite disclosure of information in memoir by former CIA Director, "the 'cat is not out of the bag.' There may be much left to hide, and if there is not, that itself may be worth hiding." (internal citation omitted)).

This pronouncement, based primarily on case law from nearly 25 years ago, simply does not take into account the reality of the PRB process as it exists today. To say that the PRB classification review process is not "official" and that the determinations do not specifically assess the classification status of certain information is a farce. Information that proceeds through a PRB classification review process are specifically assessed as to whether the contents are classified or unclassified. If the information is classified, it cannot be published and the author is so notified. If the information is unclassified, it can be published and, again, the author is so notified. The CIA cannot pick and choose on which occasions it desires to allow one former CIA employee to publish a fact, and then restrict another employee from publishing the same

information. Yet this is exactly what it is doing to Bernsten and numerous others.[6]

Bernsten initially submitted his manuscript to the PRB for classification review on May 18, 2005. Defendant's Statement of Undisputed Facts at ¶7 (filed October 2007). Revisions were submitted on June 27, 2005. Id. at ¶9. The PRB completed its review and initially returned the document with redactions on August 23, 2005. Id. at ¶10. Following a meeting with the PRB on August 29, 2005, Bernsten submitted further revisions between August 31, 2005 and September 2, 2005. Id. at ¶11. The final PRB response was issued on October 18, 2005. Id. at ¶12.

The PRB process in Bernsten's case, therefore, encompassed two separate sets of regulations governing its conduct. The current PRB regulations went into effect on July 22, 2005. The prior regulations were issued on March 14, 1995, and are the relevant governing authority to be applied to Bernsten's document. Either way, the result is the same. The PRB's actions constitute an official and documented release of unclassified information.

The CIA's regulations make it quite clear that what is being done is a classification evaluation. The authority for the PRB review process states:

---

[6] Bernsten is not addressing whether press reports, inadvertent disclosures or even official disclosures from outside the CIA (at a level lower than the Vice President) are to be considered or can serve as official releases by the CIA. In this section he is focusing entirely and specifically on PRB authorized releases.

The National Security Act of 1947, as amended; the CIA Act of 1949, as amended; and Executive Order 12333 require the Director of Central Intelligence to protect intelligence sources and methods from unauthorized disclosure. Executive Order 12356 requires protection of classified information from unauthorized disclosure. Employees and others who have been authorized access to information the public disclosure of which could harm the national security incur special obligations to protect such information. These obligations have been embodied in secrecy agreements.

See Exhibit "4" at ¶2(a). This language entirely pertains to classified information. Every sentence refers to authority to protect classified information. A casual read of the regulations supports the conclusion, particularly given that it is well-established that the CIA cannot prevent a former employee from publishing unclassified information, that the scope and exercising of authority relates solely to the PRB's determinations and issuances as to what is or is not "classified". Other examples include:

It is the Agency's policy to adopt and implement all lawful measures to protect from unauthorized disclosure information which, if disclosed, could damage the national security, and to ensure that individuals given access to such information understand and comply with their obligations not to disclose it. Prior review by the Agency of material intended for nonofficial publication[7] is a key component of efforts to prevent unauthorized disclosures. The purpose of prepublication review is twofold: to assist individuals in meeting their obligations and to ensure that information

---

[7] The CIA defines "nonofficial publication" as a "work prepared by the author as a private individual, not as a government employee or contractor acting in an official capacity." See Exhibit "4" (1995 CIA PRB Regs) at 8. That the CIA flippantly asserts that information submitted by former employees constitutes "nonofficial publication" by itself should not be permitted to end the discussion. The issue is classified vs. unclassified, not "official" vs. "unofficial".

damaging to the national security is not disclosed
inadvertently.

Id. at ¶2(b)(2).

Revelation of information damaging to the national
security to any person not authorized to receive it is
prohibited.

Id. at ¶2(c)(2).

The Chair will ensure that appropriate reviewers are
assigned to review submitted material. If the reviewers
unanimously decide that it is unobjectionable under the
standards and criteria listed above, the Chair will notify the
author through the appropriate channels.

Id. at ¶2(e)(2).

The Agency may deny permission for nonofficial
publication of any information obtained during the course
of employment or other services with the CIA that has not
been placed in the public domain by the U.S. Government
and if disclosure reasonably could be expected to harm the
national security interests of the United States.

Id. at ¶2(I)(1).

Prepublication review allows the Agency to determine
whether material contemplated for nonofficial publication
contains information which, if disclosed, could harm
national security, and gives the Agency an opportunity to
prevent the public disclosure of such information.

Id. at ¶2(j)(1).

All of the language and buzz words reproduced above speak to the same thing: classified

information. There is no other possible interpretation.

Additionally, Section (j) addresses what might occur were the individual to

commit a "breach" of the CIA/PRB regulations (and ergo his/her secrecy agreement).

-22-

The possibility that criminal penalties are available is very clearly articulated. The *only* opportunity for the Government to impose criminal penalties upon a former employee with respect to their publications would be if they revealed classified information. Therefore, it further demonstrates that any information contained within a PRB approved manuscript must be considered unclassified and available for use.

This argument should come as no surprise as the D.C. Circuit recognized what Bernsten is advocating nearly twenty-five years ago in a prepublication review case when it openly, and indeed casually, noted that "the entire scheme of prepublication review is designed for the purpose of preventing publication of classified information." McGehee, 718 F.2d at 1142. This language says it all.

### B.    The PRB Chairman Possesses Actual Authority To Bind The CIA With His Pronouncements

The CIA's regulations also make it explicitly clear that the PRB Chairman's

statements are binding upon the Agency. Section 2(d)(7) states:

> Persons preparing material for nonofficial publication are invited at any stage to discuss their plans with the Chair, PRB, the PRB legal adviser, or an authorized representative specifically designated for this purpose. The views of the Agency may be given only by one of these individuals. Anyone acting in reliance on views expressed by any person other than such authorized Agency representative must assume responsibility for the consequences of that action.

The PRB Chair also possesses authority to render unilateral decisions under certain circumstances. Id. at ¶2(e)(3).

-23-

The PRB rendered decisions in Bernsten's case that are not reflected in the "public" record presented by the CIA. Among them is the fact that the PRB's review of the Jawbreaker manuscript resulted in only five total pages of redactions. The PRB explicitly shared this information with Bernsten. Bernsten Decl. at ¶12. But then Mr. Foggo became involved and suddenly there were seventy pages of redactions imposed upon Bernsten.

Discovery should be permitted to determine the extent to which the PRB, which possesses actual authority to render decisions, had cleared portions of the manuscript prior to the retaliation exacted upon Bernsten by Agency officials. Zaid Rule 56(f) Decl. at ¶21; Krieger Rule 56(f) Decl. at ¶ 21.

**C.      Information Approved For Release By The President, Vice President and CIA Director Are Considered Official And Documented Disclosures**

In addition to books published, following approval by the CIA's PRB, by former CIA officials, Bernsten relied upon other public comments made by President George Bush, Vice President Dick Cheney and then CIA Director George Tenet. See Amended Complaint at ¶12 (filed December 5, 2005). Most notably among the sources for these official comments was Bush At War by Washington Post

-24-

editor Bob Woodward and <u>Ghost Wars</u> by former <u>Washington Post</u> editor Steve

Coll. [8]

There can be no dispute that, as a matter of law, President Bush, Vice President

Cheney and CIA Director George Tenet can declassify information by simply speaking

it.

Certainly a conscious decision to provide details to reporters constitutes an

official disclosure that binds the CIA, and thereby permits Bernsten to utilize that

information without the CIA's interference. See Executive Orders 12,958, 12,968 &

13,292.

Bernsten further addresses these books and the information contained therein in

his "classified" submission. Exhibit "2".

> **D.     The CIA Is Estopped From Preventing Bernsten From Publishing
> Information Previously Approved By The CIA's PRB Or Released By
> The CIA Director Or President And Vice President Of The United
> States Given That These Officials Were Exercising Actual Authority
> As To What Constituted Unclassified Information**

The CIA is bound by the pronouncements of its officials within the PRB. The

PRB has actual authority to issue decisions as to what information is or is not

---

[8] In fact, Gary Schroen, in his official CIA capacity, briefed Woodward and Coll and
provided information which was redacted from Bernsten's manuscript. Bernsten Decl. at
¶12. This would be yet another avenue for discovery in order to determine the extent to which
the CIA had authorized, but is now concealing from this Court, official disclosures that would
permit Bernsten to publish information. Zaid Decl. ¶ 22.

considered to be classified. Bernsten relied upon the assurances provided to other authors, most notably Gary Schroen who authored First In: An Insider's Account of How the CIA Spearheaded the War on Terror in Afghanistan, that the information contained in previously approved manuscripts contained unclassified information.

The doctrine of equitable estoppel is not, in itself, either a claim or a defense. It is "an equitable doctrine invoked to avoid injustice in particular cases." Heckler v. Community Health Services, 467 U.S. 51, 59 (1984). It is also a means of precluding a litigant from asserting an otherwise available claim or defense against a party who has detrimentally relied on that litigant's conduct. See generally 3 J. POMEROY, EQUITY JURISPRUDENCE § 804, at 189 (5th ed. 1941); Note, *Equitable Estoppel of the Government*, 79 COLUM. L. REV. 551, 552 (1979). Thus, a plaintiff seeking the benefit of equitable estoppel must have some claim, sounding in equity or in law, that otherwise entitles it to prevail against the defendant.

The circumstances in which the government may be estopped from asserting a claim or a defense are not well-defined, but "it is well settled that the Government may not be estopped on the same terms as any other litigant." Heckler, 467 U.S. at 60 (footnote and citations omitted). Although the Supreme Court has apparently never expressly applied the doctrine against the government, and regards as open the question whether the government may be estopped under any circumstances, see id.; Lyng v. Payne, 476 U.S. 926 (1986); but see United States v. Lazy FC Ranch, 481 F.2d 985, 988 (9th Cir. 1973) (suggesting that Supreme Court applied "rationale" of equitable estoppel

-26-

against the government in <u>Moser v. United States</u>, 341 U.S. 41 (1951)), the D.C. Circuit

has said that "the fundamental principle of equitable estoppel applies to government

agencies, as well as private parties." <u>ATC Petroleum, Inc. v. Sanders</u>, 860 F.2d 1104,

1111 (D.C.Cir.1988), <u>quoting</u> <u>Investors Research Corp. v. SEC</u>, 628 F.2d 168, 174 n.34

(D.C.Cir. 1980)(<u>citing</u> 2 K. DAVIS, ADMINISTRATIVE LAW TREATISE §§ 17.01-

17.04 (1958 & Supp.).

That being said, this Circuit has additionally noted that "despite the doctrine's

flexibility in disputes between private parties, its application to the government must be

rigid and sparing." <u>ATC Petroleum</u>, 860 F.2d at 1111; Rann v. Chao, 346 F.3d 192, 197

(D.C.Cir. 2003).

> The case for estoppel against the government must be
> compelling, and will certainly include proof of each of the
> traditional elements of the doctrine – "'false representation,
> a purpose to invite action by the party to whom the
> representation was made, ignorance of the true facts by that
> party, and reliance,' as well as . . . 'a showing of an
> injustice . . . and lack of undue damage to the public
> interest.'"

<u>International Org. of Masters, Mates & Pilots v. Brown</u>, 698 F.2d 536, 551 (D.C.Cir.

1983), <u>quoting</u> <u>Hoeber v. District of Columbia Redevelopment Land Agency</u>, 483 F.

Supp. 1356, 1365-66 (D.D.C. 1980), <u>aff'd mem.</u>, 672 F.2d 894 (D.C.Cir. 1981). Put

another way, in order to succeed a plaintiff's claim of estoppel must demonstrate the

-27-

essential elements of such a claim which requires a showing that: (1) there was a

"definite" representation to the party claiming estoppel; (2) the party relied on its

adversary's conduct to his detriment; and (3) the reliance on the representation was

"reasonable." Graham v. SEC, 222 F.3d 994, 1007 (D.C.Cir. 2000), quoting Heckler, 467

U.S. at 59.

At least one judge in this District has made it clear that there are definitely

circumstances in which an agency may be "bound by the representations of its employees

to members of the public." Hertzberg v. Veneman, 273 F. Supp.2d 67 (D.D.C. 2003),

citing Office of Personnel Management v. Richmond, 496 U.S. 414, 421, 423 (1990);

ATC Petroleum, Inc., 860 F.2d at 1111; Grumman Ohio Corp. v. Dole, 776 F.2d 338,

347 (D.C. Cir. 1985). "With respect to the representations of agency employees, this

standard has been interpreted to require that 'government agents engage -- by

commission or omission -- in misrepresentation or concealment, or, at least, behave in

ways that have or will cause an egregiously unfair result.'" Hertzberg, 273 F.Supp.2d at

83, quoting Grumman Ohio Corp., 776 F.2d at 347 (quoting General Accounting Office

v. General Accounting Office Personnel Appeals Board, 698 F.2d 516, 526 n.57 (D.C.

Cir. 1983)).

Bernsten relied upon official unclassified disclosures made by other former CIA

officials, which were cleared by the CIA as unclassified, and the PRB, as well as those

condoned by the highest level officials of the United States Government. Bernsten Decl.

at ¶12; see also Exhibit "4" at Sec. 2(d)(7). As a result, the CIA is estopped from

preventing Bernsten from publishing that information upon which he relied upon as

unclassified.

VI.    **ABSENT ACCESS TO THE ABOVE REFERENCED <u>EX PARTE</u> CLASSIFIED MATERIAL, UNDERSIGNED COUNSEL IS UNABLE TO PROVIDE A DETAILED ITEM-BY-ITEM RESPONSE AND ANALYSIS OF THE POINTS RAISED IN DEFENDANT'S MOTION FOR SUMMARY JUDGEMENT.**

Defendant's Motion should therefore be summarily denied or Plaintiff should be

permitted the needed discovery of facts contained in the referenced <u>ex parte</u> classified

material pursuant to Rule 56(f), Fed.R.Civ.Proc. (Declarations of Roy W. Krieger ¶ 21;

and Mark S. Zaid ¶ 21).

**CONCLUSION**

As John Hollister Hedley, the CIA's former PRB Chairman, once wrote:

> In prepublication reviews, we have to show we know the
> difference between what truly is sensitive and what is not.
> We do not earn respect just by saying "no," but neither do
> we earn respect just by giving away information. Our
> unique role is to judge whether a denial of disclosure would
> stand up in court--whether we could make a compelling
> case in acourt of law that specific damage to US national
> security would result. We can have it both ways: we can
> protect that which needs to be protected, while being

-29-

> forthcoming about intelligence activities in a way that can
> help educate, inform, enlighten, and even entertain the
> general public. That is the cost of doing business in this
> free society we help to preserve; trying to have it both ways
> is a challenge that comes with the territory.

*https://www.cia.gov/csi/studies/spring98/Secret.html.*

The CIA has failed to live up to this standard. For the foregoing reasons, the CIA's

Motion should be denied.

Respectfully submitted,

_____/s/_____

Roy W. Krieger

DC Bar #375754

Paleos & Krieger, P.C.

1250 Connecticut Ave, N.W.

Suite 200

Washington, D.C. 20036

(202) 261-3576

Counsel for Plaintiff

**CERTIFICATE OF FILING**

I, Roy W. Krieger, do hereby certify that a trus and correct copy of the foregoing was filed Via ECF this 10th day of January, 2008.

_____/s/_____

Roy W. Krieger

1.    Throughout the course of this Memorandum In Opposition, counsel has incorporated by reference the documents submitted in support of the original Opposition: Exhibit 1, Zaid Declaration, including Exhibits thereto; Exhibit 2 -Bernsten Classified Submission; Exhibit 3, Bernsten Declaration; Exhibit 4, 1995 CIA/PRB Regulations; and, Exhibit 5, Woolsey Declaration.